**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

TRANSAMERICA LIFE INSURANCE
COMPANY, WESTERN RESERVE
LIFE ASSURANCE CO. OF OHIO, and
TRANSAMERICA FINANCIAL LIFE
INSURANCE COMPANY,

        Plaintiffs,

vs.

LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

        Defendant.

No. C 06-110-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
CONSTRUCTION OF DISPUTED
PATENT CLAIM TERMS**

————————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      *1.* *The parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      *2.* *The patent-in-suit* . . . . . . . . . . . . . . . . . . . . . . . . 10
         *a.* *The inventors and dates of filing and issuance* . . . . . . 10
         *b.* *The Abstract and Field Of The Invention* . . . . . . . . 10
         *c.* *The Background Of The Invention* . . . . . . . . . . . . . 11
         *d.* *The Brief Summary Of The Invention* . . . . . . . . . . . 13
         *e.* *The Detailed Description* . . . . . . . . . . . . . . . . . . . 22
            *i.* *The description of a first method* . . . . . . . . . . 22
            *ii.* *The description of a second method* . . . . . . . . 28
            *iii.* *Is a third method described?* . . . . . . . . . . . . . 31
         *f.* *The Flow Charts* . . . . . . . . . . . . . . . . . . . . . . . . 38
         *g.* *Pertinent claims of the patent* . . . . . . . . . . . . . . . . 39
   *C.* *Agreed Constructions* . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   *D.* *Disputed Constructions* . . . . . . . . . . . . . . . . . . . . . . . . . 44

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
  A. Principles Of Patent Claim Construction . . . . . . . . . . . . . . . . . . 54
     1. The Phillips methodology . . . . . . . . . . . . . . . . 54
       a. The starting point . . . . . . . . . . . . . . . . . . . . 54
       b. Hierarchy of evidence . . . . . . . . . . . . . . . . . . 55
     2. Other canons of claim construction . . . . . . . . . . . . 61
     3. The court's independent obligation to construe terms . . . . . . 62
     4. The court's supposed duty to determine overall scope of
        exclusive claim coverage . . . . . . . . . . . . . . . . . . 63
  B. Agreed Constructions Of Terms Of The '201 Patent . . . . . . . . . . . . 66
  C. Disputed Constructions Of Terms Of The '201 Patent . . . . . . . . . . . 67
     1. Claim 35: Preamble . . . . . . . . . . . . . . . . . . . . . 67
       a. "Annuity" . . . . . . . . . . . . . . . . . . . . . . . . 68
       b. "Variable annuity" . . . . . . . . . . . . . . . . . . . . 69
         i. Proffered constructions . . . . . . . . . . . . . . . 69
         ii. Initial arguments of the parties . . . . . . . . . . . 70
         iii. Tentative analysis . . . . . . . . . . . . . . . . . . 71
         iv. Oral and post-hearing arguments . . . . . . . . . . 76
         v. Post-hearing analysis . . . . . . . . . . . . . . . . 77
       c. "Systematic withdrawal program" . . . . . . . . . . . . . 79
         i. Proffered constructions . . . . . . . . . . . . . . . 79
         ii. Initial arguments of the parties . . . . . . . . . . . 80
         iii. Tentative analysis . . . . . . . . . . . . . . . . . . 82
         iv. Post-hearing arguments . . . . . . . . . . . . . . . 87
         v. Post-hearing analysis . . . . . . . . . . . . . . . . 89
       d. "Guaranteed minimum payment feature associated
         with a systematic withdrawal program" . . . . . . . . . . 92
         i. Proffered constructions . . . . . . . . . . . . . . . 92
         ii. Initial arguments of the parties . . . . . . . . . . . 93
         iii. Tentative analysis . . . . . . . . . . . . . . . . . . 95
         iv. Oral and post-hearing arguments . . . . . . . . . . 99
         v. Post-hearing analysis . . . . . . . . . . . . . . . . 101
       e. "Scheduled payment" . . . . . . . . . . . . . . . . . . . 104
         i. Proffered constructions . . . . . . . . . . . . . . . 104
         ii. Initial arguments of the parties . . . . . . . . . . . 104
         iii. Tentative analysis . . . . . . . . . . . . . . . . . . 105

|  |  | iv. | Oral and post-hearing arguments | 108 |
|  |  | v. | Post-hearing analysis | 110 |
|  | f. | | "Periodically determining an amount [of a scheduled payment]" | 112 |
|  |  | i. | Proffered constructions | 112 |
|  |  | ii. | Initial arguments of the parties | 113 |
|  |  | iii. | Tentative analysis | 114 |
|  |  | iv. | Oral and post-hearing arguments | 118 |
|  |  | v. | Post-hearing analysis | 120 |
| 2. | | | Claim 35: Step a | 122 |
|  | a. | | "Account value" | 122 |
|  |  | i. | Proffered constructions | 123 |
|  |  | ii. | Initial arguments of the parties | 123 |
|  |  | iii. | Tentative analysis | 124 |
|  |  | iv. | Oral and post-hearing arguments | 125 |
|  |  | v. | Post-hearing analysis | 126 |
|  | b. | | "Withdrawal rate" | 127 |
|  |  | i. | Proffered constructions | 127 |
|  |  | ii. | Initial arguments of the parties | 128 |
|  |  | iii. | Tentative analysis | 129 |
|  |  | iv. | Oral and post-hearing arguments | 132 |
|  |  | v. | Post-hearing analysis | 133 |
|  | c. | | "Payout term" | 135 |
|  |  | i. | Proffered constructions | 135 |
|  |  | ii. | Initial arguments of the parties | 135 |
|  |  | iii. | Tentative analysis | 136 |
|  |  | iv. | Oral arguments | 138 |
|  |  | v. | Post-hearing analysis | 139 |
|  | d. | | "Benefit payments" | 139 |
|  |  | i. | Proffered constructions | 139 |
|  |  | ii. | Arguments of the parties | 140 |
|  |  | iii. | Analysis | 141 |
|  | e. | | "Period of benefit payments" | 143 |
|  |  | i. | Proffered constructions | 143 |
|  |  | ii. | Arguments of the parties | 143 |
|  |  | iii. | Analysis | 144 |

*3.*      *Claim 35:  Step b:  "Determining an initial scheduled*
          *payment"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
          *a.*      *The proffered constructions* . . . . . . . . . . . . . . . . . 148
          *b.*      *Initial arguments of the parties* . . . . . . . . . . . . . 149
          *c.*      *Tentative analysis* . . . . . . . . . . . . . . . . . . . . . . . 149
          *d.*      *Oral and post-hearing arguments* . . . . . . . . . . 151
          *e.*      *Post-hearing analysis* . . . . . . . . . . . . . . . . . . . 152
*4.*      *Claim 35:  Step c* . . . . . . . . . . . . . . . . . . . . . . . . . 152
          *a.*      *"Periodically determining account value"* . . . . . . . . 153
                    *i.*       *Proffered constructions* . . . . . . . . . . . . . 153
                    *ii.*      *Initial arguments of the parties* . . . . . . . . . . 153
                    *iii.*     *Tentative analysis* . . . . . . . . . . . . . . . . . . . 154
                    *iv.*      *Oral arguments* . . . . . . . . . . . . . . . . . . . . . 156
                    *v.*       *Post-hearing analysis* . . . . . . . . . . . . . . . . . 156
          *b.*      *"Making the scheduled payment [by withdrawing that*
                    *amount from the account value]"* . . . . . . . . . . . . . 158
                    *i.*       *Proffered constructions* . . . . . . . . . . . . . 158
                    *ii.*      *Arguments of the parties* . . . . . . . . . . . . . . 158
                    *iii.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 159
*5.*      *Claim 35:  Step d* . . . . . . . . . . . . . . . . . . . . . . . . . 159
          *a.*      *"Monitoring"* . . . . . . . . . . . . . . . . . . . . . . . . . 160
          *b.*      *"Unscheduled withdrawal"* . . . . . . . . . . . . . . . . . 161
                    *i.*       *Proffered constructions* . . . . . . . . . . . . . 161
                    *ii.*      *Arguments of the parties* . . . . . . . . . . . . . . 162
                    *iii.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 163
          *c.*      *"Adjusting the amount of the scheduled payment in*
                    *response to said unscheduled withdrawal"* . . . . . . . 168
                    *i.*       *Proffered constructions* . . . . . . . . . . . . . 168
                    *ii.*      *Arguments of the parties* . . . . . . . . . . . . . . 168
                    *iii.*     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . 169
*6.*      *Claim 35:  Step e:  "Periodically paying the scheduled*
          *payment. . . ."* . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
          *a.*      *The proffered constructions* . . . . . . . . . . . . . . . . . 171
          *b.*      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 172
          *c.*      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
*7.*      *Claim 36* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
          *a.*      *"Scheduled withdrawal payment"* . . . . . . . . . . . . . 181

4

     *b.*  *"[Initial] scheduled payment"* . . . . . . . . . . . . . . . . 183
        *i.*  *Proffered constructions* . . . . . . . . . . . . . . 183
        *ii.* *Arguments of the parties* . . . . . . . . . . . . . . 184
        *iii.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 184
     *c.*  *"Initial account value"* . . . . . . . . . . . . . . . . . . . 187
        *i.*  *Proffered constructions* . . . . . . . . . . . . . . 187
        *ii.* *Arguments of the parties* . . . . . . . . . . . . . . 187
        *iii.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 188
   *8.*  *Claim 37* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
     *a.*  *"Account value is periodically determined by the [stated] formula"* . . . . . . . . . . . . . . . . . . . . . . . . 190
        *i.*  *Proffered constructions* . . . . . . . . . . . . . . 190
        *ii.* *Arguments of the parties* . . . . . . . . . . . . . . 191
        *iii.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 191
     *b.*  *"Net fund performance"* . . . . . . . . . . . . . . . . . . . 192
        *i.*  *Proffered constructions* . . . . . . . . . . . . . . 192
        *ii.* *Arguments of the parties* . . . . . . . . . . . . . . 192
        *iii.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 192
   *9.*  *Claim 38: "The scheduled payment is adjusted in response to an unscheduled withdrawal, according to the [stated] formula"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193
     *a.*  *The proffered construction* . . . . . . . . . . . . . . . . . . 194
     *b.*  *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 194
     *c.*  *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

This matter, which involves a patent for a "method and apparatus for providing retirement income benefits," United States Patent No. 7,089,201 B1 (the '201 patent), is this court's first foray into the rarefied realm of "business method" patents. Until quite recently, that realm was believed to lie outside the borders of the domain of

patents. *See State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368, 1375 (Fed. Cir. 1998) (taking the opportunity "to lay [to rest] this ill-conceived notion" that a method of doing business was not "within the statutory classes" of patentable inventions); *accord In re Comiskey*, 499 F.3d 1365, 1374 (Fed. Cir. 2007) (explaining that *State Street Bank* held that patentability of a business method "does 'not turn on whether the claimed subject matter does "business" instead of something else'") (quoting *State Street Bank*, 149 F.3d at 1377). Because it is now clear that "business method" patents are "subject to the same legal requirements for patentability as appl[y] to any other process or method," *State Street Bank*, 149 F.3d at 1375, it follows that such patents are also subject to the same standards for claim construction. Therefore, this matter comes before the court for construction of disputed claim terms after a so-called "*Markman* hearing." *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

## I. INTRODUCTION

### A. Procedural Background

On August 8, 2006, plaintiffs Transamerica Life Insurance Company (TLIC), Western Reserve Life Assurance Company of Ohio (WRL), and Transamerica Financial Life Insurance Company (TFLIC), collectively the Transamerica Plaintiffs, filed a Complaint For Declaratory Judgment (docket no. 1) initiating this action. In their Complaint, the Transamerica Plaintiffs assert, in essence, that they are not infringing the '201 patent owned by defendant Lincoln National Life Insurance Company (Lincoln) by selling various annuity product contracts. In contrast, in an Answer To Plaintiffs' Complaint And Patent Infringement Counterclaim (docket no. 14), filed December 29, 2006, Lincoln seeks declarations that the '201 patent is not invalid and that the

6

Transamerica Plaintiffs are infringing it. Lincoln also seeks damages for infringement, injunctive relief from such infringement, and reasonable attorney fees for litigating this matter.

Pursuant to a Scheduling Order (docket no. 23), on September 10, 2007, the parties filed a Joint Claim Construction Statement And Chart (docket no. 28) setting forth the construction of patent claim terms, phrases, and clauses on which the parties agree, the constructions of disputed claim terms proposed by each party, and the parts of the patent or prosecution history of the patent supporting each party's construction of disputed claim terms. Lincoln filed its *Markman* claim construction brief on September 14, 2007, *see* Lincoln's Claim Construction Brief (docket no. 32), and the Transamerica Plaintiffs filed their *Markman* brief on September 17, 2007. *See* Markman Brief By Transamerica Level Parties (docket no. 37). The parties filed rebuttal briefs on claim construction on September 28, 2007. *See* Lincoln's Rebuttal Claim Construction Brief (docket no. 41); Markman Reply Brief By Transamerica Level Parties (docket no. 42). In the original Scheduling Order, the court set a *Markman* hearing on claim construction issues for November 2, 2007, but a conflict in the court's schedule required the court to reschedule the *Markman* hearing to a mutually convenient date of December 3, 2007.

In two prior patent cases, the court provided the parties with tentative draft rulings on claim construction before the *Markman* hearings in those cases. *See Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 498 F. Supp. 2d 1131, 1136 (N.D. Iowa 2007); *Maytag Corp. v. Electrolux Home Prods, Inc.*, 1008, 1015-16 (N.D. Iowa 2006). The court found that such a procedure was very effective in focusing the parties' arguments on true disputes about construction of pertinent claim terms as well as on specific parts of the court's tentative claim constructions where the parties believed that the court had gone wrong. The parties in those cases appeared to agree, because they recommended that the

7

court follow such a procedure for rendering *Markman* decisions in future patent cases. Prior to the *Markman* hearing in this case, the court also offered the parties the opportunity to receive a tentative draft of the court's claim constructions to prepare for the hearing. The parties readily agreed to such a procedure. Therefore, on November 29, 2007, the court provided the parties with a 176-page tentative draft ruling on claim construction issues.

At the *Markman* hearing, the Transamerica Plaintiffs, the declaratory judgment plaintiffs and infringement counterclaim defendants, were represented by Glenn L. Johnson, who presented the Transamerica Plaintiffs' argument, Sarah J. Gayer, and Kevin H. Collins of Shuttleworth & Ingersoll. P.L.C., in Cedar Rapids, Iowa.◘[1] Lincoln, the patent holder and, consequently, the declaratory judgment defendant and infringement counterclaimant, was represented by D. Randall Brown, who presented Lincoln's argument, and Gary C. Furst of Barnes & Thornburg, L.L.P., in Fort Wayne, Indiana, and by local counsel Denny M. Dennis of Bradshaw, Fowler, Proctor & Fairgrave, P.C., in Des Moines, Iowa.◘[2] The parties' arguments at the *Markman* hearing were remarkably well-prepared and informative.

At the conclusion of the hearing, the court authorized the Transamerica Plaintiffs to file a post-hearing brief on or before January 14, 2008; Lincoln to file a response on or before January 31, 2008; and the Transamerica Plaintiffs to file any reply by February 11, 2008. The post-hearing briefs were filed according to schedule. *See* Transamerica's Post-

---

[1]Tim Bennett and Frank Camp also appeared at the hearing on behalf of the Transamerica Plaintiffs, but the court does not know the firms with which they are affiliated.

[2]Russell Strunk also appeared on behalf of Lincoln, but the court does not know with which firm he is affiliated.

8

*Markman* Hearing Brief (docket no. 59); Lincoln's Post-*Markman* Hearing Response Brief (docket no. 60); Transamerica's Reply Post-*Markman* Brief (docket no. 63). With the conclusion of this briefing, the question of the proper construction of disputed claim terms of the '201 patent is now fully submitted.

## B. Factual Background

To provide necessary context to determination of the proper construction of disputed claim terms, the court turns to the pertinent factual background. The court's focus in this recitation of the factual background is on the parties and the patent-in-suit, including the patent claims at issue in the infringement dispute. The court will not recount here the prosecution history of the patent-in-suit. Instead, the court will reserve discussion of any pertinent parts of the prosecution history for the court's analysis of the proper construction of disputed claim terms, when and if resort to the prosecution history for guidance is appropriate.

### 1. The parties

The Transamerica Plaintiffs allege, and Lincoln concedes, that the parties are all in the business of designing, marketing, and selling annuity products and other financial products. The parties also agree that Lincoln is the assignee of the patent-in-suit, United States Patent No. 7,089,201 B1 (the '201 patent), which is entitled "METHOD AND APPARATUS FOR PROVIDING RETIREMENT INCOME BENEFITS."◘[3]

---

[3]The '201 patent is found in Joint Appendix Exhibit A. However, the court will simply refer to "the '201 patent" throughout this decision and will cite columns and lines of the patent, rather than pages of the Joint Appendix, when referring to specific portions of the '201 patent.

## 2. The patent-in-suit

### a. The inventors and dates of filing and issuance

Although Lincoln is the assignee of the '201 patent, the inventors are identified as Jeffrey K. Dellinger, Stephen H. Lewis, Denis G. Schwartz, and Jason H. Richard. The '201 patent stems from Application No. 09/406,290, filed on September 24, 1999. The patent issued on August 8, 2006. The patent identifies two related applications: Provisional Application No. 60,101,883, filed on September 25, 1998, and Provisional Application No. 60/115,570, filed on January 12, 1999. The related Provisional Applications are still being prosecuted.

### b. The Abstract and Field Of The Invention

The Abstract of the '201 patent briefly describes the invention disclosed therein as follows:

> Computerized methods for administering variable annuity plans are disclosed. In certain embodiments, minimum payment features and mechanisms for adjusting current payments in response to cumulative payment totals are provided. Other embodiments provide withdrawal features under which certain guarantees are provided if withdrawals do not exceed predetermined withdrawal rates.

The '201 patent, Abstract. The Field Of The Invention, which follows, is only slightly more illuminating:

> The present invention relates to financial services and products. More particularly, the present invention relates to a method and system for administering retirement income benefits. The invention further relates to a data processing method and system for the efficient administration of variable annuity products, including provisions for guarantees related to retirement income derived from and death benefits associated with variable annuities, in both the accumulation

10

and distribution (or payout) phases. The invention also relates to data processing and administrative systems used to administer withdrawals from mutual funds, particularly systematic withdrawals from such funds.

The '201 patent, Field Of The Invention, Col. 1, *ll.* 15-26.

### c.      The Background Of The Invention

The Background Of The Invention provides some further context to the claimed invention. It explains, "Annuities typically serve the useful function of providing economic protection against the risk of longevity, in that an annuitant has the option of electing a life-contingent retirement income, thereby transferring the risk of outliving one's accumulated assets to an insurer." The '201 patent, Col. 1, *ll.* 30-34. The Background Of The Invention then attempts to explain the "different kinds of annuities available to meet the diverse needs of different individuals." *Id.* at Col. 1, *ll.* 35-36.

Somewhat more specifically, the Background explains, first, that the kinds of annuities "include deferred annuities and immediate annuities," which are described, in pertinent part for present purposes, as follows:

> In a deferred annuity, an individual is typically still in the "accumulation phase" of the annuity, amassing assets intended to sustain him or her during retirement years, when an earned wage from performing work is absent. In an immediate annuity, a lump sum of money is applied to purchase a series of retirement income benefit payments, with the first payment typically being made about one month after purchase, with subsequent benefit payments arriving each month thereafter.

The '201 patent, Col. 1, *ll.* 37-46. The Background explains, next, that "[a]nother distinction of the type of annuities available is whether it is classified as a 'fixed annuity' or a 'variable annuity.'" *Id.* at Col. 2, *ll.* 1-3. Although the Background purports to

11

explain, in some detail, the differences between these two kinds of annuities, *see id.*, Col. 2, *l.* 4, to Col. 3, *l.* 59, the proper constructions of "annuity" and "variable annuity" (but not "fixed annuity"), as used in the pertinent claims of the patent-in-suit, are in dispute. Therefore, for the moment, at least, the court will pass on to the last portion of the Background, which distinguishes among "annuitizations," "systematic withdrawal programs," and "unannuitized" contracts, as follows:

> While annuitization guarantees lifetime income, the contract holder loses liquidity (and, depending on the type of annuity, some or all of the death benefit implied by full liquidity). During the accumulation phase, the contract holder has full access to the account value. After annuitization, the contract holder cannot withdraw account value in excess of that provided in monthly payments, and the death benefit available is either zero or limited in some way (e.g. paid only as a continuation of payments throughout the certain period). Because of this loss of liquidity and reduced (or non-existent) death benefit, many contract holders wanting periodic income choose not to annuitize. Instead, they make systematic withdrawals from their annuity while maintaining it in its active, or accumulation, phase.
>
> Systematic withdrawal programs from active, unannuitized deferred annuity contracts are an alternative mechanism (i.e., an alternative to annuitization) for distributing retirement income to contract holders. While these programs provide full liquidity, that liquidity requires some tradeoffs. For example, if withdrawals are set at a specified dollar level, then these distributions can fully deplete the account value. In other words, the contract holder can outlive the retirement income provided by this method of systematic withdrawal. Alternatively, if withdrawals are set as a percent of account value, then the period of distribution may be extended indefinitely, but a meaningful level of monthly retirement income may not be achieved. For example, if the percentage chosen is too high, the bulk of the account value

12

will be distributed in the early years, leaving a much smaller account value base against which the same percentage will be applied, resulting in inconsequential monthly retirement income payments. Systematic withdrawal programs may also be applied to mutual funds, which aside from differences in taxation and asset charges, are very similar to the accumulation phase of variable annuities.

The '201 patent, Col. 3, *l.* 60, to Col. 4, *l.* 27.

### d. *The Brief Summary Of The Invention*

The Brief Summary Of The Invention is somewhat more illuminating than the Abstract as to the nature of what is claimed in the '201 patent, perhaps in part because of the context provided by the Background Of The Invention. Unfortunately, the parties' different impressions of what—or specifically, how many—inventions are described in the Brief Summary and the Detailed Description suggest that the illumination is less than brilliant. Because the court finds that the Brief Summary Of The Invention is helpful to understanding both what is later described in detail and what is ultimately claimed, the Brief Summary is quoted below, in its entirety. The court has placed in italics those portions of the Brief Summary that the court believes highlight principal aspects of the claimed invention.

The first portion of the Brief Summary states the following:

> *One aspect of the present invention provides an annuity based retirement program which utilizes a variable annuity product with a guaranteed minimum payment. Unlike existing products, however, the product of the present invention is administered by a process in which deficits (i.e., differences between the minimum payments and what would otherwise be the actual payments when actual payments fall below the minimums) are repaid from future payments.* The chart in FIG. **3** illustrates this aspect of the invention. FIG. **3** illustrates variable annuity payouts with a simple floor

13

> guarantee and a program administered by a method that funds current deficiencies (without interest) from future payments. Another aspect of the invention is the provision of alternative techniques (including a retrospective method and a prospective method) of implementing such a program.

The '201 patent, Col. 4, *ll.* 31-45. Figure **3**, to which this first portion of the Brief Summary refers, is shown below:

| | Simple 90% Floor Guarantee | | | | | 90% Floor Guarantee w/ Reduced Future Payments | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Normal Variable Payment | Payment with 90% Guarantee | Amount Due From Fut Payments | Cost to Insurance Company | | Normal Variable Payment | Payment with 90% Guarantee | Amount Due From Fut Payments | Cost to Insurance Company |
| 1 | $100 | $100 | $0 | $0 | | $100 | $100 | $0 | $0 |
| 2 | $115 | $115 | $0 | $0 | | $115 | $115 | $0 | $0 |
| 3 | $112 | $112 | $0 | $0 | | $112 | $112 | $0 | $0 |
| 4 | $95 | $95 | $0 | $0 | | $95 | $95 | $0 | $0 |
| 5 | $83 | $90 | $0 | $7 | | $83 | $90 | $7 | $7 |
| 6 | $72 | $90 | $0 | $18 | | $72 | $90 | $25 | $18 |
| 7 | $61 | $90 | $0 | $29 | | $61 | $90 | $54 | $29 |
| 8 | $75 | $90 | $0 | $15 | | $75 | $90 | $69 | $15 |
| 9 | $81 | $90 | $0 | $9 | | $81 | $90 | $78 | $9 |
| 10 | $102 | $102 | $0 | $0 | | $102 | $90 | $66 | -$12 |
| 11 | $115 | $115 | $0 | $0 | | $115 | $90 | $41 | -$25 |
| 12 | $78 | $90 | $0 | $12 | | $78 | $90 | $53 | $12 |
| 13 | $99 | $99 | $0 | $0 | | $99 | $90 | $44 | -$9 |
| 14 | $108 | $108 | $0 | $0 | | $108 | $90 | $26 | -$18 |
| 15 | $125 | $125 | $0 | $0 | | $120 | $99 | $5 | -$21 |
| Totals | $1,421 | $1,511 | | $90 | | $1,416 | $1,421 | | $5 |

Figure 3

The remainder of the Brief Summary describes further "aspects" of the invention, as follows:

> *Another aspect of the present invention relates to distributions associated with withdrawal programs, including systematic withdrawal programs.* More specifically, this aspect of the invention provides a method for administering a systematic withdrawal program in which the distribution program calls for a percentage withdrawal, the dollar amount of which is allowed to vary as the account value varies due to withdrawals, fees and expenses, and appreciation.

> *Another aspect of the present invention provides a combination of benefits superior to both annuitizations and systematic withdrawal programs (whether from deferred annuities or from mutual funds) by joining the two programs seamlessly so as to provide lifetime income annuities (or mutual fund programs) which maintain liquidity for the contract holder for as many years as the contract holder chooses.* Upon commencement of the program, the contract holder may elect the number of years during which full liquidity is desired. For example, an owner age 65 may elect to retain contract liquidity for twenty years. Using an assumed interest rate (AIR) and other factors, an initial payment will be determined. The amount of this payment will change from period to period based on the same formula used in determining payment changes under a typical variable immediate annuity, or annuitization under a variable deferred annuity. At the end of twenty years, if the contract holder wants payments to continue on this basis and be guaranteed for life, then liquidity is given up and the account value is no longer available as a death benefit. The exchange of account value liquidity for payments guaranteed for life may be optional at or before the end of the liquidity period. The liquidity period may be changed at any time, or the contract holder may also continue the withdrawal program on some

16

other basis, or may elect to surrender the contract for its account value. For mutual fund programs, the assets remaining in the mutual fund at the end of the liquidity period may, at the owner's option, be transferred to an immediate variable annuity to complete the program.

This aspect of the invention provides a type of systematic withdrawal program (which may be applied to either deferred annuities or to mutual funds) that converts at the end of a stated period (the liquidity period) to an annuity. The annuity chosen is assumed here to be a life annuity, but other forms of annuities might also be made available. Essentially, the value remaining in the account at the end of the liquidity period is used to purchase a life annuity that continues payments for the life of the annuitant. The program blends the withdrawal program with this annuitization in a seamless way. Payments, first as withdrawals and later as annuity payments, are adjusted each period to reflect actual net investment returns, in the same way that variable annuity payments are normally adjusted. Consequently, while payments under the life annuity portion of the program are guaranteed for the life of the annuitant, the amount of each payment is not guaranteed. This invention involves a unique administrative system that, among other things, customizes the liquidity period and the level of withdrawal to the particular owner.

This aspect of the present invention differs in several ways from variable annuitizations that allow commutation of future payments, and which therefore provide some degree of "liquidity." First, this program primarily applies to the accumulation period of the deferred annuity and does not require actual annuitization. Second, commutation of future payments requires demonstration of good health. Third, commutation may provide for less surrender value than the present invention provides, due to additional loads or charges applied at the time of commutation. Fourth, during its liquidity period, the present invention utilizes a "retrospective"

17

approach in determining contract value while commutation programs utilize a prospective approach.

Since initial and subsequent payments are higher with shorter liquidity periods, contract holders may decide for themselves the appropriate length of the liquidity period. Some my elect very short periods, such as five years. Others may elect very long periods, in effect maintaining complete access to their account values for the entirety of their lives. Even in the latter instance, contract holders enjoy advantages over conventional systematic withdrawal programs. In particular, the initial payment anticipates returning some portion of principal over the contract holder's expected lifetime (the remaining portion being returned at death), while still guaranteeing that payments will be made regardless of how long the contract holder lives. Changes in payments from period to period are governed by the same formula as is used for life annuities and resulting payments are guaranteed for life.

*Certain embodiments of the present invention provide a data processing method and apparatus for the determination and administration of annuity payments that derive from the seamless combination of systematic withdrawals (from deferred annuities and/or mutual funds) and annuitization as indicated above and as will be described more fully below.*

The invention described is intended primarily to apply to variable annuities and mutual funds. Nonetheless, the invention can also be applied to fixed annuities.

Other goals, advantages and novel features of the present invention will become apparent from the following detailed description of the invention when considered in conjunction with the accompanying drawing.

The '201 patent, Col. 4, *l.* 31, to Col 6, *l.* 11 (emphasis added).

This Brief Summary suggests that the invention has three primary "aspects": (1) an annuity-based retirement program that utilizes a variable annuity product with a guaranteed minimum payment, but administered by a process in which deficits are repaid from future

18

payments (*i.e.*, an "annuitized" program), *see id.* at Col. 4, *ll.* 31-45; (2) a program involving distributions associated with withdrawal programs, including systematic withdrawal programs (*i.e.*, an "unannuitized" program permitting withdrawals before the contract is annunitized), *see id.* at Col. 4, *ll.* 46-54; and (3) a program joining or combining annuitization and systematic withdrawal programs "seamlessly" so as to provide lifetime income annuities which maintain liquidity for the contract holder for as many years as the contract holder chooses (*i.e.*, a "combination" program, in which a systematic withdrawal program converts at the end of a stated liquidity period to an annuity), *see id.* at Col. 4, *l.* 55, to Col. 5, *l.* 65. In addition to these "aspects," the Brief Summary indicates that certain embodiments of the invention provide a data processing method and apparatus for the determination and administration of the third, "combination" aspect. *See id.* at Col. 5, *l.* 66, to Col. 6, *l.* 4.

In its claim construction brief, however, Lincoln contends that the '201 patent inventors "generally conceived *two* distinct methods to administer annuity products." Lincoln's Claim Construction Brief at 4 (emphasis added). Lincoln explains that the "first general method," which Lincoln asserts is *not* covered by the patent claims at issue in its infringement counterclaim, "relates to a variable annuity product that is administered 'by a process in which deficits (i.e., differences between minimum payments and what would otherwise be the actual payments when actual payments fall below the minimums) are repaid from future payments.'" *Id.* (quoting the '201 patent, Brief Summary, Col. 4, *ll.* 30-38). Lincoln also explains that this "first general method" is "used in connection with an annuitized variable annuity—i.e., after account value has been exchanged for the promise of future payments." *Id.* at 5 (citing the '201 patent, Brief Summary, Col. 4, *ll.* 31-45). Lincoln cites the same portion of the Brief Summary as describing its first aspect of the invention as the court cited, above, as the basis for the court's belief that one

19

aspect of the invention is an "annuitized" program. Therefore, the court concludes that Lincoln's "first general method" corresponds to what the court described above as the "annuitized" program, or first aspect of the invention. The "second general method" identified by Lincoln, which Lincoln contends is the subject of this lawsuit, "relates to distributions associated with withdrawal programs from unannuitized variable annuity accounts." Lincoln's Claim Construction Brief at 5 (citing the '201 patent, Detailed Description, Col. 10, *ll*. 35-39, and Col. 11, *ll*. 4-11). It is not clear to the court, however, from Lincoln's further explanation whether this "second general method" includes both the second aspect (the "unannuitized" program) and the third aspect (the "combined" program) identified by the court from the Brief Summary, or just the second aspect. Such confusion arises, because, in Lincoln's explanation of the "second general method," Lincoln cites sections of the Brief Summary and Detailed Description that describe both "unannuitized" or "never annuitized" programs, such as the Detailed Description, Col. 10, *ll*. 35-55, and Col. 11, *ll*. 4-11, and sections that describe programs in which annuitization is "postponed" until after a "liquidity period" of some specified duration, such as in the Brief Summary, Col. 4, *ll*. 58-64, and Col. 5, *ll*. 56-62. Moreover, the sections of the Brief Summary that Lincoln points to as describing this "second general method" are those that the court has identified as describing a third "combination" program, while Lincoln never cites or explains what is described in the Brief Summary, Col. 4, *ll*. 46-54, which is the section that the court identified as describing the second, "unannuitized" program.

The Transamerica Plaintiffs, like the court, assert that the '201 patent discloses "three distinct methods." Markman Reply Brief By Transamerica Level Parties at 8. The Transamerica Plaintiffs identify the three methods as follows: (1) "[a] variable annuity benefit plan maintained in the post-annuitization period," citing the '201 patent, Detailed

Description, Col. 7, *l.* 1, to Col 10, *l.* 34, and Description of the Flow Charts, Col. 18, *ll.* 13-59; (2) "[a] distribution program associated with a withdrawal program that is 'never annuitized,'" citing the '201 patent, Detailed Description, Col. 10, *l.* 35, to Col 12, *l.* 10; and (3) "[a] distribution program associated with a withdrawal program wherein the annuitization of the contract is 'postponed' until the end of the 'liquidity period,'" citing the '201 patent, Detailed Description, Col. 12, *l.* 11, to Col. 14, *l.* 21. Markman Reply Brief By Transamerica Level Parties at 8-9. These three "methods" identified by the Transamerica Plaintiffs appear to correspond, at least generally, to the three "aspects" identified by the court from the Brief Summary. The Transamerica Plaintiffs contend, however, that it is the *first* method that is covered by the patent claims at issue here, whereas Lincoln contends that it is the *second* method (or second and third methods) that is (or are) covered by the patent claims at issue here.◻[4]

The court will examine the Detailed Description and the claims in the patent to determine what aspects of the invention are covered by the patent claims at issue here, which may entail determining how many aspects or methods are described and claimed. For the moment, however, suffice it to say that the fundamental disagreement between the parties about what methods or inventions are disclosed and what methods or inventions are covered by the patent claims at issue in this case is reflected in a fundamental disagreement about the meanings of some of the disputed claim terms.

---

[4]The Transamerica Plaintiffs also contend that the '201 patent improperly claims more than one invention and that Lincoln's pending patent applications actually separately claim certain of the inventions described in the Detailed Description of the '201 patent.

21

### e.    The Detailed Description

*i.    The description of a first method*.  The court turns, next, to the Detailed

Description Of The Invention for further explanation of the invention or inventions

disclosed in the '201 patent.  The court and the parties apparently agree that the first

section of the Detailed Description, Col. 7, *l.* 4, to Col. 10, *l.* 34, describes a program or

programs for variable annuities that have, in fact, been "annuitized," that is, a program

that corresponds to the court's first "aspect" of the invention, to Lincoln's "first general

method," and to the Transamerica Plaintiffs' "first method."  In part because Lincoln

contends that this method is *not* covered by the pertinent claims at issue in this litigation,

the court will summarize this section of the Detailed Description as briefly as it can.

This portion of the Detailed Description illustrates approaches for administration of

an annuity based program in which deficits are funded from future benefits in "other than

the conventional manner," using either a "retrospective" or a "prospective" formula.  The

"retrospective" formula is described from Col. 7, *l.* 37, to Col. 8, *l.* 18, but the court

finds it unnecessary to quote that formula here.  Instead, the court finds it appropriate to

quote the portion of the Detailed Description describing distinguishing features of this

"retrospective" formula:

> Under this retrospective approach, the determination of
> the benefit payment for each period differs from the typical
> approach previously described.  The insurer guarantees that if
> the account value determined by the progression of values in
> the series shown above goes to zero, the insurer will
> commence making payments to the annuitant from its own
> funds.
>
> The table of FIG. **4** compares the normal variable
> benefit typically payable under an annuity contract to the
> benefit payable under a contract which incorporates the
> retrospective method of this example where the guaranteed

> minimum payment is equal to the initial payment. The total payments under the retrospective method exceed those under the normal benefit. The insurer pays all amounts after the account value is exhausted.

The '201 patent, Col. 8, *ll.* 19-34. Figure **4**, to which this section of the Detailed Description refers, is shown below:

Retrospective Method: Floor Payment Equals Initial Payment

| Payment Number | Normal Benefit | Account Value BOY | Annuity Factor | Benefit Payment | Investment Return | Survivorship Adjustment | Account Value EOY |
|---|---|---|---|---|---|---|---|
| 1 | $1,526.69 | $10,000.00 | 6.550 | $1,526.69 | 13.0% | 1.0101 | $9,671.56 |
| 2 | $1,643.01 | $9,671.56 | 5.887 | $1,643.01 | 3.0% | 1.0204 | $8,438.17 |
| 3 | $1,611.71 | $8,438.17 | 5.236 | $1,611.71 | -30.0% | 1.0309 | $4,926.31 |
| 5 | $1,074.47 | $4,926.31 | 4.585 | $1,526.69 | 10.0% | 1.0638 | $3,978.29 |
| 6 | $1,125.64 | $3,978.29 | 4.004 | $1,526.69 | -5.0% | 1.0989 | $2,559.36 |
| 7 | $1,018.44 | $2,559.36 | 3.467 | $1,526.69 | 30.0% | 1.1364 | $1,525.55 |
| 8 | $1,260.92 | $1,525.55 | 2.943 | $1,526.69 | 25.0% | 1.1765 | $0.00 |
| 9 | $1,501.09 | $0.00 | 2.400 | $1,526.69 | 22.0% | 1.2048 | $0.00 |
| 10 | $1,744.13 | $0.00 | 1.771 | $1,526.69 | 15.0% | 1.2346 | $0.00 |
| Total | $12,506.09 | | | $13,941.52 | | | |

Figure 4

The Detailed Description describes an illustrative example for the "prospective" formula as another example of an approach to the administration of an annuity based program in "other than the conventional manner," as follows:

> In this approach, a guaranteed minimum variable income benefit is established below which the benefit payment will not fall. However, in the event the benefit payment calculated without regard to the minimum falls below the minimum benefit payment guaranteed, a portion of the variable annuity benefit reserve held by the insurer will be liquidated in an amount sufficient to cover the shortfall. This will result in reduced benefits in the long term when performance of the funds might otherwise dictate a larger benefit payment.
>
> As mentioned, the series of variable annuity benefit payments traditionally has a lower bound of zero. There are a variety of ways in which a positive, non-zero lower bound can be introduced. It will be assumed here that the lower bound will be a function of the initial variable annuity benefit payment. In this example, the initial variable annuity benefit payment is $1,000 and all future variable annuity benefit payments will be assumed to be no less than 100% of the initial benefit.
>
> Alternative, but similar, methods and systems to support them may be used to facilitate the same objective of providing a guaranteed floor of periodic annuity income. For example, annuity payments immediately subsequent to the one(s) creating a shortfall could be reduced—but not below the guaranteed floor level of payment—until the cumulative shortfall had been made up. The present invention provides the computer-automated process to handle these variants.
>
> The table of FIG. **5** shows the reduction in units per payment under a program that guarantees a minimum payment of $1,500 and accounts for any shortfall by reducing the number of units used to calculate future benefit payments.

The '201 patent, Col. 8, *l.* 39, to Col. 9, *l.* 3.   Figure **5**, to which this section of the Detailed Description refers, is shown below:

Prospective Method
Variable Annuity with Guaranteed Minimum Payments

| Annuity Units | Annuity Unit Value | Annuity Reserve | Units per Payment | Benefit Payment | Shortfall Amount | Shortfall (in units) | Adjusted Reserve | Reduced Units |
|---|---|---|---|---|---|---|---|---|
| 10,112.25 | $1.00 | $10,112.25 | 1,500.00 | $1,500.00 | $0.00 | 0.00 | $10,112.25 | 1,500.00 |
| 9,134.20 | $1.10 | $10,047.62 | 1,500.00 | $1,650.00 | $0.00 | 0.00 | $10,047.62 | 1,500.00 |
| 8,179.50 | $0.87 | $7,116.17 | 1,500.00 | $1,500.00 | $195.00 | 224.14 | $6,921.17 | 1,449.67 |
| 6,987.77 | $0.97 | $6,778.13 | 1,449.67 | $1,500.00 | $93.82 | 96.73 | $6,684.31 | 1,424.35 |
| 6,078.13 | $1.05 | $6,382.04 | 1,424.35 | $1,500.00 | $4.44 | 4.22 | $6,377.60 | 1,423.05 |
| 5,364.88 | $1.07 | $5,740.42 | 1,423.05 | $1,522.67 | $0.00 | 0.00 | $5,740.42 | 1,423.05 |
| 4,703.31 | $1.05 | $4,938.48 | 1,423.05 | $1,500.00 | $5.79 | 5.52 | $4,932.68 | 1,420.66 |
| 4,045.27 | $1.00 | $4,045.27 | 1,420.66 | $1,500.00 | $79.34 | 79.34 | $3,965.93 | 1,377.71 |
| 3,219.92 | $1.04 | $3,348.71 | 1,377.71 | $1,500.00 | $67.18 | 64.59 | $3,281.53 | 1,329.41 |
| 2,304.31 | $1.04 | $2,396.48 | 1,329.41 | $1,500.00 | $117.42 | 112.90 | $2,279.06 | 1,175.45 |

Figure 5

Case 1:06-cv-00110-MWB   Document 64   Filed 03/10/08   Page 27 of 213

The description of the first method continues with descriptions of "[o]ther variations of the system and method of the present invention," which include "[n]on-level variable benefit floors," and "[b]enefit floors in conjunction with benefit ceilings ('collars')." The '201 patent, Col. 9, *l.* 4, to Col. 10, *l.* 34.

      *ii.*     ***The description of a second method***.  Accepting, at least for now, Lincoln's contention that the claims at issue do not cover an "annuitized" program or programs, the court turns to the portion of the Detailed Description that Lincoln contends is covered by the pertinent claims of the patent.  The parties appear to agree that a second method or program is described beginning at Col. 10, *l.* 35.  Lincoln contends that this portion of the Detailed Description describes the "second general method" pertaining to unannuitized variable accounts, the Transamerica Plaintiffs contend that it describes the method for "never annuitized" accounts, and the court identifies it as describing an "uannuitized" program.

      This portion of the Detailed Description begins with the following description, in which references to annuitization or lack of annuitization have been italicized:

> *In addition to distribution methods associated with true annuitizations*, distributions associated with withdrawal programs—including systematic withdrawal programs—*from active (unannuitized) deferred annuity contracts* are also encompassed by this invention.
>
>     For example, for a given attained age(s) and, where allowed, gender(s), an insurer may permit withdrawals from an *active (unannuitized) deferred annuity contract*.  Under such a program, if these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period.

As a hypothetical example, if a male age 60 withdraws 4.4% of the initial account value each year, such withdrawals are guaranteed to last a lifetime. (Initial account value is that account value at the time a systematic withdrawal program, inclusive of this guaranteed minimum benefit payment option, commences.) There is an explicit increment to the asset charge for those customers who opt to purchase this benefit.

*This distribution program contrasts with those shown earlier in two major ways. First, the variable annuity contract is never "annuitized." Rather, a series of partial withdrawals is made from an active (unannuitized) deferred variable annuity contract.* This means that, upon death of the contract owner, the account value is paid to the beneficiary. *This contrasts with distribution methods associated with true annuitizations*, where the form of the annuity payout option chosen determines whether any residual value remains for a secondary annuitant or beneficiary. For example, *under a variable annuity contract annuitized under a single life annuity option* with no certain period or other refund option, the insurer's obligation to the annuitant ceases upon death. No further payments, "account value," or any other form of residual value flows to the beneficiary.

*Second, because the variable annuity contract is never annuitized under this distribution program, a lump sum or partial account value withdrawal capability still resides with the variable deferred annuity contract owner(s).* However, withdrawals in excess of the amounts stated by the insurer to keep the guaranteed payout program in place may alter or may terminate the program.

One variant of this distribution program calls for the percentage withdrawal allowed to be not just of the initial account value, but rather of the highest account value achieved on any policy anniversary following inception of the program, such account value necessarily recognizing all withdrawals and fees as well as appreciation.

For example, suppose a male age 60 may withdraw 4.4% of the initial account value each year under this program

and be guaranteed a lifetime income of that amount. Suppose the initial account value at inception of this program is $100,000. The contract owner withdraws $4,400, the maximum permitted. Favorable fund performance causes the account value to increase from $100,000—$4,400=$95,600 to $110,000 as of the contract owner's next policy anniversary when he has attained age 61. The account value against which the 4.4% withdrawal applies is then re-established as the "high-water mark" account value on any policy anniversary. Thus, he may now withdraw up to 4.4% of $110,000, or $4,840, each year and have the lifetime income guarantee program remain in place. If the account value subsequently decreases at all—even to zero—the $4,840 is guaranteed to be paid for life.

The table in FIG. **6** illustrates the operation of this aspect of the invention. In the illustration of FIG. **6**, the initial account value is $100,000, the withdrawal guarantee is 7.5% of the highest account value attained, the investment return is assumed to be as illustrated, and the term is 15 years.

In addition to guaranteed income for specified periods including lifetime periods under systematic withdrawal programs, this invention also encompasses the integration of such income guarantees with death benefit guarantees. For example, such death benefit guarantees may promise that the contract owner will have returned to him or her a specified percentage (e.g., 0%-100%, inclusive) of either the initial account value or the "high-water mark" account value as of any subsequent policy anniversary.

The '201 patent, Col. 10, *l.* 35, to Col. 11, *l.* 48 (emphasis added). Figure **6**, to which this portion of the Detailed Description refers, is shown below.

30

| Withdrawal Number | Account Value BOY | Withdrawal Amount | Investment Return | Account Value EOY |
|---|---|---|---|---|
| 1 | $100,000.00 | $7,500.00 | 12% | $103,600.00 |
| 2 | $103,600.00 | $7,770.00 | 16% | $111,162.80 |
| 3 | $111,162.80 | $8,337.21 | 12% | $115,164.66 |
| 4 | $115,164.66 | $8,637.35 | -5% | $101,200.95 |
| 5 | $101,200.95 | $8,637.35 | -10% | $83,307.24 |
| 6 | $83,307.24 | $8,637.35 | -21% | $58,989.21 |
| 7 | $58,989.21 | $8,637.35 | 5% | $52,869.45 |
| 8 | $52,869.45 | $8,637.35 | -14% | $38,039.61 |
| 9 | $38,039.61 | $8,637.35 | 1% | $29,696.28 |
| 10 | $29,696.28 | $8,637.35 | -15% | $17,900.09 |
| 11 | $17,900.09 | $8,637.35 | -5% | $8,799.61 |
| 12 | $8,799.61 | $8,637.35 | 15% | $186.60 |
| 13 | $186.60 | $8,637.35 | 23% | $0.00 |
| 14 | $0.00 | $8,637.35 | 10% | $0.00 |
| 15 | $0.00 | $8,637.35 | 8% | $0.00 |

*iii.* ***Is a third method described?*** As the italicized text in the quotation above indicates, the Detailed Description explains that the method described in Col. 10, *l.* 35, to Col. 11, *l.* 48, involves "uannuitized" contracts or contracts that are "never annuitized." In contrast, the remainder of the Detailed Description describes contracts that have both a "liquidity period" and an "annuity period" or "annuitized" phase. Specifically, the first references to a "liquidity period," and more particularly, to a method in which withdrawals and benefit payments continue from the "liquidity period" into the "annuity period," appear in the section of the Detailed Description beginning at Col. 11, *l.* 49, immediately following the portion of the Detailed Description quoted above and identified by the parties and the court as describing a second method. The section of the Detailed Description beginning at Col. 11, *l.* 49, begins as follows:

Under this approach, the initial withdrawal amount is adjusted in the same way variable annuity benefit payments subsequent to the initial payment are adjusted (see above), substituting "withdrawal" for "benefit" in the formulas. *Such adjustment occurs during the liquidity period (chosen by the contract holder at the beginning of the program) and continues into the life annuity period to adjust the variable payments under that phase of the program also.*

Since the first adjustments are made *during the liquidity period*, the deferred annuity account value (or mutual fund account value) must be maintained as usual for deferred annuities (or mutual funds), with special adaptation for additional deposits and for withdrawals in excess of the calculated withdrawal amount. . . .

The '201 patent, Col. 11, *ll*. 40-63 (emphasis added). The second paragraph quoted just above continues with the statement of a formula for the administration of the account value, assuming no additional deposits and no excess withdrawals. *Id.* at Col. 11, *l*. 63, to Col. 12, *l*. 10.

The part of the Detailed Description quoted just above presents a quandary. The first paragraph, from Col. 11, *ll*. 49-56, states that it pertains to "this approach," apparently meaning the one described in the preceding section, from Col. 10, *l*. 35, to Col. 11, *l*. 48. On the other hand, the paragraph at Col. 11, *ll*. 49-56, and the paragraphs that follow, including the second one quoted just above from Col. 11, *ll*. 57-64, refer to a "liquidity period" *and* a "life annuity period" and "postponement" of "annuitization" until the end of a "liquidity period," which irreconcilably conflicts with the description from Col. 10, *l*. 35, to Col. 11, *l*. 48, of a method for contracts that are "never annuitized." One way to resolve this irreconcilable conflict would be to read the section of the Detailed Description beginning at Col. 11, *l*. 49, as describing a *different* method from the "never

32

annuitized" method described from Col. 10, *l.* 35, to Col. 11, *l.* 48, notwithstanding the reference to "this approach" in the paragraph beginning at Col. 11, *l.* 49.

Indeed, the Transamerica Plaintiffs contend that a *different* method from the "never annuitized" method is described in later parts of the Detailed Description, although they place the demarcation between a "second method" and a "third method" somewhat later than the court does, at Col. 12, *l.* 11. The Transamerica Plaintiffs' demarcation is at least as problematic as the court's, however, because at the demarcation point they identify, the Detailed Description describes how "[t]his withdrawal program," that is, one apparently previously described, "contrasts with normal annuitization in two ways." *Id.* at Col. 12, *ll.* 11-42. Thus, as with the court's demarcation point, the Transamerica Plaintiffs' demarcation point appears to be a continuation of the description of a prior method, not a description of a new method. This problem with the Transamerica Plaintiffs' demarcation point is ameliorated if "this withdrawal program" is read to refer to a program that is described beginning at the court's suggested demarcation point, Col. 11, *l.* 49. That solution, of course, still leaves the problems with the court's demarcation point, which also begins with a confusing reference to "this approach," suggesting that it is a continuation of the description of the prior method, not the beginning of a description of a different method.

Although the court is tempted to throw up its hands and declare the Detailed Description hopelessly vague, because the precise demarcation point between a second and third method or program is not clear, what is clear is that the remainder of the Detailed Description, that is, the part beginning at Col. 11, *l.* 49, describes a "withdrawal program" with both a "liquidity period" or "unannuitized" period and a "life annuity period" or "annuitized" period, *i.e.*, a third, "combined" program. Indeed, the court finds that the Detailed Description describes how a "never annuitized" plan can actually be

33

"seamlessly" combined with an "annuitized" plan by postponing the annuitization of the plan until the end of the systematic withdrawal plan applicable to the "liquidity period" of the contract. This reading rationalizes, to some extent, the perception of the court and the Transamerica Plaintiffs that three aspects of the invention are disclosed with the contention of Lincoln that only two general methods are disclosed, because it is apparent that Lincoln's second method includes the "seamless" combination of the first two methods identified by the court and the Transamerica Plaintiffs.

Specifically, the Detailed Description explains that "[t]his withdrawal program contrasts with normal annuitization in two ways." The '201 patent, Col. 12, *ll.* 11-12. Those two ways are described as follows:

> First, *the annuitization of the contract (or, in the case of a mutual fund, purchase of an annuity) is postponed until the end of the liquidity period (which may be the end of the mortality table, if so elected)*. Rather, a series of partial withdrawals in amounts specified by the program is made *from an active (unannuitized) deferred variable annuity contract* (or mutual fund). This means that, upon death of the contract owner during the liquidity period, the account value is paid to the beneficiary. *This contrasts with distribution methods associated with true annuitizations,* where the form of the annuity payout option chosen governs whether any residual value remains for a secondary annuitant or beneficiary. . . .
>
> Second, *because the annuitization of the variable annuity contract (or mutual fund) is postponed, a lump sum or partial account value withdrawal capability still resides with the owner(s) during the liquidity period.* Additionally, the contract holder may elect to withdraw less than the allowable withdrawal amount; payments under a variable annuity payout do not offer this flexibility.

The '201 patent, Col. 12, *ll.* 11-24, 36-42 (emphasis added). The court reiterates that, not only does this "combined" program purportedly contrast with a "normal annuitization" for

the stated reasons, but the "postponement" of annuitization in this program contrasts with the second aspect of the invention described in Col. 10, *l.* 35, to Col. 11, *l.* 48, in which the variable annuity contract is "never annuitized." *See id.* at Col. 11, *ll.* 4-5.

The Detailed Description also explains, in some detail, the workings of this "combined" program, as follows:

> Under this approach (which applies equally well to joint ownership as to single ownership), *the contract holder chooses a period during which systematic withdrawals will be taken and during which full account value liquidity is maintained. At the end of this period, the remaining account value is annuitized according to standard annuity payout options.* The insurance company determines the amount of the initial systematic withdrawal, based on the length of the period chosen, the age of the contract holder, and other factors. Using the assumed interest rate (AIR), the company calculates the initial withdrawal so that, if the AIR is realized over time, *sufficient account value will be present at the end of the systematic withdrawal period to fund the annuitization.* FIG. **7** illustrates variable payments made *during and after the liquidity period* in a program of this type. FIG. **8** illustrates the cash surrender value and death benefits *before and after annuitization* for a program of this type.

The '201 patent, Col. 12, *ll.* 43-59 (emphasis added). The two Figures referred to in this section of the Detailed Description are shown below.

35



Figure 7



Figure 8

The Detailed Description then explains two methods to determine the amount of the initial withdrawal, *see* the '201 patent, Col. 12, *l.* 60, to Col. 13, *l.* 45, but the court finds it unnecessary to repeat those methods at this time. The court does find it useful, however, to point out that the Detailed Description explains that, under either method for

36

determining the amount of the initial withdrawal quoted above, "the liquidity period can be extended to the end of the mortality table (for example, age 115); in such case, if the owner lives until that age, a life annuity is guaranteed, but by that age the financial risk to the insurer is de minimis." *Id.* at Col. 13, *ll.* 46-50.

Next, the Detailed Description explains that a contract holder can make additional deposits and withdrawals, as well as the necessary adjustments to the program that would be required if such additional deposits or withdrawals are actually made, as follows:

> The contract holder may make additional deposits and may make withdrawals in excess of the designated withdrawal amount, *provided the end of the liquidity period has not yet been reached*. In such instances, the withdrawal program must be adjusted. Adjustments are made by increasing or decreasing the current withdrawal amount by the same proportion as the amount of the new transaction (deposit or excess withdrawal) bears to the account value just prior to the transaction. For example, if the current account value is $50,000 and the current withdrawal amount is $1,500, an additional deposit of $5,000 increases the account value by 10% and the withdrawal amount is therefore increased by 10%. In the same example, an unscheduled withdrawal of $5,000 (which is therefore an excess withdrawal of $5,000) reduces the account value by 10% and the current withdrawal amount reduces by 10%. In the adjustments, the investment return for the period from the most recent scheduled withdrawal to the date of the new transaction may be reflected in the adjustment.

The '201 patent, Col. 13, *l.* 51, to Col. 14, *l.* 2.

Like the second "never annuitized" aspect of the invention, this third "combined" aspect of the invention can provide for a death benefit:

> This invention also encompasses the integration of this program with death benefit guarantees. For example, such

> death benefit guarantees may promise that the contract owner
> will have returned to him or her a specified percentage of
> either the initial deposit, the "high-water mark" account value
> as of any subsequent policy anniversary, deposits accumulated
> at a specified interest rate or rates, or other definitions of
> value.

The '201 patent, Col. 14, *ll.* 3-10; *and compare* Col. 11, *ll.* 40-49 (describing death

benefit guarantees under the "never annuitized" aspect of the invention, as quoted above,

beginning on page 30).

Finally, the Detailed Description explains a variation of the "combined" program,

as follows:

> *One variation of the invention, applicable to deferred*
> *annuities only, would substitute for the liquidity period a death*
> *benefit period; that is, the contract would have a period during*
> *which the contract holder would not be allowed to access the*
> *account value for amounts in excess of the specified*
> *withdrawal amounts, but during which the account value is*
> *paid at death.* One advantage of this variation may be that the
> program may qualify for more favorable tax treatment. In
> particular, the withdrawals made during the death benefit
> period may be taxed on the same basis as are payments made
> under traditional annuitizations.

The '201 patent, Col. 14, *ll.* 11-21 (emphasis added).

### *f.    The Flow Charts*

The '201 patent includes various "flow charts," identified as Figures **9** through **16**.

Those flow charts are described briefly in the Brief Description Of The Drawings, at Col.

6, *ll.* 15-67, before the Detailed Description, and in more detail in the Description Of The

Flow Charts, at Col. 14, *l.* 25, to Col. 18, *l.* 67, immediately following the Detailed

Description. The court finds it unnecessary to quote any portions of the detailed

Description Of The Flow Charts until and unless those flow charts become pertinent to the

court's construction of specific claim terms. For the sake of a fair description of the patent, however, the court does find it helpful to quote the brief descriptions of the flow charts from the Brief Description Of The Drawings. Those brief descriptions are as follows:

> FIG. **9** shows a flow chart illustrating the data collection and entry steps of the computerized method of the present invention.
> FIG. **10** illustrates a portion of a computerized method which utilizes a retrospective approach to annuity benefit calculation.
> FIG. **11** shows a flow chart which is a continuation of the flow chart in FIG. **10**.
> FIG. **12** shows a flow chart which illustrates a portion of a computerized method which utilizes a prospective approach to annuity benefit calculation.
> FIG. **13** shows a flow chart which is a continuation of the flow chart of FIG. **12**.
> FIG. **14** shows a flow chart illustrating a portion of a computerized method for implementing a systematic withdrawal program.
> FIG. **15** shows a flow chart which is a continuation of the flow chart of FIG. **14**.
> FIG. **16** shows a flow chart illustrating a computerized method which provides for scheduled and unscheduled withdrawals in an investment program, in accordance with one aspect of the present invention.

The '201 patent, Col. 6, *ll*. 45-67.

### g. *Pertinent claims of the patent*

The parties' Joint Claim Construction Statement And Chart (docket no. 28) and their various claim construction briefs show that the claims of the '201 patent at issue in this litigation are independent Claim **35** and dependent Claims **36**, **37**, **38**, **39**, and **42**, all of which depend from Claim **35**. Those claims are quoted below, with bold indicating claim

terms for which the parties have agreed on a construction and italics indicating claim terms for which the parties dispute the construction. In those claims, the inventors claim the following:

**35**. A computerized method for administering a *variable annuity* plan having a *guaranteed minimum payment feature associated with a systematic withdrawal program*, and for *periodically determining an amount of a scheduled payment* to be made to the owner under the plan, **comprising the steps of**:

    a) **storing data relating to a variable annuity account**, including data relating to at least one of an *account value*, a *withdrawal rate*, a scheduled payment, a *payout term* and a *period of benefit payments*;

    b) *determining an initial scheduled payment*;

    c) *periodically determining the account value* associated with the plan and *making the scheduled payment by withdrawing that amount from the account value*;

    d) *monitoring* for an *unscheduled withdrawal* made under the plan and *adjusting the amount of the scheduled payment in response to said unscheduled withdrawal*; and

    e) *periodically paying the scheduled payment to the owner for the period of benefit payments, even if the account value is exhausted before all payments have been made*.

**36**. The method of claim **35**, wherein the amount of the *scheduled withdrawal payment* is determined by the following formula:

$$Scheduled\ Payment = Account\ Value_O \times WD\ Rate$$

Where: *Scheduled Payment* = dollar amount of the *scheduled payment*

$$\text{Account Value}_O = \textit{initial account value}$$

WD Rate $= \%$ of the *initial account value* used to determine the *initial scheduled payment*.

**37**.     The method of claim **35**, wherein the *account value is periodically determined by the following formula*:

$$\text{Account Value}_{t+1} = \text{Max}[(\text{Account Value}_t - \text{With-drawal}), 0] \times (1 + i)$$

Where:

Account Value$_{t+1}$ = account value at time t+1

Account Value$_t$ = account value at time t

Withdrawal = dollar amount of the scheduled payment at time t

i = *net fund performance* during the period t to t+1.

**38**.     The method of claim **35**, wherein *the scheduled payment is adjusted in response to an unscheduled withdrawal, according to the following formula:*

Scheduled   Payment$'$ = Scheduled   Payment $\times (1 + \text{US}$ Withdrawal$_t$/Account Value$_t$).

**39**.     The method of claim **35**, further comprising the additional step of creating a **master record** for the variable annuity account, and wherein said storing steps include storing data on said master record.

            * * *

**42**.     The method of claim **35**, further comprising the additional step of **generating** a **report**, and **forwarding** the report to the owner.

The '201 patent, Col. 25, *l.* 12, to Col. 26, *l.* 34.


## C.   Agreed Constructions

The parties' Joint Claim Construction Statement And Chart (docket no. 28) reflects that the parties have reached an agreement concerning the "preamble" to independent

41

Claim **35**, to the following effect:  "The parties agree that the preamble of Claim 35 gives life and meaning to the claims, and the terms therein constitute positive limitations of the claim."  Joint Claim Construction Statement And Chart, 1.  Despite this hopeful start, the parties hasten to add that they "do not agree upon the interpretation of those limitations." *Id*.  Moreover, the Joint Claim Construction Statement And Chart reflects that the parties have agreed on the construction of relatively few of the pertinent terms of the '201 patent. The constructions on which the parties have agreed are set forth in the following chart:

| THE '201 PATENT | | |
| --- | --- | --- |
| | **Claim Term** | **Parties' Agreed Construction** |
| **Claim 35 (Preamble)** | | |
| a. | Comprising the steps of | Open-ended language meaning that the method includes the steps listed in the claim, but is not limited to those steps or the order in which the steps are recited in the claim. *See, e.g., Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1347 (Fed. Cir. 2001). |
| **Claim 35 (Step a)** | | |
| b. | Storing data relating to a variable annuity account | Storing information relating to a variable annuity account. '201 patent, Col. 15, *ll.* 8-34. |
| **Claim 39** | | |
| c. | Master record | A central or main document (electronic or paper) that stores or contains data relating to a variable annuity account. '201 patent, Col. 14, *l.* 7, to Col. 15, *l.* 7. |
| **Claim 42** | | |
| d. | Generating | To create or bring into existence. '201 patent, Col. 16, *ll.* 10-12; Col. 17, *ll.* 61-67; WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 510 (1991) (defining "generate" as "to bring into existence"). |
| e. | Report | An accounting or description of a variable annuity account or contract. The report, for example, may show distributions, account value, etc. '201 patent, Col. 16, *ll.* 10-22; WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 999 (1991) (defining "report" as "detailed account or statement" or "to give an account of"). |
| f. | Forwarding | Mak[ing] available, transmit[ting], or send[ing]. '201 patent, Col. 16, *ll.* 10-12; THE AMERICAN HERITAGE DICTIONARY 527 (2d ed. 1982) (defining "forward" as "[t]o send on to subsequent destination or address" and to "advance"). |

### D.  Disputed Constructions

The parties offer differing constructions of numerous terms in the pertinent claims of the '201 patent.  The following chart shows the claim terms that the parties have identified as requiring construction, Lincoln's (the patentee's) construction for each such term, if any, and the Transamerica Plaintiffs' alternative construction for each such term, if any.  The authority for each proffered construction is also indicated, if any authority was shown in the Joint Claim Construction Statement And Chart.

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Preamble)** | | |
| a. Annuity | A contract that guarantees the payment or distribution of a sum of money at intervals of time. '201 Patent col. 2, *l*. 50 - col. 3, *l*. 6; John P. Burger & Kristen L. Falk, ANNUITY PRINCIPLES AND PRODUCTS 5, 11, and 156-57 (LOMA); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 88 (1991) (defining "annuity" as "a sum of money payable yearly or at other regular intervals ... a contract or agreement providing for the payment of an annuity."). | [None offered.] |
| b. Variable annuity | An annuity in which the owner bears the investment risks, as opposed to a "fixed annuity," in which the insurer bears the investment risks. '201 patent, Col. 2, *ll*. 1-20. | A contract that pays an annuitant "benefit payments" of which the amounts vary in accordance with the market value of the securities in the separate account of the insurer on the respective valuation days. '201 patent, Col. 2, *ll*. 50-55; Col. 7, *ll*. 4-21; Col. 2, *l*. 67- Col. 3, *l*. 33; Col. 18, *ll*. 24-28; '201 Patent Prosecution History at Document Control Numbers LIN078687; LIN078718; LIN078763; LIN078767; LIN078769; LIN078771; FIG. 16 (showing the actual returns are calculated in box 166); THE ANNUITY HANDBOOK, Chapter 6 – Variable Annuities 75, 86-87 (Bennett Affidavit Paragraph 12). |

45

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Preamble) (continued) | | |
| c. Systematic withdrawal program | A process for distributing money from a deferred annuity contract without requiring the owner to irrevocably exchange or relinquish the account value and without any guarantee that distributions will continue. 201 Patent, col. 4, *ll.* 5-27; col. 7, *ll.* 45-54. *See* Darlene K. Chandler, THE ANNUITY HANDBOOK 45 (Nat'l Underwriters Co., 4th ed.) and www.retireonyourterms.com/glossary maintained by the National Association for Variable Annuities for definitions of a systematic withdrawal program to counter Transamerica's position that payments under such programs are "required." | Required "scheduled payments" taken from the "account value" and made to the owner or beneficiary at the predetermined intervals established by the "period of benefit payment" during the "payout term." '201 Patent Col. 4, ll. 7-24; Col. 4, ll. 46-48; Col. 10, ll. 35- 39; Col. 18, ll. 1-59. |
| d. Guaranteed minimum payment feature associated with a systematic withdrawal program | Distributions or disbursements of money from an annuity plan that do not exceed a predetermined percentage established by the insurer and that are guaranteed by the insurer without a relinquishment of account value by the owner. '201 Patent, col. 4, *l.* 46 – col. 5, *l.* 16; col. 5, *ll.* 55-62; col. 10, *ll.* 43-47. | "Guaranteed minimum payment feature" means that the "scheduled payment" will not fall below an amount (floor) predetermined by the insurance company. '201 Patent, Col. 8, *ll.* 35-48; Col. 8, *l.* 58 – Col. 9, *l.* 3. Therefore, "guaranteed minimum payment feature associated with a systematic withdrawal program" means required "scheduled payments" of an amount equal or greater than a preset minimum (floor) level made on a periodic basis during a systematic withdrawal program. RANDOM HOUSE UNABRIDGED DICTIONARY, 2nd Edition (definition of "associate" – "to unite, combine"). |

46

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Preamble) (continued) | | |
| e. Scheduled payment | A distribution or disbursement of money in accordance with the guarantees of an annuity plan. '201 Patent, col. 10, *ll*. 43-47 ; col. 11, *ll*. 8-10. See extrinsic evidence cited in connection with a "systematic withdrawal program" to counter Transamerica's position that payments are "required." | A required monetary distribution taken from the "account value" of at least the guaranteed (floor) amount periodically paid at the predetermined intervals established by the "period of benefit payments" during the "systematic withdrawal program." '201 Patent, Col. 4, *ll*. 46-54; Col. 18, *ll*. 18-47; and Claim 36. |
| f. Periodically determining an amount [of a scheduled payment] | From time to time calculating or establishing the amount of money to be distributed or disbursed in accordance with the guarantees of the annuity plan. '201, Patent col. 10, *ll*. 43-47; col. 11, *ll*. 8-10. WEBSTER'S NINTH COLLEGIATE DICTIONARY 875 (1991) (defining "periodic" as "occurring or recurring at regular intervals"); THE AMERICAN HERITAGE DICTIONARY 923 (2d ed. 1982) (defining "periodic" as "[h]aving periods or repeated cycles."). | The action undertaken at time intervals established by the "period of benefit payments" in which the insurance company authoritatively sets the amount of the required "scheduled payment" based upon the performance of the investments within the variable annuity account (net investment returns) as a necessary precursor to calculating and making the next required, minimum "scheduled payment" of at least the guaranteed (floor) amount. '201 Patent, Col. 4, *ll*. 46-54; Col. 18, *ll*. 24-28; '201 Patent Prosecution History at Document Control Numbers LIN078687; LIN078718; LIN078763; LIN078767; LIN078769; LIN078771; FIG. 16 (showing the actual returns are calculated in box 166). |

47

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step a)** | | |
| g. Account value | The dollar value of or amount of proceeds associated with a variable annuity account, that includes deposits and earnings, less disbursements, withdrawals or payments, benefits, and charges. '201 Patent, col. 11, *l*. 57 - col. 12, *l*. 10. | A monetary value that is maintained on a variable annuity contract upon which the required "scheduled payments" are based. '201 Patent, Col. 7, *ll*. 44-54; Col. 18, *ll*. 13-36. |
| h. Withdrawal rate | A percentage that may be applied when determining amounts to be distributed. '201 Patent, col. 11, *ll*. 11-22; col. 25, *ll*. 43-44. | A predetermined percentage of the "account value" which percentage is established by the insurance company for a given "scheduled payment" made during the "systematic withdrawal program." '201 Patent, Col 10, *ll*. 40-47; Prosecution History of US Patent Application No. 09/804,667 at page 9 of the April 6, 2006 Office Action Response. |
| i. Payout term | The time period (e.g., lifetime) for which distributions or disbursements of money are guaranteed under the annuity plan. '201 Patent, col. 1, *ll*. 48-50; col. 1, *ll*. 64-67. | The duration of the systematic withdrawal program during the post–annuitization phase (also called the payout phase or distribution phase) of the "variable annuity" during which required "scheduled payments" are made by the insurance company. '201 Patent Col. 1, *ll*. 18-23; Col. 2, *ll*. 12-13; Col. 4, *l*. 40; Col. 10, *ll*. 3-10; Burger & Falk, LOMA, ANNUITY PRINCIPLES AND PRODUCTS, pp. 8, 25-26. |

48

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step a) (continued)** | | |
| j. | Benefit payments | The "scheduled payments" referenced above. See Darlene K. Chandler, THE ANNUITY HANDBOOK 90 (Nat'l Underwriters Co., 4th ed.) to counter Transamerica's position that such payments are made in the post-annuitization phase. | Income payments made in the post-annuitization phase (also called the payout phase or distribution phase) of the "variable annuity." '201 Patent Col. 1, *ll*. 41-47; Col. 2, *ll*. 39-43; Col. 3, *ll*. 18-33; Col. 10, *ll*. 3-13; Col. 18, *ll*. 13-17; THE ANNUITY HANDBOOK, Chapter 6 – Variable Annuities, pp. 75, 86-87 (Bennett Affidavit Paragraph 12), Chapter 4 – The Various Types of Annuities, p. 57 (Bennett Affidavit Paragraph 12), Chapter 1 – The Definition of an Annuity, pp. 9-10 (Bennett Affidavit Paragraph 12), Chapter 3 – Standard Annuity Contract Provisions, pp. 35-36 (Bennett Affidavit Paragraph 12); LOMA, INTRO TO ANNUITIES – FUNDAMENTALS OF ANNUITY CONCEPTS AND PRODUCTS, pp. 11-12 (Bennett Affidavit Paragraph 13); Dellinger, THE HANDBOOK OF VARIABLE INCOME ANNUITIES, p. 381 (Bennett Affidavit Paragraph 12). |
| k. | Period of benefit payments | The frequency of distributions or disbursements of money (e.g., yearly, monthly, etc.). '201 patent, col. 7, *ll*. 22-32; col. 10, *ll*. 42-50. | The frequency or interval (a length of time) between "scheduled payments" (i.e., monthly distributions, quarterly distributions, semi-annual distributions, or annual distributions) during the "payout term" of the systematic withdrawal program. '201 Patent, Col. 7, *ll*. 22-27; Col. 13, *l*. 64 – Col. 14, *l*. 2. |

49

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step b)** | | |
| l. Determining an initial scheduled payment | "Determining" is an act of calculating or establishing. '201 Patent, col. 7, *ll*. 4-35. "Initial scheduled payment" means a first amount of money to be distributed in accordance with the guarantees of the variable annuity plan. '201 Patent, col. 7, *ll*. 1-5. | The authoritative decision and action by the insurance company to set a dollar amount level for the first required distribution from the "account value" made during the "period of benefit payments" to the contract owner or beneficiary. '201 Patent, Col. 4, *ll*. 46-54; Col. 18, *ll*. 18-47; FIG. 16 step 164. |
| **Claim 35 (Step c)** | | |
| m. Periodically determining account value | From time to time calculating the account value. '201 Patent Fig. 6 (showing the periodic determination of account value); WEBSTER'S NINTH COLLEGIATE DICTIONARY 875 (1991) (defining "periodic" as "occurring or recurring at regular intervals"); THE AMERICAN HERITAGE DICTIONARY 923 (2d ed. 1982) (defining "periodic" as "[h]aving periods or repeated cycles."). | The action by the insurance company to calculate the net investment return of the "variable annuity account" at the predetermined intervals established by the "period of benefit payments" as a necessary precursor to calculating and making the next required "scheduled payment" of at least the guaranteed (floor) amount taken from the "account value." '201 Patent, Col. 18, *ll*. 13-36; Col. 7, *ll*. 44-54; '201 Patent Prosecution History at Document Control Numbers LIN078687; LIN078718; LIN078763; LIN078767; LIN078769; LIN078771; FIG 16. |
| n. Making the scheduled payment [by withdrawing that amount from the account value] | Distributing money from the account value in accordance with the guarantees of the variable annuity plan. '201 Patent, col. 10, *ll*. 40-55; col. 25, *ll*. 23-26; '201 File History at LIN078825. | The action by the insurance company of periodically paying the required distribution at the predetermined intervals established by the "period of benefit payments" during the "systematic withdrawal program." '201 Patent, Col. 4, *ll*. 46-54; Col. 18, *ll*. 18-36; and Claim 36 of the '201 Patent; FIG. 16. |

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step d)** | | |
| o. Monitoring | An act of observing, checking or keeping track of. '201 Patent, col. 11, *ll.* 60-63; col. 18, *ll.* 28-32; WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 767 (1991) (defining "monitoring" as "to watch, observe, or check esp. for a special purpose" and "to keep track of, regulate or control the operation of (as a machine or process)."). | [None offered.] |
| p. Unscheduled withdrawal | A withdrawal means that exceeds a predetermined percentage established by the insurer to keep the guaranteed payment program in place. '201 Patent, co1. 11, *ll.* 7-34. | A discretionary monetary distribution of an amount set by the authoritative decision of the contract owner or beneficiary made by the insurance company on a date selected by the contract owner or beneficiary. An "unscheduled withdrawal" is always an excess withdrawal in that it exceeds the "withdrawal rate" and the guaranteed minimum payment feature. An "unscheduled withdrawal" is never a "scheduled payment." '201 Patent, Col. 6, *ll.* 64-67; Col. 13, *ll.* 51– Col. 14, *l.* 2; Col. 18, *ll.* 18-53; FIG. 16 step 178. |
| q. Adjusting the amount of the scheduled payment in response to said unscheduled withdrawal | Reducing the amount of the scheduled payment in response to an unscheduled withdrawal. '201 Patent, col. 13, *l.* 51 - col. 14, *l.* 2. | The actions by the insurance company of reducing the "account value" maintained under the annuity contract by the amount of the "unscheduled withdrawal" and calculating the decrease factor resulting in a reduction of the amount of the required "scheduled payments" to be made for the remainder of the "payout term" of the "systematic withdrawal program." '201 Patent, Col. 18, ll. 18-47; Col. 13, ll. 51–66; '201 Patent, Figure 16, Steps 160, 166, 168; and Steps 178, 182, 184, 186. |

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step e)** | | |
| r. | Periodically paying the scheduled payment to the owner for the period of benefit payments even if the account value is exhausted before all payments have been made | The guarantee of scheduled distributions or disbursements of money will continue if the account value reaches zero or an amount less than the amount of the scheduled payment during the payout term. '201 Patent, col. 10, lns. 40-47; col. 5, lns. 55-62; '201 File History at LIN078825-26; '201 Patent Fig. 6 (showing the distribution of money even though the account value reaches zero). | Making the required scheduled distribution of at least the guaranteed (floor) amount taken from the "account value" at predetermined intervals during the postannuitization phase (also called the payout phase or distribution phase) of the "variable annuity," *see* '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 18-36; and Claim 36 of the '201 Patent, where "exhausted" means that the "account value" is zero, *see* '201 Patent, Col. 3, *l.* 44; Col. 8, *ll.* 33-34, and "before all payments have been made" means during the "payout term" of the "systematic withdrawal program." |
| **Claim 36** | | |
| s. | Scheduled withdrawal payment | [None offered.] | A "scheduled payment" made during the "systematic withdrawal program." '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 18-36. |
| t. | [Initial] scheduled payment | Dependent claim 36 narrows the manner in which the scheduled payment of claim 35 is calculated. Under claim 36, the "scheduled payment" is calculated by multiplying initial account value by a withdrawal rate or percentage. | The first required withdrawal payment taken from the "account value" and made pursuant to the "period of benefit payments" during the "systematic withdrawal program." |
| u. | Initial account value | The account value at the time the guaranteed payment program begins. '201 Patent, col. 10, *ll.* 50-52. | The account value at the beginning of the "systematic withdrawal program." |

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 37 | | |
| v. Account value is periodically determined by the [stated] formula | Dependant claim 37 narrows the manner in which the account value of claim 35 is periodically calculated. Under claim 37, the account value is calculated by subtracting scheduled payments from account value and multiplying the amount by one plus the net fund performance during the particular time period. | [None offered.] |
| w. Net fund performance | [None offered.] | The financial gains and/or losses of the investment(s) into which the "account value" of the owner's variable annuity contract have been invested. '201 Patent, Col. 3, *ll.* 18-33. |
| Claim 38 | | |
| x. The scheduled payment is adjusted in response to an unscheduled withdrawal, according to the [stated] formula | Dependant claim 38 narrows the manner in which a scheduled payment of claim 35 is adjusted in response to an unscheduled withdrawal by multiplying the scheduled payment amount by an amount equal to one minus the unscheduled withdrawal divided by account value. '201 Patent, col. 13,, *l* 51 – col. 14, *l.* 2; Affidavit of Dr. Donald F. Behan. | [None offered, but the Transamerica Plaintiffs dispute the substitution of "minus" for "plus."] |

## II. LEGAL ANALYSIS

### A. Principles Of Patent Claim Construction

In construing patent claims, courts follow the methodology set forth in the recent *en banc* decision of the Federal Circuit Court of Appeals in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). *See, e.g., Intamin, Ltd. v. Magnetar Techs. Corp.*, 483 F.3d 1328, 1334 (Fed. Cir. 2007) ("This court construes claims according to the principles set forth by this court in [*Phillips*]."); *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1347 (Fed. Cir. 2005). The court will, therefore, summarize that methodology and review key canons of patent claim construction.

### 1. The Phillips methodology

#### a. The starting point

As the court explained in *Phillips*, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Consequently, before and since the decision in *Phillips*, the Federal Circuit Court of Appeals has reiterated that courts must "begin [their] claim construction analysis with the words of the claim." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 2004)); *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("It is elementary that claim construction begins with, and remains focused on, the language of the claims."). "The construction of claims," the Federal Circuit Court of Appeals has explained, "is simply a way of

54

elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkman Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) (internal quotation marks and citations omitted).

### b.    Hierarchy of evidence

The Federal Circuit Court of Appeals has explained that the process of claim construction begins with "intrinsic" evidence:

> The words of the claim are generally given their ordinary and customary meaning. [*Vitronics Corp.*, 90 F.3d] at 1582. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. The person of ordinary skill in the art views the claim term in the light of the entire intrinsic record. *See id.* Thus, the claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*). "'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). In addition to the written description, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317.

*Nystrom*, 424 F.3d at 1142; *accord Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.*, 485 F.3d 1364, 1369 (Fed. Cir. 2007) (the goal of claim construction is "to implement the invention described in the specification and prosecution history, within the confines of the prior art") (citing *Phillips*); *Intamin, Ltd.*, 483 F.3d at 1334 (under *Phillips*, "the court

consults primarily the claims themselves in context, with much of that context supplied by the specification and the prosecution history"); *Biagro Western Sales*, 423 F.3d at 1302 (explaining that "prosecution history, . . . like the patent itself, has been designated as part of the 'intrinsic evidence'" for claim construction) (quoting *Phillips*, 415 F.3d at 1317).

When examining such "intrinsic" evidence, "dependent claims can supply additional context for construing the scope of the independent claims associated with those dependent claims." *Intamin, Ltd.*, 483 F.3d at 1335 (citing *Phillips*, 415 F.3d at 1314). This is so, because "[a]n independent claim impliedly embraces more subject matter than its narrower dependent claim." *Id.* For example, a dependent claim may demonstrate what distinctions the patentee perceived and what the independent claim impliedly embraced. *Id.* More specifically, under the doctrine of claim differentiation, "'[t]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.'" *Acumed L.L.C. v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). "'That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim.'" *Id.* (quoting *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003)). More generally, the doctrine of claim differentiation "is based on 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" *Andersen Corp. v. Fiber Composites, L.L.C.*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (quoting *Karlin Tech., Inc. v. Surgical Dyanimcs, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1998)). Thus, "'[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the

56

difference between claims is significant.'" *Id.* at 1369-70 (quoting *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)).

The Federal Circuit Court of Appeals has explained that the "central importance" of the specification of the patent, another form of "intrinsic" evidence, in claim construction is "because 'the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.'" *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) (quoting *Phillips*, 415 F.3d at 1313); *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005) ("It is presumed that the person of ordinary skill in the art read the claim in the context of the entire patent, including the specification, not confining his understanding to the claim at issue."). Indeed, "[w]here . . . the disputed claim term is technical or a term of art, '[t]he best source for understanding [it] is the specification from which it arose, informed, as needed, by the prosecution history.'" *Aquatex*, 419 F.3d at 1380 (quoting *Phillips*, 415 F.3d at 1315). The specification is not only "highly relevant" to claim construction, "[u]sually, it is dispositive." *Phillips*, 415 F.3d at 1314 (adding that the specification "is the single best guide to the meaning of a disputed term").

The court may also consult the prosecution history as "intrinsic" evidence to determine the proper construction of claim terms. *See Phillips*, 415 F.3d at 1317. "'The purpose of consulting the prosecution history in construing a claim is to "exclude any interpretation that was disclaimed during prosecution."'" *Research Plastics*, 421 F.3d at 1296 (quoting *Rhodia Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005), in turn quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)). This is so, because "the prosecution history can reveal instances where the

57

inventor limited the invention in the course of prosecution and thus narrowed the scope of the claim." *Id.* (citing *Phillips*, 415 F.3d at 1317-18).

In addition to "intrinsic" evidence, consisting of the claim language, the specification, and the prosecution history, "extrinsic" evidence can also be useful in claim construction. *Terlep*, 418 F.3d at 1382 ("Extrinsic evidence . . . also 'may be considered if the court deems it helpful in determining the true meaning of the language used in the patent claims.'") (quoting *Phillips*, 415 F.3d at 1318). For example, "'technical dictionaries may provide [help] to a court "to better understand the underlying technology" and the way in which one of skill in the art might use the claim terms.'" *Aquatex*, 419 F.3d at 1380 (quoting *Phillips*, 415 F.3d at 1315, in turn quoting *Vitronics Corp.*, 90 F.3d at 1584). Indeed, "[i]n some cases, it is possible to construe a claim term by applying 'the widely accepted meaning of commonly understood words.'" *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1359 (Fed. Cir. 2005) (quoting *Phillips*, 415 F.3d at 1314). Therefore, "a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term." *Phillips*, 415 F.3d at 1324.

However, the Federal Circuit Court of Appeals has recently reevaluated the usefulness of dictionaries to determine the meaning of claim terms:

> Our en banc decision in *Phillips* clarified the appropriate use of dictionaries in claim construction, rejecting the view that dictionary definitions govern unless contradicted by intrinsic evidence. *Phillips*, 415 F.3d at 1320. Nonetheless *Phillips* confirms that courts may "'rely on dictionary definitions when construing claim terms'" and that "[d]ictionaries . . . are often useful to assist in understanding the commonly understood meaning of words." *Id.* at 1322

58

(quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n. 6 (Fed. Cir. 1996)). The court must ensure that any reliance on dictionaries accords with the intrinsic evidence: the claims themselves, the specification, and the prosecution history. *Id.* at 1314. Under *Phillips*, the rule that "a court will give a claim term the full range of its ordinary meaning," *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), does not mean that the term will [*1349] presumptively receive its broadest dictionary definition or the aggregate of multiple dictionary definitions, *Phillips*, 415 F.3d at 1320- 1322. Rather, in those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the intrinsic evidence in order to determine the most appropriate [dictionary] definition. *Id.* at 1322-23, 1324.

*Free Motion Fitness, Inc.*, 423 F.3d at 1348-49. Thus, while standard and specialized dictionaries have their place in patent claim construction, the court must choose the proper dictionary definition in light of the "intrinsic" evidence of the meaning of patent terms, consisting of the patent description and the prosecution history, not merely choose a dictionary definition over the definition suggested by such "intrinsic" evidence. *See also Terlep*, 418 F.3d at 1382 (dictionaries are useful, "provided the court 'attach[es] the appropriate weight . . . to those sources in light of the statutes and policies that inform patent law.'") (quoting *Phillips*, 415 F.3d at 1324). Thus, "[w]hat *Phillips* now counsels is that in the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public—*i.e.*, those of ordinary skill in the art—that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source." *Nystrom*, 424 F.3d at 1145; *see also Acumed L.L.C.*, 483 F.3d at 813 (in *Phillips*, the en banc court expressly rejected construing claim terms in

accordance with the broader of two dictionary definitions, where there was no express disavowal of claim scope in the specification).◘[5]

Extrinsic evidence that may be useful in claim construction also includes "expert testimony," but such testimony should also be considered in the context of intrinsic evidence. *Biagro*, 423 F.3d at 1302; *Phillips*, 415 F.3d at 1318-19. More specifically, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by . . . the written record of the patent." *Phillips*, 415 F.3d at 1318 (internal quotation marks and citation omitted); *accord Network Commerce, Inc.*, 422 F.3d at 1361 (citing *Phillips* for the proposition that "expert testimony at odds with the intrinsic evidence must be disregarded").

---

[5]The *Nystrom* decision demonstrates how the impact of dictionary definitions of claim terms has changed after *Phillips*. In a pre-*Phillips* opinion in that case, *Nystrom v. TREX Co., Inc.*, 374 F.3d 1105 (Fed. Cir. 2004), the court relied heavily on dictionary definitions to construe claim terms, such as "board" and "convex." *See Nystrom*, 374 F.3d at 1111-13 & 1115. However, the panel withdrew that opinion following the issuance of the *en banc* decision in *Phillips* and issued a second opinion. *See Nystrom*, 424 F.3d at 1138. In the post-*Phillips* opinion, instead of beginning with dictionary definitions of "board," the court began its analysis by looking at the patent itself. *Id.* at 1143-46. Such reorientation of the court's analysis led to a different, narrower construction of the claim term "board." *Id.* It is possible that, in light of the emphasis on the language of the patent, rather than dictionary definitions, as required by *Phillips* and applied in *Nystrom*, patent claims will be construed more narrowly in many future case. As two commentators noted, "[I]f the result of *Phillips/Nystrom* is that the courts more often confine the scope of [a] patent claim to the embodiments disclosed in the patent, patents will become less valuable, but their scope perhaps more predictable." James J. Foster and Adam Kessel, *'Phillips' leads to a different result in 'Nystrom,'* THE NATIONAL LAW JOURNAL/WWW.NLJ.COM, Dec. 5, 2005, at S.9. The wisdom of such a change, and whether or not it was the intended result of the policy shift in *Phillips*, of course, is for the Federal Circuit Court of Appeals to determine.

## 2.    *Other canons of claim construction*

Apart from the evidence upon which claim construction may be based, claim construction involves various "canons." One canon of claim construction is that "claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Research Plastics, Inc.*, 421 F.3d at 1295 (citing *Phillips*, 415 F.3d at 1313-14, and *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)). On the other hand, "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed." *Nystrom*, 424 F.3d at 1143 (citing *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)); *see also Andersen Corp.*, 474 F.3d at 1369 (describing this presumption as the doctrine of claim differentiation). Similarly, the court must interpret claims so that no term becomes "superfluous." *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (stating that interpretations of claims rendering claim terms superfluous is generally disfavored).

Another canon of patent claim construction is that the patentee may act as "lexicographer." *See Phillips*, 415 F.3d at 1316. In other words, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," and when that happens, the patentee's definition must govern. *Id.* Nevertheless, the authority of the specification as a source for definitions for claim terms is not limitless. Rather, "[t]he court must take care in its analysis, when locating in the written description the context for a disputed term, not to import a limitation from that written description. It must use the written description for

61

enlightenment and not to read a limitation from the specification [into the construction of the term]." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) (citing *Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)). To put it another way, "'[i]t is axiomatic that claims, not the specification embodiments, define the scope of protection.'" *Id.* (quoting *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) (internal citation omitted)).◻[6]

With these principles in mind, the court turns to construction of the disputed claim terms in this case, claim-by-claim. However, the court must first resolve the question of the role that the parties' proffered constructions play in the court's construction of claim terms.

### 3.      *The court's independent obligation to construe terms*

In a recent patent case, this court asked the parties to brief the question of whether the court is bound by the parties' competing definitions in its claim construction process, that is, whether the court must choose only between the parties' competing definitions or

---

[6]The Federal Circuit Court of Appeals has, itself, recognized the difficulty of looking to the specification to construe claim terms without reading limitations in the specification into the claims and has offered some guidance:

> "We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186, 48 USPQ2d 1001, 1005 (Fed. Cir. 1998). In locating this "fine line" it is useful to remember that we look "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention," and not merely to limit a claim term. *Id.* at 1187, 48 USPQ2d at 1005.

*Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331-32 (Fed. Cir. 2001).

is, instead, free to construe the claim terms for itself. *See Maytag Corp. v. Electrolux Home Prods., Inc.*, 411 F. Supp. 2d 1008, 1042-43 (N.D. Iowa 2006). Based on the agreements of the parties in that case and the authorities that they cited, this court concluded that it is not bound to make a "binary" choice between the parties' proffered constructions, but must, instead, independently construe disputed claim terms. *Id.* Indeed, the Federal Circuit Court of Appeals has expressly held that the court is free to adopt a construction independent of those suggested by the parties. *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995). Thus, the court reiterates its conclusion, in *Maytag Corp.*, 411 F. Supp. 2d at 1042-43, and a subsequent decision in *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 498 F. Supp. 2d 1131, 1155 (N.D. Iowa 2007), that it has an obligation to construe the patent terms independently, applying the *Phillips* methodology, and is not bound to adopt either party's proffered construction of any claim term. Lincoln expressly concurs in this conclusion. *See* Lincoln's Claim Construction Brief at 14 (citing *Maytag* and *Ideal Instruments*).

Therefore, the court must make an independent construction of the claim terms, but in construing disputed claim terms, the court will use the parties' proffered constructions as its starting point.

### 4. The court's supposed duty to determine overall scope of exclusive claim coverage

Before construing specific claim terms, however, the court must resolve one more "global" issue. The Transamerica Plaintiffs begin the argument section of their claim construction brief with their assertion that, before establishing the definition for specific terms and phrases contained within the claims at issue, the court must determine the "claim boundaries" and, more specifically, that the court "is called upon to examine the claims at issue on the basis of the overall scope of exclusive coverage that is being sought by the

63

patent owner." In support of this contention, the Transamerica Plaintiffs cite *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985), and *Macrovision Corp. v. Dwight Cavendish Developments, Ltd.*, 105 F. Supp. 2d 1070, 1073 (N.D. Cal. 2000).◻[7] Lincoln disputes the Transamerica Plaintiffs' contention, arguing that neither case cited by the Transamerica Plaintiffs stands for the cited proposition and that, in any event, such a proposition is contrary to law. Lincoln acknowledges that courts do look to the prosecution history to see if a proposed interpretation was disclaimed or disavowed, but points out that resort to the prosecution history for this purpose is not the first step in claim construction.

The court agrees that neither case cited by the Transamerica Plaintiffs even remotely stands for the proposition asserted. In the portion of the *Standard Oil* case cited by the Transamerica Plaintiffs, the court noted the different requirements for the specification and claims set forth in 35 U.S.C. § 112, then the role of the prosecution history in limiting

---

[7] The Transamerica Plaintiffs contend that it follows from this proposition that the court should conclude that the terms of the preamble of Claim **35** constitute positive limitations—a contention that the Transamerica Plaintiffs argue at some length, even though the parties have stipulated in the Joint Claim Construction Statement And Chart that the terms of the preamble to Claim **35** do, indeed, constitute positive limitations of the claims. The Transamerica Plaintiffs also contend that it follows from this proposition that claim terms are limited to a "systematic withdrawal program" wherein the "scheduled payments" are mandatory and the "unscheduled withdrawals" are discretionary and further operate to reduce the amount of future "scheduled payments"; that claim terms are limited to a "systematic withdrawal program" wherein the "guaranteed minimum payment feature" establishes a floor below which the "scheduled payments" will not fall; that claim terms are limited to a "variable annuity plan" wherein the amount of the "scheduled payments" varies from period to period; and that claim terms relating to payments under the annuity plan are limited to the post-annuitization period, and more specifically, that the claim term "benefit payments" relates only to the post-annuitization period and that the claim term "payout term" resides only in the post-annuitization period.

interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. *Standard Oil Co.*, 774 F.2d at 452. Nowhere did the court state or imply that the court's first step in claim construction was "to determine the overall scope of exclusive coverage that is being sought by the patent owner," however. Indeed, the court applied the principles it actually stated only to conclude that the specification of the patent in question in that case expressly stated that "metallic copper when used alone is ineffective" in the claimed process. The court found that the patentee's counsel had responded to a rejection by arguing that a prior patent disclosed the use of a "metallic copper which is outside [the] claims" of the application, so that, "[b]y making this disclaimer or concession, [the patentee] surrendered any interpretation of its claim that would include metallic copper catalysts." *Id.* at 452-53. Similarly, in the portion of the *Macrovision Corp.* decision cited by the Transamerica Plaintiffs, the court stated only that "[t]he file history is often of critical significance in determining the meaning of the claims" and that "[a]ny interpretation that is provided or disavowed in the file history shapes the claim scope." *Macrovision Corp.*, 105 F. Supp. 2d at 1073. The unremarkable proposition that a party can disclaim certain claim scope in the prosecution history applied in *Standard Oil* and *Macrovision* is a far cry from any exhortation to courts to determine the overall scope of exclusive coverage that is being sought by the patent owner as a first step in claim construction.

This is not to say that the court construes patent claim terms oblivious to the context in which they are placed by the claims, specification, and prosecution history. *See, e.g., Intamin, Ltd.*, 483 F.3d at 1334 (under *Phillips*, "the court consults primarily the claims themselves in context, with much of that context supplied by the specification and the prosecution history"). Even so, the starting point for claim construction is not to determine the "overall scope" of the patent coverage, because the Federal Circuit Court

65

of Appeals has reiterated that courts must "begin [their] claim construction analysis with the words of the claim." *Nystrom*, 424 F.3d at 1142. The court's job is to determine "the meaning that the term [in question] would have to a person of ordinary skill in the art in question at the time of the invention," *Phillips*, 415 F.3d at 1313, keeping in mind that "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250).

In short, the court is not required to determine the "overall scope" of the patent as a first step in claim term construction. Instead, the court must begin with the words of the claim, but the court must be mindful of the context of the claim terms, including the claims, specification, and prosecution history of the patent.

### B. Agreed Constructions Of Terms Of The '201 Patent

This court has held that its independent obligation to construe patent claim terms includes an obligation to construe terms for which the parties have agreed on a construction. *Ideal Instruments, Inc.*, 498 F. Supp. 2d at 1184. In performing that independent obligation, this court has not hesitated to reject agreed constructions that the court found included inapposite, inaccurate, or confusing language, and to accept only constructions that were well-supported by the intrinsic evidence. *See id.* In this case, the court finds no deficiencies in the parties' agreed constructions and, instead, concludes that their agreed constructions are well-supported by the intrinsic evidence and the ordinary meanings of the terms in question to one of ordinary skill in the art. Therefore, the court accepts the parties' agreed constructions of various claim terms, as set out in the table beginning on page 43.

66

## C. Disputed Constructions Of Terms Of The '201 Patent

The parties dispute the constructions of some two dozen claim terms in the pertinent claims of the '201 patent. The court will consider the disputed claim terms claim-by-claim and, where appropriate, step-by-step.

### 1. Claim 35: Preamble

The preamble to Claim **35** claims the following, with bold indicating claim terms for which the parties have agreed on a construction and italics indicating claim terms for which the parties dispute the construction:

> **35**. A computerized method for administering a *variable annuity* plan having a *guaranteed minimum payment feature associated with a systematic withdrawal program*, and for *periodically determining an amount of a scheduled payment* to be made to the owner under the plan, **comprising [five] steps**[.]

The '201 patent, Claim **35** (emphasis added). As noted above, the Joint Claim Construction Statement And Chart states that "[t]he parties agree that the preamble of Claim **35** gives life and meaning to the claims, and the terms therein constitute positive limitations of the claim," but then adds that the parties "do not agree upon the interpretation of those limitations." Joint Claim Construction Statement And Chart, 1. Indeed, the Joint Claim Construction Statement shows that the parties dispute the proper constructions of six terms of the preamble to Claim **35**. The court will consider in turn the proper constructions of those six disputed terms. Because Lincoln is the patentee, the court will begin its summary of the parties' arguments concerning the proper construction of each disputed term with Lincoln's construction, if any.

67

### a. "Annuity"

The parties have placed the term "annuity" in the "disputed" category in their Joint Claim Construction Statement And Chart, but the court finds that only Lincoln has offered a construction of that term and that neither party has offered any argument concerning the proper construction of that term. Nevertheless, acting on its independent obligation to construe claim terms, the court will consider whether Lincoln's proffered construction is acceptable. Lincoln contends that "annuity" must be construed as "[a] contract that guarantees the payment or distribution of a sum of money at intervals of time." Lincoln cites intrinsic and extrinsic evidence in support of this construction. Again, the Transamerica Plaintiffs offer no evidence or argument to contradict this construction.

The court finds nothing in either the claim language or the specification that indicates that the patentee intended a special definition of "annuity," *see Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern), although the Background Of The Invention describes a number of specific kinds of annuities. *See* the '201 patent, Col. 1, *l.* 31, to Col. 4, *l.* 27. On the other hand, the court does not find the portion of the Background Of The Invention cited by Lincoln in support of its definition, Col. 2, *l.* 50, to Col. 3, *l.* 6, to be particularly supportive of its definition, because that portion describes a specific kind of annuity, a variable annuity.

Lincoln's construction of "annuity" is, nevertheless, consistent with the ordinary dictionary definition of the term. *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult

a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."). For example, the pertinent definitions of "annuity" in an ordinary dictionary are "a sum of money payable yearly or at other regular intervals," and "a contract or agreement providing for the payment of an annuity." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 47 (10th ed. 1995); OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) ("An investment of money, whereby the investor becomes entitled to receive a series of equal annual payments, which, except in the case of perpetual annuities, includes the ultimate return of both principal and interest."). The court finds that Lincoln's proffered construction of "annuity" "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250). Therefore, the court accepts Lincoln's proffered construction of "annuity" as "[a] contract that guarantees the payment or distribution of a sum of money at intervals of time."

### b. *"Variable annuity"*

*i.* ***Proffered constructions***. The parties do offer competing constructions of the term "variable annuity," as used in the preamble to Claim **35**. Those competing constructions are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Preamble)** | | |
| b. Variable annuity | An annuity in which the owner bears the investment risks, as opposed to a "fixed annuity," in which the insurer bears the investment risks. '201 patent, Col. 2, *ll.* 1-20. | A contract that pays an annuitant "benefit payments" of which the amounts vary in accordance with the market value of the securities in the separate account of the insurer on the respective valuation days. '201 patent, Col. 2, *ll.* 50-55; Col. 7, *ll.* 4-21; Col. 2, *l.* 67- Col. 3, *l.* 33; Col. 18, *ll.* 24-28; '201 Patent Prosecution History at Document Control Numbers LIN078687; LIN078718; LIN078763; LIN078767; LIN078769; LIN078771; FIG. 16 (showing the actual returns are calculated in box 166); THE ANNUITY HANDBOOK, Chapter 6 – Variable Annuities 75, 86-87 (Bennett Affidavit Paragraph 12). |

*ii.* ***Initial arguments of the parties***. In its opening brief on claim construction, Lincoln contends that its construction of "variable annuity" is based on the ordinary meaning of the phrase and is consistent with the specification of the '201 patent and general purpose dictionary definitions. Lincoln contends that, in contrast, the Transamerica Plaintiffs' construction attempts to import multiple unclaimed features into the term, including terms that are not found in the claim at all. In their opening brief, however, the Transamerica Plaintiffs contend that their definition is consistent with the description of "variable annuities" in the specification of the '201 patent and statements

70

by the patentee in the prosecution history of the patent. The Transamerica Plaintiffs contend that these sources make clear that the scheduled payments in a variable annuity vary or "float" in accordance with the market performance of the underlying investment. In its rebuttal brief, Lincoln argues that whether payments vary or not is not what distinguishes a variable annuity from a fixed annuity and that the patentee never argued to the examiner that payments *must* vary from period to period under a variable annuity. In their rebuttal brief, the Transamerica Plaintiffs reiterate their contention that the patentee made public statements in prosecution of the patent concerning the nature of a "variable annuity" upon which the public has a right to rely. Specifically, the Transamerica Plaintiffs argue that the prosecution history shows that the patentee argued that the benefit payments under a "variable annuity" *would* vary.

     ***iii.***     ***Tentative analysis.*** In its tentative analysis, when the court began with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court found that Lincoln's proffered construction does not address in what respect a "variable annuity" is, in fact, "variable." One of ordinary skill in the art, reading the term "variable annuity" in the context of the entirety of Claim **35**, however, would no doubt glean from the steps in the method claimed that what is "variable" may be either or both the account value and the scheduled payment calculated on the basis of some account value. *See, e.g.,* the '201 patent, Claim **35**, step c (periodically determining the account value associated with the plan and making the scheduled payment by withdrawing that amount from the account value).

     Unfortunately, beyond those observations, the court found that the words of the claim provide little insight into the meaning of "variable annuity." Therefore, the court

turned to the specification to see if it provides more guidance. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).

The court noted that it is true, as Lincoln contends, that the Background Of The Invention defines a "variable annuity," in part, as an "annuity contract" in which "the contract owner bears the investment risk during the accumulation phase of the annuity." *See* the '201 patent, Col. 2, *ll*. 10-12. Nevertheless, that is far from all of the explanation or definition of "variable annuity" found in the Background Of The Invention. For example, the Background Of The Invention also explains that the "annuitant(s) bear(s) the investment risk during the distribution, or payout, phase of the variable annuity." *See id.* at Col. 2, *ll*. 12-13. Who bears the investment risk during the distribution phase appears to the court to be as salient a feature of a "variable annuity" as who bears the investment risk during the accumulation phase.

The court found that, still more salient than who bears the risk in each phase of the variable annuity contract, however, is the explanation in the Background Of The Invention of the manner in which the "variable annuity" actually "varies," in comparison to a "fixed annuity." That explanation begins as follows:

> In a fixed annuity, the account value during the accumulation phase can only increase with time. In a variable annuity, the account value during the accumulation phase can either increase or decrease with time, depending on the performance of the fund(s) in which the annuity contract owner has directed that deposits be invested.

72

The '201 patent, Col. 2, *ll*. 21-26. Not only are "variable annuities" and "fixed annuities" distinguished on the basis that the account value of a "variable annuity" can vary during the accumulation phase, while the account value of a "fixed annuity" only increases, but the two kinds of annuities are distinguished on the basis of the dollar value of each annuity payment during the distribution phase:

> In a fixed annuity, the dollar amount of each annuity benefit payment during the distribution phase is known with certainty at the time the account value is applied to the purchase of an annuity benefit option. . . .
> In a variable annuity, the dollar amount of each annuity benefit payment during the distribution phase is not known with certainty at the time the account value is applied to the purchase of an annuity benefit option. Rather, the annuitatant(s) typically receive(s) the value of a specified number of annuity units each month.

The '201 patent, Col. 2, *ll*. 36-39 & 50-55. Examples set forth in the Background Of The Invention then demonstrate that, if the value of an annuity unit in a "variable annuity" changes at a succeeding valuation date, the annuity benefit payment will also change. *Id*. at Col. 2, *ll*. 55-65. Furthermore, while the annuity benefit payments of a "variable annuity" are determinable only as to "annuity units" at the time of the annuity option election, the benefit payments of a "variable annuity" "are not definitely determinable as to dollar amount at the point where the annuity contract owner elects the annuity benefit option from among his or her choices." *Id*. at Col. 2, *l*. 66, to Col. 3, *l*. 6.

In short, the court found that the Background Of The Invention shows that, as the patentee describes a "variable annuity," it is an annuity contract that is "variable" in the sense that the account value may either increase or decrease with time, depending on the performance of the fund(s) in which deposits have been invested, and the dollar amount of the annuity benefit payments may also increase or decrease depending upon the account

value at each succeeding valuation date. This understanding of a "variable annuity," the court found, was also consistent with what little the court concluded, above, could be gleaned from the words of Claim **35**, in their entirety. The parties have not shown that this definition differs from the meaning that the term "variable annuity" would otherwise possess, but to the extent that this definition does differ, the patentee's definition must govern. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).

A consequence of this understanding of a "variable annuity" is that the contract owner bears the investment risk during the accumulation phase of the annuity and that the annuitant bears the investment risk during the distribution, or payout, phase of the variable annuity, but who bears the risk at any phase of the contract simply does not define the provisions of the contract that distinguish it from other contracts. Instead, focusing the construction of "variable annuity" on who bears the risk improperly focuses on the *effect* of those distinguishing provisions. For this reason, Lincoln's definition, which focuses on only one of several effects of the distinguishing provisions of a "variable annuity," rather than on the distinguishing provisions themselves, is not the correct definition.

The construction of "variable annuity" set forth by the court above is also consistent with the prosecution history, which likewise provides a basis for understanding claim terms, *Aquatex*, 419 F.3d at 1380, and serves the purpose of "exclud[ing] any interpretation that was disclaimed during prosecution." *Research Plastics*, 421 F.3d at 1296 (internal quotation marks and citations omitted). As the Transamerica Plaintiffs point out, the prosecution history includes the patentee's definitions of a "variable annuity" as "a contract that, in exchange for a specified amount, pays an annuitant income payments

74

which vary in accordance with the market values of the underlying investments purchased by the specified amount," Exhibit B, Joint Appendix at 139, and as "a contract that pays an annuitant income payments of which the amounts vary in accordance with the market value of the securities in the separate account of the insurer on the respective valuation days." *Id.* at 188. Although the court found that these statements in the prosecution history are consistent with the definition that the court has gleaned from the words of the claim and the specification, they are not, as the Transamerica Plaintiffs apparently contend, such specific disclaimers of any other meaning that they must be used as the specific definitions of the term at issue.

Finally, the court found that neither the claim language, the specification, nor the prosecution history establishes that benefit payments *must* vary in a "variable annuity," as the Transamerica Plaintiffs contend. Rather, all three sources for interpretation of the term reflect that the benefit payments vary *in accordance with* the market value of the underlying investments. Thus, if the market values of the underlying investments show only consistent growth from one valuation to the next, the benefit payments tied to the value of those investments would not necessarily change. Therefore, the benefit payments *may* vary, because the market value of the underlying investments *may* vary, but it would be unduly restrictive to construe the term "variable annuity" to *require* that the benefit payments vary.

Therefore, the court tentatively concluded that the proper construction of the term "variable annuity"—that is, the construction that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250)—is the following: An annuity contract in which the account value may either increase or decrease with time, depending on the performance of the fund(s) in which

75

deposits have been invested, and the dollar amount of the annuity benefit payments may also increase or decrease depending upon the account value at each succeeding valuation date.

      **iv.**     ***Oral and post-hearing arguments***.  At the *Markman* hearing, Lincoln suggested that a "tighter" construction of "variable annuity" would state that account value and benefit payments "may vary," rather than "may increase or decrease." *See Markman* Hearing Transcript at p. 87, *ll*. 1-21.  The Transamerica Plaintiffs, on the other hand, stated that they believed that the "increase or decrease" language was appropriate and was supported by and consistent with the record.  *See id.* at 88, *ll*. 1-8.  The Transamerica Plaintiffs also argued that defining "variable annuity" in terms of payments that "vary" was less illuminating than using the "increase or decrease" language that the court had chosen.  *Id.*

      The parties' post-hearing briefing reflects further unhappiness with the court's tentative construction of "variable annuity."  In their post-hearing brief, the Transamerica Plaintiffs back away from the "increase or decrease" language that they had embraced at the *Markman* hearing, because they argue that the phrases "may increase or decrease . . . depending upon" in the court's tentative construction should be replaced with "varies in accordance with."  The Transamerica Plaintiffs contend that this construction does not *require* the benefit payments or account value to vary, but does properly tie the account value and benefit payments to market performance, so that account value and benefit payments can inherently increase, decrease, or stay the same.  Thus, it appears post-hearing that the parties agree that "vary" is preferable to "increase or decrease."  Other disagreements remain, however.

      In its post-hearing brief, Lincoln contends that the Transamerica Plaintiffs are attempting an "end run" around the court's rejection of their post-annuitization argument

by offering their "vary in accordance with" construction, because the specification makes clear that benefit payments need not vary with market performance. For example, Lincoln points out that, in some embodiments, benefit payments may be tied to the high water mark of account value, so that benefit payments may not thereafter vary from the amount determined by that high water mark of account value. Lincoln then offers its own alternative construction of "variable annuity" to incorporate the "may vary" language that it suggested at the *Markman* hearing and to defeat what Lincoln considers to be the Transamerica Plaintiffs' attempt to reincorporate a post-annuitization limitation. That proposed construction is the following: "An annuity contract in which the account value in the accumulation phase and the annuity benefit payments in the distribution, or post-annuitization, phase may vary over time, depending on the performance of the fund(s) in which deposits have been invested."

In their post-hearing reply brief, the Transamerica Plaintiffs dispute Lincoln's contention that they are attempting any "end run." Instead, they argue that their proposed modification is simply consistent with the court's analysis as well as the claim language and the specification. They then argue that, based on the record, the benefit payments "must be subject to variance" owing to fund performance and other factors affecting account value.

*v.* ***Post-hearing analysis***. The court finds that "may vary" is, perhaps, a "tighter" construction than "may either increase or decrease," and that such a modification is consistent with the claim language, the specification, and the prosecution history. This is so, because, for example, "may vary" includes a "stay the same" condition as well as the polar conditions of increase or decrease in either account value or benefit payments, while "may either increase or decrease" suggests only those polar alternatives. The "may vary" language also necessarily conveys that account value and benefit payments may be

77

"subject to variance"—where "subject to" presumably has its ordinary meaning of "likely or prone to be affected by," OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com), or "having a tendency or inclination: PRONE," MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1172 (10th ed. 1995)—but does not impose a "*must be subject to variance*" limitation, *i.e.*, *must* be likely to vary, where a "*must* be subject to variance" limitation is not supported by the claim language, the specification, or the prosecution history. *See, e.g.,* The '201 patent, Col. 2, *ll.* 22-26 (explaining that, "[i]n a variable annuity, the account value during the accumulation phase *can* either increase or decrease with time, depending on the performance of the fund(s) in which the annuity contract owner has directed that deposits be invested," not *must* either increase or decrease with time) (emphasis added).

Beyond that change, however, the court does not embrace the parties' suggestions for further modifications. The court's construction already demonstrates the relationship between account value and the performance of the fund(s) in which deposits have been invested and the relationship between annuity benefit payments and account value at succeeding valuation dates, so that the "in accordance with" language favored by the Transamerica Plaintiffs is not necessarily an improvement. Indeed, the court already observed above, and reiterates now, that even though the prosecution history includes the patentee's explanations of a "variable annuity" as "a contract that, in exchange for a specified amount, pays an annuitant income payments which *vary in accordance with* the market values of the underlying investments purchased by the specified amount," Exhibit B, Joint Appendix at 139 (emphasis added), and as "a contract that pays an annuitant income payments of which the amounts *vary in accordance with* the market value of the securities in the separate account of the insurer on the respective valuation days," *id.* at 188 (emphasis added), those statements are not such specific disclaimers of any other

78

meaning that they must be used as the specific definitions of the term at issue. Rather, the court's construction relies primarily on the definition disclosed in the specification. *See* The '201 patent, Col. 2, *ll.* 22-26 (explaining that, "[i]n a variable annuity, the account value during the accumulation phase can either increase or decrease with time, depending on the performance of the fund(s) in which the annuity contract owner has directed that deposits be invested"); *id.*, Col. 2, *ll.* 55-65 (if the value of an annuity unit in a "variable annuity" changes at a succeeding valuation date, the annuity benefit payment will also change); *see also Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).

Consequently, the court now concludes that the proper construction of the term "variable annuity"—that is, the construction that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250)—is the following: An annuity contract in which the account value may vary with time, depending on the performance of the fund(s) in which deposits have been invested, and the dollar amount of the annuity benefit payments may also vary depending upon the account value at each succeeding valuation date.

### c. *"Systematic withdrawal program"*

*i. Proffered constructions.* The parties also dispute the construction of "systematic withdrawal program" in the preamble to Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

79

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Preamble) | | |
| c. Systematic withdrawal program | A process for distributing money from a deferred annuity contract without requiring the owner to irrevocably exchange or relinquish the account value and without any guarantee that distributions will continue. '201 Patent, col. 4, *ll.* 5-27; col. 7, *ll.* 45-54. *See* Darlene K. Chandler, THE ANNUITY HANDBOOK 45 (Nat'l Underwriters Co., 4th ed.) and www.retireonyourterms.com/glossary, maintained by the National Association for Variable Annuities, for definitions of a systematic withdrawal program to counter Transamerica's position that payments under such programs are "required." | Required "scheduled payments" taken from the "account value" and made to the owner or beneficiary at the predetermined intervals established by the "period of benefit payment" during the "payout term." '201 Patent Col. 4, ll. 7-24; Col. 4, ll. 46-48; Col. 10, ll. 35- 39; Col. 18, ll. 1-59. |

*ii.* ***Initial arguments of the parties***. In its opening brief, Lincoln contends that the specification makes clear that a "systematic withdrawal program" is an alternative to annuitization for distributing retirement income, because it does not require a relinquishment of account value. However, Lincoln contends that conventional "systematic withdrawal programs" lack guarantees that distributions will continue regardless of how long the contract holder lives. Lincoln contends that the Transamerica Plaintiffs' construction of this term is not the construction that one of ordinary skill in the art would give the term, but simply refers to later claim limitations without defining the phrase at all. Lincoln also argues that the Transamerica Plaintiffs' definition inserts a

80

"required" payments limitation that is contrary to the intrinsic and extrinsic evidence. Instead, Lincoln argues that it is clear from both extrinsic and intrinsic evidence that there is no "requirement" that any distributions actually be made from a "systematic withdrawal program," although the contract holder has the ability to elect to withdraw proceeds under such a program.

For their part, the Transamerica Plaintiffs contend that there are two kinds of monetary distributions claimed in the "systematic withdrawal program" of Claim **35**: "scheduled payments," which are mandatory, and "unscheduled withdrawals," which are not mandatory. They contend that step **d** of Claim **35** clearly demonstrates that "scheduled payments" are mandatory, because it states that the insurance company "adjust[s] the amount of the scheduled payment in response to said unscheduled withdrawal." The Transamerica Plaintiffs argue that there would be no need for the insurance company to adjust the amount of the "scheduled payment" in response to an "unscheduled withdrawal" unless the "scheduled payments" are for a predetermined amount, paid at a predetermined frequency, and the "unscheduled withdrawals" are distributions in excess of the predetermined amount and frequency. The Transamerica Plaintiffs also argue that the mandatory nature of a "scheduled payment" is apparent from the '201 patent specification, which states that the program "calls for" a percentage withdrawal. The Transamerica Plaintiffs also argue that, if the "scheduled payments" were discretionary rather than mandatory, the contract owner, rather than the insurance company, would determine the amount of the initial and subsequent "scheduled payments." In the pertinent part of their rebuttal brief, the Transamerica Plaintiffs reiterate their general contention that the "systematic withdrawal program" term, like all other terms of Claim **35**, relates to a post-annuitized plan, *i.e.*, a plan in the distribution phase. The Transamerica Plaintiffs contend that this is so, because other terms in Claim **35**, including "payment," "payout term," and

81

"benefit payments" would all be understood by one of ordinary skill in the art to be post-annuitization terms.

    ***iii.***     ***Tentative analysis***. In its tentative analysis, in performing its independent obligation to construe the terms of the patent, the court found neither party's construction of "systematic withdrawal program" entirely satisfactory. First, Lincoln's construction does not adequately address or identify the distinguishing provisions of the program or contract. Second, the court finds wholly unconvincing the Transamerica Plaintiffs' contention that the "systematic withdrawal program" relates to the post-annuitized phase of a plan and finds equally unconvincing their argument that "scheduled payments" under a "systematic withdrawal program" are *mandatory*.

    Beginning, as always, with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court again found little that defines or clarifies the meaning of "systematic withdrawal program" in Claim **35** itself. Rather, the court found that the patentee intended the term "systematic withdrawal program" to be understood as the term had been defined in the specification, precisely because the claim itself provides little or no illumination as to the meaning of the term. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).

    Turning to the specification, the court found that, contrary to the Transamerica Plaintiffs' contentions, the Background Of The Invention, the Brief Summary, and the Detailed Description all make clear that a "systematic withdrawal program" is a program

82

of a deferred annuity that is never annuitized or a program during the accumulation phase of a deferred annuity, that is, during the phase in which annuitization is postponed, and that such a program is an alternative to annuitization. Specifically, the Background explains that "[s]ystematic withdrawal programs from active, unannuitized deferred annuity contracts are an alternative mechanism (i.e., an alternative to annuitization) for distributing retirement income to contract holders," during which "liquidity" is maintained. The '201 patent, Col. 4, *ll.* 7-27. Similarly, the Brief Summary distinguishes "aspects" of the invention involving "systematic withdrawal programs" for annuities that are either never annuitized or in which annuitization is postponed, on the one hand, from an "aspect" of the program in which the annuity is annuitized, on the other. *See id.* at Col. 4, *l.* 31, to Col. 5, *l.* 16. The Detailed Description maintains these distinctions, because "systematic withdrawal programs" are only mentioned in relation to the second and third aspects or methods defined, *see id.*, Col. 10, *l.* 35, to Col. 11, *l.* 48 (second "never annuitized" method); Col. 11, *l.* 49, to Col. 14, *l.* 21 (third method in which annuitization is "postponed"), but not in relation to the first aspect or method, which describes an annuitized contract, *see id.*, Col. 7, *l.* 4, to Col. 10, *l.* 34. In short, one of ordinary skill in the art, reading Claim **35** in the context of the specification, *see Aquatex Indus., Inc.*, 419 F.3d at 1380 ("'[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.'") (quoting *Phillips*, 415 F.3d at 1313); *Research Plastics, Inc.*, 421 F.3d at 1295 ("It is presumed that the person of ordinary skill in the art read the claim in the context of the entire patent, including the specification, not confining his understanding to the claim at issue."), could not possibly understand "systematic withdrawal program" to relate to an annuitized contract.

Moreover, contrary to the Transamerica Plaintiffs' contentions, the patentee's use of certain terms in Claim **35** that the Transamerica Plaintiffs contend a person of ordinary skill in the art would associate with an annuitized contract do not mean that the "systematic withdrawal program" necessarily relates to the post-annuitization phase of a plan. The preamble to Claim **35** refers to administration of "a variable annuity plan . . . associated with a systematic withdrawal program," so that annuitization of the plan may occur at some point *after* the systematic withdrawal program has run its course. Thus, terms associated only with a post-annuitization phase, if indeed there are such terms, may relate only to the post-annuitization phase of the claimed plan.

The question that remains, however, is what is a "systematic withdrawal program"? Again, the Background Of The Invention appears to the court to define the term as it is intended to be understood in the context of the '201 patent. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). The Background explains that a "systematic withdrawal program" is a program for withdrawals "from [an] active, unannuitized deferred annuity contract[]" or "mutual fund," as "an alternative to annuitzation," that "provide[s] full liquidity" and that provides "for distributing retirement income to contract holders" in the form of scheduled or systematic "withdrawals" that are either "set at a specified dollar level" or "set as a percent of account value." The '201 patent, Col. 4, *ll.* 7-27.

This construction is consistent with the Brief Summary and Detailed Description, which explain how the invention calculates and adjusts the withdrawals under a systematic withdrawal program to achieve certain ends. *See id.*, Brief Summary, Col. 4, *ll.* 46-54 (describing an aspect of the invention as a withdrawal program, including a systematic

84

withdrawal program, in which distributions are a percentage withdrawal); Col. 4, *l.* 55, to Col. 5, *l.* 65 (describing an aspect of the invention involving a systematic withdrawal program that is "seamlessly" joined to an annuitization); Detailed Description, Col. 10, *ll.* 40-47 (describing a systematic withdrawal program in which the insurer guarantees that withdrawals will last for the period prescribed, if the withdrawals do not exceed a perdetermined percentage established by the insurer); Col. 12, *ll.* 11-34 (describing a withdrawal program in which "partial withdrawals" are made during the "liquidity period"); Col. 12, *ll.* 43-59 (describing a period of "systematic withdrawals" prior to annuitization followed by payments from an annuitized contract). Notably, the ends that the invention is designed to achieve are precisely to address the specific drawbacks of conventional systematic withdrawal programs identified in the Background Of The Invention. *See id.* at Col. 4, *ll.* 12-24 ("[I]f withdrawals are set at a specified dollar level, then these distributions can fully deplete the account value. In other words, the contract holder can outlive the retirement income provided by this method of systematic withdrawal. Alternatively, if withdrawals are set as a percent of account value, then the period of distribution may be extended indefinitely, but a meaningful level of monthly retirement income may not be achieved. For example, if the percentage chosen is too high, the bulk of the account value will be distributed in the early years, leaving a much smaller account value base against which the same percentage will be applied, resulting in inconsequential monthly retirement income payments.").

The court specifically disagrees with the Transamerica Plaintiffs' contention that any withdrawals under a "systematic withdrawal program" are "required" or "mandatory," at least to the extent that the Transamerica Plaintiffs contend that the contract holder must take such withdrawals. The fact that a systematic withdrawal program "calls for" a percentage withdrawal, *see id.* at Col. 4, *ll.* 48-54, means that such a withdrawal must be

available to the contract holder, but does not mean that the contract holder is required to take the withdrawal. As Lincoln elsewhere points out, the Detailed Description states that the contract holder may elect to withdraw less than the allowable withdrawal amount, *see id.* at Col. 12, *ll.* 39-42 (Detailed Description of third method), and may withdraw *up to* the specified percent of account value, *see id.* at Col. 11, *ll.* 29-32 (Detailed Description of second method). Moreover, because the "systematic withdrawal programs" described as aspects of the invention permit the contract holder to make further deposits during the accumulation or liquidity phase, the contract holder could simply redeposit any unneeded systematic withdrawal made by the insurer, thus increasing the amount of subsequent systematic withdrawals. On the other hand, as described, the insurer is required to allow and pay withdrawals under a "systematic withdrawal program," as guaranteed by the terms of the plan, if the contract holder's withdrawals do not exceed the specified percent of account value. *See, e.g., id.* at Detailed Description, Col. 10, *ll.* 40-47 (second aspect or method, explaining that "[u]nder such a program, if these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period").

Thus, in its tentative draft, the court concluded that the construction of "systematic withdrawal program" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A program for withdrawals from an active, unannuitized deferred annuity contract or mutual fund that, as an alternative to annuitzation, provides full liquidity and provides for distributing retirement income to contract holders in the form of scheduled withdrawals that are set either at a specified dollar level or as a percent of account value.

86

*iv.* ***Post-hearing arguments****.* At the *Markman* hearing, the Transamerica Plaintiffs took issue with the court's tentative conclusion that partial withdrawals are permissible (claimed or enabled) by the '201 patent for a systematic withdrawal program, at least one associated with a guaranteed minimum payment feature; rather, they argue that only the "redeposit" scenario envisioned by the court is claimed and enabled by the '201 patent. *Markman* Hearing Transcript at 36-45. Lincoln disputed that contention.

In their post-hearing briefing, without waiving any of their prior arguments, the Transamerica Plaintiffs request modification of the court's tentative construction in two respects: (1) to reflect that Claim **35** imposes upon the insurance company an obligation to make and pay the scheduled withdrawal to the owner, and (2) to eliminate reference to a "mutual fund," because Claim **35** clearly sets forth that the scope of the claim is limited to a "variable annuity plan." As to the first proposed modification, the Transamerica Plaintiffs assert that they are attempting to clarify their prior argument that scheduled payments are "mandatory" by acknowledging that the insurance company cannot physically require the contract holder to accept the distributions, but that the insurance company is under an obligation to make and pay the scheduled withdrawal to the owner. They also contend that the owner's "redeposit" of unneeded systematic withdrawals, as envisioned by the court, is the method actually available under the patent for the contract holder to refuse to take the scheduled payment or to take less than the full amount of the scheduled payment, citing Figure **16**. To reflect their proposed modifications, the Transamerica Plaintiffs proffer the following claim construction, with strike-outs showing deletions from and bold showing additions to the court's tentative construction: A program for withdrawals from an active, unannuitized deferred annuity contract ~~or mutual fund~~ that, as an alternative to annuitzation, provides full liquidity and provides for distributing retirement income to contract holders in the form of scheduled withdrawals that **are**

87

**required by the plan to be made by the insurer at regular intervals, which payments** are set either at a specified dollar level or as a percent of account value.

In its post-hearing response, Lincoln argues that the Transamerica Plaintiffs have not explained the difference between "physically require the contract holder to accept the distributions" and "an obligation upon the insurance company to make and pay the scheduled withdrawal to the owner," nor have they explained how the owner could "redeposit" the payment into the account without first having physically accepted the distribution. Lincoln contends that the court already noted that the Detailed Description explains that the contract holder may elect to withdraw less than the allowable amount, and may withdraw *up to* the specified percentage of account value, and that the court then opined that the contract holder could "redeposit" unwanted distributions, but the court certainly did not limit the claim to that possibility. Lincoln also contends that the Transamerica Plaintiffs' assertion that Figure **16** shows a "redeposit pathway" is a fabrication, because neither the flow chart of Figure **16** nor the corresponding description makes any reference to redepositing unwanted payments. Even if some "redeposit pathway" were disclosed as an embodiment, Lincoln contends that such an embodiment would not limit the claims. Furthermore, Lincoln contends that there is nothing in the intrinsic record that suggests that the insurance company must make a scheduled payment that the owner does not want. Lincoln contends that the court properly recognized that the insurer has guaranteed that it will make such scheduled withdrawals, but that the owner may elect to withdraw a lesser amount. Thus, Lincoln contends that no modification of the court's tentative construction of this claim term is required.

In their post-hearing reply brief, the Transamerica Plaintiffs assert that Lincoln has mischaracterized their positions, and that their proposed modification is intended only to be, and is, entirely consistent with the court's observations that "a withdrawal must be

88

available to the contract holder" and that "the insurer is required to allow and pay withdrawals under a 'systematic withdrawal program.'"

    *v.    Post-hearing analysis*. Taking the Transamerica Plaintiffs' suggested modifications in the order in which they would appear in the construction of the claim term at issue, the court finds that Lincoln has not expressly objected to deletion of the reference to "mutual fund" as a plan to which a "systematic withdrawal program" could apply. The court also agrees with the Transamerica Plaintiffs that Claim **35** does explicitly refer to a "variable annuity plan having . . . a systematic withdrawal program," not to a "mutual fund" having such a program. Nevertheless, the Transamerica Plaintiffs have elsewhere objected to "context specific" definitions of claim terms, arguing that the same claim term must have the same construction in every context in which that claim term appears. *See also Research Plastics, Inc.*, 421 F.3d at 1295 (one canon of claim construction is that "claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims"). The court also reiterates that the Background Of The Invention defines a "systematic withdrawal program," generally, as a program for withdrawals "from [an] active, unannuitized deferred annuity contract[]" that "may also be applied to mutual funds." The '201 patent, Col. 4, *ll.* 7-27. Thus, at least when "systematic withdrawal program" is defined generally (or in isolation) it is a program that may be applied to mutual funds as well as to active, unannuitized deferred annuity contracts. The court believes that this general meaning as well as the specific context of use of the term in Claim **35** can be addressed simply by placing "or mutual fund" in parentheses in the court's construction of the term "systematic withdrawal program," because doing so will acknowledge the possibility of application of such a program to a mutual fund, while

keeping the focus on application of such a program to a variable annuity plan, which is what is at issue in Claim **35**.

The stickier issue is the Transamerica Plaintiffs' second proposed modification of the court's construction of "systematic withdrawal program" to include an explicit statement of the insurer's obligation to make scheduled payments, which is a significant variation from the Transamerica Plaintiffs' original argument that scheduled payments are "mandatory." Lincoln contends that the Transamerica Plaintiffs' proposed modification does not take into account that the contract owner does not have to take the scheduled withdrawal and, instead, may take nothing, may take less than the allowable amount, or may take up to the allowable amount for any scheduled withdrawal.

As noted above, the Detailed Description explains that the insurer guarantees that scheduled withdrawals under the program will be available for the prescribed period, if the scheduled withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, *see* the '201 patent, Detailed Description, Col. 10, *ll.* 40-47; that the contract holder may elect to withdraw less than the allowable withdrawal amount, *id.* at Col. 12, *ll.* 39-42; and that the contract holder may withdraw up to the specified percent of account value, *id.* at Col. 11, *ll.* 29-32. Similarly, the Brief Summary Of The Invention, on which the Transamerica Plaintiffs previously relied, states that a systematic withdrawal program "calls for" a percentage withdrawal. *See id.* at Col. 4, *ll.* 48-54. From these portions of the specification, this court reasoned above, and reiterates here, that the insurer must make scheduled withdrawals "available to the contract holder" and must "allow and pay" scheduled withdrawals, but that the contract holder may elect to take none, some, or all of each scheduled withdrawal, up to the allowable amount or percentage. The court now finds that these concepts can be incorporated into the construction of "systematic withdrawal program" by adding, at the end of the court's

90

construction, language making clear that the insurer must allow and pay the scheduled withdrawal or make it available to the contract holder, but that the contract holder may elect not to take the withdrawal or may elect to take any amount up to the specified dollar level or specified percent of account value.

The court did observe, above, that, because the systematic withdrawal program, as described, permits the contract holder to make further deposits during the accumulation or liquidity phase, the contract holder could simply redeposit any unneeded systematic withdrawal made by the insurer. However, the court did not suggest that such a procedure was the only or preferred means by which the contract holder could take less than the full amount of the scheduled withdrawal or decline to take any of it. Nor is the court persuaded that Figure **16** shows that a "redeposit" method is the only means for a contract holder to take none or less than all of a scheduled payment, although Figure **16** would accommodate a "redeposit" of a scheduled payment like any other kind of deposit. Thus, the court finds it unnecessary to refer to the "redeposit" scenario in its construction of "systematic withdrawal program," where the construction that best aligns with the claim language and the description of the invention focuses on the insurer's obligation to make the scheduled withdrawal available in the guaranteed amount and the contract holder's right to take all, some, or none of the scheduled withdrawal.

Thus, having considered the parties' arguments at the *Markman* hearing and in their post-hearing briefing, the court now concludes that the construction of "systematic withdrawal program" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A program for withdrawals from an active, unannuitized deferred annuity contract (or mutual fund) that, as an alternative to annuitization, provides full liquidity and provides for

91

distributing retirement income to contract holders in the form of scheduled withdrawals that are set either at a specified dollar level or as a percent of account value in which the insurer must allow and pay the full scheduled withdrawal or make it available to the contract holder, but the contract holder may elect to take none, some, or all of the scheduled withdrawal up to the specified dollar level or specified percent of account value.

    *d.*   ***"Guaranteed minimum payment feature associated with a systematic withdrawal program"***

   *i.*   ***Proffered constructions***. The parties also dispute the construction of "guaranteed minimum payment feature associated with a systematic withdrawal program" in the preamble to Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Preamble)** | | |
| d. Guaranteed minimum payment feature associated with a systematic withdrawal program | Distributions or disbursements of money from an annuity plan that do not exceed a predetermined percentage established by the insurer and that are guaranteed by the insurer without a relinquishment of account value by the owner. '201 Patent, col. 4, *l*. 46 – col. 5, *l*. 16; col. 5, *ll*. 55-62; col. 10, *ll*. 43-47. | "Guaranteed minimum payment feature" means that the "scheduled payment" will not fall below an amount (floor) predetermined by the insurance company. '201 Patent, Col. 8, *ll*. 35-48; Col. 8, *l*. 58 – Col. 9, *l*. 3. Therefore, "guaranteed minimum payment feature associated with a systematic withdrawal program" means required "scheduled payments" of an amount equal or greater than a preset minimum (floor) level made on a periodic basis during a systematic withdrawal program. RANDOM HOUSE UNABRIDGED DICTIONARY, 2nd Edition (definition of "associate" – "to unite, combine"). |

  ***ii. Initial arguments of the parties***. In its opening brief, Lincoln contends that its proffered construction of this term is correct, because the part of the specification that corresponds to Claim **35** provides, in pertinent part, that "the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period" provided that "withdrawals do not exceed a predetermined percentage established by the insurer for a given frequency," citing the '201 patent, Col. 10, *ll*. 43-47. Lincoln contends that the Transamerica Plaintiffs' construction, in contrast, imports non-existent limitations into the claim, in part, because the Transamerica Plaintiffs are relying on parts of the specification that relate to true annuitizations, not to parts that describe the method

93

covered by Claim **35**, in which annuitization never occurs or is postponed. In their opening brief, on the other hand, the Transamerica Plaintiffs contend that the plain and ordinary meaning of "associated with" is that the "scheduled payments" made from the "systematic withdrawal program" are *united with* a "guaranteed minimum payment feature," so that the "variable annuity plan" claimed in Claim **35** must have a "guaranteed minimum payments feature" operative during and functioning as part of a "systematic withdrawal program." The Transamerica Plaintiffs contend that Lincoln's definition does not require a "guaranteed minimum payment feature" during a "systematic withdrawal program," but requires only an "annuity plan" tied to a guarantee.

In its rebuttal brief, Lincoln reiterates its contention that the Transamerica Plaintiffs' construction of this term is circular and nonsensical and ignores the ordinary and customary meaning in the art of "systematic withdrawal program." More specifically, Lincoln reiterates that describing the "guaranteed minimum payment feature" as imposing a "floor" amount improperly relies on a part of the specification that is inapposite, because that part of the specification relates to traditional annuities administered in the post-annuitization phase. In contrast, Lincoln contends that the pertinent parts of the specification show that there is no fixed dollar floor. Lincoln also contends that the Transamerica Plaintiffs have mischaracterized Lincoln's construction as associating the guaranteed minimum payment with the annuity plan, instead of with a systematic withdrawal program. Lincoln contends that what it has added to its construction of a systematic withdrawal program is a guaranteed minimum payment feature itself. Lincoln also reiterates that no payments are "required" or "mandatory." In their rebuttal brief, the Transamerica Plaintiffs contend that, because the guaranteed minimum payment feature is associated with a systematic withdrawal program, the distributions from the systematic

94

withdrawal program are required. They also contend that the "guaranteed minimum payment feature" is in existence at the time the payments are being made.

    ***iii.***    ***Tentative analysis***. Again, in its tentative draft, the court did not find either party's proffered construction of this claim term to be entirely satisfactory. The court found that the Transamerica Plaintiffs are correct that Lincoln's construction associates the guaranteed minimum payment feature with an annuity plan, rather than with the systematic withdrawal program of a deferred annuity. On the other hand, the court found that Lincoln is correct that the Transamerica Plaintiffs' construction imports limitations, such as "required" payments, that are not properly part of the claim, and uses parts of the specification that are associated with an "annuitized" plan to define a term associated with a "scheduled withdrawal program," which the court has now construed to apply to an "unannuitized" plan or a plan in which annuitization is postponed until the end of the liquidity phase.

    In its tentative draft, when the court began with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court found that the "guaranteed minimum payment feature" is expressly stated to be "associated with" a "systematic withdrawal program" of a "variable annuity plan" claimed in Claim **35**, not more generally "associated with" the "variable annuity plan" itself. Thus, Lincoln's construction is unsatisfactory, because it improperly associates the "guaranteed minimum payment feature" with "an annuity plan."

    The court found that there did not appear to be any dispute that a person of ordinary skill in the art would understand "associated with" to have its ordinary dictionary meaning. *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary

95

may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."). "Associate," in the sense intended here, means "to join or connect together; COMBINE." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 70 (10th ed. 1995); OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) ("associate" means "to join, combine in action, unite"). Thus, the court concluded that the "guaranteed minimum payment feature" is claimed to be joined or connected to the "systematic withdrawal program." To put it another way, the "guaranteed minimum payment feature" is claimed to be a feature *of* a specific "systematic withdrawal program." The court had already construed, above, the term "systematic withdrawal program." Thus, the critical question for construction of this part of the preamble of Claim **35**, the court concluded, is the meaning of "guaranteed minimum payment feature."

The court found that, like other claim terms construed so far, it appears that the patentee intended the term "guaranteed minimum payment feature" to be understood as the term is defined in the specification, precisely because the claim itself provides little or no illumination as to the meaning of the term. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). Therefore, the court turned to the specification for guidance.

The court noted that a "guaranteed minimum payment" is described in the Brief Summary as a feature of an annuitized variable annuity. *See* the '201 patent, Brief

Summary, Col. 4, *ll*. 31-33. The court concluded, however, that this does not mean that the "guaranteed minimum payment feature" associated with a "systematic withdrawal program" must be available only in an annuitized contract or annuitized phase of a contract, as the Transamerica Plaintiffs contend. Rather, for the reasons stated above, in the court's construction of "systematic withdrawal program," the court concluded that a "systematic withdrawal program," with which the "guaranteed minimum payment feature" is "associated," does not relate to the annuitized phase of an annuity contract.

The court found that the pertinent portion of the Detailed Description for illumination of a "guaranteed minimum payment feature" that is "associated" with a "systematic withdrawal program" is a part of the Detailed Description describing the second, "never annuitized" method:◼[8]

> In addition to distribution methods associated with true annuitizations, *distributions associated with withdrawal programs—including systematic withdrawal programs—from active (unannuitized) deferred annuity contracts are also encompassed by this invention.*
>
> For example, for a given attained age(s) and, where allowed, gender(s), an insurer may permit withdrawals from an active (unannuitized) deferred annuity contract. *Under such a program, if these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period.*
>
> As a hypothetical example, if a male age 60 withdraws 4.4% of the initial account value each year, such withdrawals

---

[8] Again, the court finds that the Detailed Description describes how a "never annuitized" plan can actually be "seamlessly" combined with an "annuitized" plan by postponing the annuitization of the plan until the end of the systematic withdrawal plan applicable to the "liquidity period" of the contract.

97

> are guaranteed to last a lifetime. (Initial account value is that
> account value at the time a systematic withdrawal program,
> inclusive of *this guaranteed minimum benefit payment option*,
> commences.)

The '201 patent, Detailed Description, Col. 10, *ll.*, 35-53 (emphasis added). It is apparent

from this description that the *minimum* percentage of initial account value that the insurer

guarantees that the contract holder *will be able to* withdraw pursuant to the "systematic

withdrawal program" determines the *maximum* percentage that the contract holder can

*actually* withdraw without losing the guarantee. If, for example, the contract holder

*actually* withdraws a smaller percentage or deposits additional assets, or the investment

exceeds its projected growth, then the insurer may be able to pay a larger percentage of

the *initial* account value than the insurer guaranteed at the commencement of the systematic

withdrawal program. On the other hand, if the contract holder withdraws in excess of the

predetermined percentage, then the insurer can no longer guarantee that future withdrawals

will meet the minimum percentage of initial account value promised at the commencement

of the systematic withdrawal program. Thus, in light of this portion of the specification,

a "guaranteed minimum payment feature" (or option) "associated with" a "systematic

withdrawal program" is a feature of a systematic withdrawal program in which the insurer

guarantees that withdrawals of at least a predetermined percentage of initial account value

for a given withdrawal frequency will last the period prescribed, if the (actual) withdrawals

under the systematic withdrawal program do not exceed that predetermined percentage.

Therefore, the court tentatively concluded that the construction of "guaranteed

minimum payment feature associated with a systematic withdrawal program" that "'stays

true to the claim language and most naturally aligns with the patent's description of the

invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316

(quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A feature of a systematic

98

withdrawal program in which the insurer guarantees that withdrawals of at least a predetermined percentage of initial account value for a given withdrawal frequency will last the period prescribed, if the (actual) withdrawals under the systematic withdrawal program do not exceed that predetermined percentage.

   *iv.   Oral and post-hearing arguments*.   At the *Markman* hearing, the Transamerica Plaintiffs argued that a "guaranteed minimum payment feature" means that the scheduled payment will not fall below an amount (floor) pre-determined by the insurance company. *Markman* Hearing Transcript at 6-7.   They asserted that, even with a "guaranteed minimum payment feature," the payments under the systematic withdrawal plan are allowed to vary, but the variance is to a lesser degree, because the "guaranteed minimum payment feature" imposes a "floor" on the payments. *Id*. at 7.   They argued that this effect of a "guaranteed minimum payment feature" was illustrated by examining independent Claim **15**, which is admittedly not at issue in this litigation, but is a claim in which a "guaranteed minimum payment feature" is *not* associated with a systematic withdrawal program, as well as other claims of the patent. *Id*. at 7-9.   In essence, the Transamerica Plaintiffs argued that "guaranteed minimum payment feature" should be separately defined and that the separate definition should then be made a part of the definition of "guaranteed minimum payment feature associated with a systematic withdrawal program." *Id*. at 13.   Finally, the Transamerica Plaintiffs asserted that the "guaranteed minimum payment feature" is a "dollar amount," which is compared to the dollar amount of the payment that would otherwise result from application of the terms of the plan, and the higher dollar amount is paid to the owner. *Id*.

   At the *Markman* hearing, Lincoln rejected all of the Transamerica Plaintiffs' proposed modifications.   More specifically, Lincoln argued that a systematic withdrawal program, as the court elsewhere recognized, can require payments in a fixed dollar amount

or fixed percentage of initial account value, so that the payments under a systematic withdrawal program do not necessarily vary in the absence of a guaranteed minimum payment feature. *Id.* at 15-16. Lincoln also argued that the Transamerica Plaintiffs' arguments concerning "guaranteed minimum payment features" in other contexts missed the significance of the association of a "guaranteed minimum payment feature" with a systematic withdrawal program, as claimed in Claim **35**. *Id.* at 17-18. Lincoln also characterized the Transamerica Plaintiffs' argument that the "guaranteed minimum payment feature" imposes a "floor" as a back door attempt to reintroduce their assertion that "scheduled payments" are "mandatory." *Id.* at 19. Lincoln also asserted that the court should modify its construction to refer to "an account value," rather than "initial account value." *Id.* at 20-23.

In its post-hearing brief, Lincoln again asserts that the construction of this claim term presents one context in which it is proper to refer to "an account value" rather than "initial account value." Lincoln contends that this revision is appropriate, because the court elsewhere recognizes that a withdrawal percentage could be applied to "the initial account value or the account value at some subsequent date, as provided under the terms of the plan." *See, infra*, page 130 (construing "withdrawal rate" in step **a** of Claim **35**).

The Transamerica Plaintiffs respond that Lincoln's proffered revision would impermissibly broaden the scope of the '201 patent beyond that to which Lincoln is entitled. The Transamerica Plaintiffs contend that the court has already provided for the "step up" feature—which allows the guaranteed amount to increase if the "account value" is larger on a policy anniversary date than on the initial or previous policy date—by including in its tentative construction "at least a predetermined percentage of initial value." Therefore, the Transamerica Plaintiffs urge the court to reject Lincoln's proffered post-hearing revision of the construction of this claim term.

100

*v.*   ***Post-hearing analysis***.   The court finds that this is one context in which Lincoln's assertion that the construction should refer to "an account value" rather than to "the account value" or some specified "account value," such as "initial account value," is correct.   The court finds that its reference to "initial account value" in its tentative construction was drawn from a portion of the specification describing a hypothetical example or particular embodiment, not a portion providing a special definition.   *Compare Playtex Prods., Inc.*, 400 F.3d at 906 ("'It is axiomatic that claims, not the specification embodiments, define the scope of protection.'") (quoting *Dow Chem. Co.*, 257 F.3d at 1378); *with Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).   More specifically, the court drew the reference to "initial account value" from what was clearly identified as a "hypothetical example," quoted above, in which the withdrawal percentage was a percentage "of initial account value."   *See* the '201 patent, Detailed Description, Col. 10, *ll.* 48-53.   However, the specification elsewhere describes embodiments in which guaranteed withdrawals are based, for example, on a percentage of the highest account value on any policy anniversary, or what might be called a "high water mark" account value.   *Id.*, Detailed Description, Col. 11, *ll.* 12-34 (describing such an embodiment).   Thus, an "account value" on which the guaranteed minimum payment is based is not necessarily or exclusively the "initial account value" for every variable annuity plan covered by Claim **35**.   The court rejects the Transamerica Plaintiffs' contention that using "an account value," rather than "the initial account value" improperly broadens the scope of Lincoln's claim; rather, the court finds that its tentative construction improperly restricted the scope of Lincoln's claim to a particular embodiment.   *Playtex Prods., Inc.*, 400 F.3d at 906 ("'It is axiomatic that

101

claims, not the specification embodiments, define the scope of protection.'") (quoting *Dow Chem. Co.*, 257 F.3d at 1378).

Also contrary to the Transamerica Plaintiffs' contention, the court did not account for a possible "step up" to a withdrawal percentage based on a "high water mark" account value, rather than a withdrawal percentage based on "initial account value," by referring to "withdrawals of at least a predetermined percentage of initial account value." The "withdrawals of at least a predetermined percentage" language was, instead, a construction of "guaranteed minimum payments." What the court now understands to be taught by the descriptions of certain examples at Col. 10, *ll.* 40-53, mentioned above—now that the court expressly recognizes that those examples are descriptions of embodiments, not special definitions—is that the *minimum* percentage of the *pertinent* account value, which may be the initial account value, that the insurer guarantees that the contract holder *will be able to* withdraw pursuant to the "systematic withdrawal program" determines the *maximum* percentage that the contract holder can *actually* withdraw without losing the guarantee. If, for example, the contract holder *actually* withdraws a smaller percentage or deposits additional assets, or the investment exceeds its projected growth, then the insurer may be able to pay a larger percentage of the *pertinent* account value than the insurer guaranteed at the commencement of the systematic withdrawal program. On the other hand, if the contract holder withdraws in excess of the predetermined percentage of the *pertinent* account value, then the insurer can no longer guarantee that future withdrawals will meet the minimum percentage of the *pertinent* account value promised at the commencement of the systematic withdrawal program. Thus, the "at least" language refers to the predetermined percentage, not to the pertinent account value to which the predetermined percentage is applied to determine the guaranteed payment. The language properly

102

reflecting the possibility that some account value other than the "initial account value" may be the pertinent account value is "an account value."

That is not the end of the matter in the court's view, however. Rather, the court believes that some indication of how the *pertinent* account value is selected is also appropriate. The court concludes, *infra*, at page 130—in its construction of "withdrawal rate," relying on the same descriptions of embodiments in which a percentage withdrawal rate is applied to either the "initial account value," *see* the '201 patent, Col. 10, *ll.* 48-53, or "the highest account value achieved on any policy anniversary following inception of the program," *see id.* at Col. 11, *ll.* 11-34, to determine the amount of withdrawals that are guaranteed to last for the prescribed period—that "withdrawal rate" applies to some account value, and more specifically, applies to the initial account value or the account value at some subsequent date, *as provided under the terms of the plan*. Similarly, here, and for essentially the same reasons, the court concludes that the *minimum* percentage of the *pertinent* account value also applies to the initial account value or the account value at some subsequent date, as provided under the terms of the plan.

Therefore, the court now concludes that the construction of "guaranteed minimum payment feature associated with a systematic withdrawal program" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A feature of a systematic withdrawal program in which the insurer guarantees that withdrawals of at least a predetermined percentage of the initial account value or the account value at some subsequent date, as provided under the terms of the plan, for a given withdrawal frequency will last the period prescribed, if the (actual) withdrawals under the systematic withdrawal program do not exceed that predetermined percentage.

103

### e.   *"Scheduled payment"*

*i.   **Proffered constructions**.*   The parties also dispute the construction of "scheduled payment" in the preamble to Claim **35**.  The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Preamble) | | |
| e.   Scheduled payment | A distribution or disbursement of money in accordance with the guarantees of an annuity plan. '201 Patent, col. 10, *ll.* 43-47 ; col. 11, *ll.* 8-10. See extrinsic evidence cited in connection with a "systematic withdrawal program" to counter Transamerica's position that payments are "required." | A required monetary distribution taken from the "account value" of at least the guaranteed (floor) amount periodically paid at the predetermined intervals established by the "period of benefit payments" during the "systematic withdrawal program." '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 18-47; and Claim 36. |

*ii.   **Initial arguments of the parties**.*   In its opening brief, Lincoln contends that "scheduled payment"◘[9] is defined by the claim language as "guaranteed" and that the corresponding part of the specification covered by the invention provides that "if these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime," citing the '201 patent, Col. 10, *ll.* 43-47.  The Transamerica Plaintiffs contend that "scheduled payments" are contrasted

---

[9]Lincoln separately defines the term "scheduled payment" in the portion of its opening brief defining the next claim term, "periodically determining an amount of a scheduled payment."

with "unscheduled withdrawals" in Claim **35**, so that "scheduled payments" must be mandatory, while "unscheduled withdrawals" are not. Lincoln contends that the Transamerica Plaintiffs have, again, improperly imported unclaimed limitations into the definition of a relatively straight-forward claim term. In their rebuttal brief, the Transamerica Plaintiffs add that it is clear from representations made to the Patent Office that the insurance company calculates the "scheduled payments" using the investment return data.

       ***iii.***      ***Tentative analysis***. In its tentative analysis, when the court began with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court found that the "scheduled payment" in Claim **35** is a "payment to be made to the owner under the plan." *See* the '201 patent, Claim **35**, preamble, Col. 24, *ll*. 15-16. Still more specifically, it is a "*scheduled* payment" under the "plan," which is claimed to be a "variable annuity plan having a guaranteed minimum payment feature associated with a systematic withdrawal program." *Id*. at Col. 25, *ll*. 12-14. Thus, a "scheduled payment" is one of the "systematic withdrawals," in a "guaranteed minimum" amount, "to be made to the owner" under a "systematic withdrawal program" of "a variable annuity plan." *See also id*. at Col. 25, *l*. 23-25 (step **c**) (providing for "withdrawing" the "scheduled payment" from the account value). The fact that a "scheduled payment" is one of the "systematic withdrawals" under such a program, the court found, is reinforced by the claim language providing that a "scheduled payment" is "periodically determin[ed]" and "periodically pa[id]." *See id*. at Col. 25, *l*. 15; *see also id*. at Col. 23-25 (step **c**); Col. 25, *ll*. 30-33 (step **e**). Moreover, step **d** of the claim expressly contrasts a "scheduled payment" with an "unscheduled withdrawal,"

105

which is neither "periodic," nor "systematic," nor "guaranteed," even if it is also made "under the plan." *See id.* at Col. 25, *ll.* 26-29 (step **d**). Finally, dependent Claim **36** equates a "scheduled payment" with a "scheduled withdrawal payment," adding only a specific method for determining the amount of the "scheduled withdrawal payment." *See* the '201 patent, Claim **36**; *Intamin, Ltd.*, 483 F.3d at 1335 (observing that "dependent claims can supply additional context for construing the scope of the independent claims associated with those dependent claims," while adding particular limitations, citing *Phillips*, 415 F.3d at 1314). Thus, the claim language led the court to conclude that a "scheduled payment" is one of the "systematic withdrawals," in a guaranteed minimum amount, under the "systematic withdrawal program."

The court concluded that this reading is reinforced by the ordinary dictionary meanings of "scheduled" and "payment." *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."). For example, "scheduled," as an adjective, means "entered on a schedule or list; included in a schedule." OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com); *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1044 (10th ed. 1995) ("appoint[ed], assign[ed], or designate[d] for a fixed time," from "scheduled" as a *v.*). Thus, the meaning of "scheduled" is comparable to the meaning of "systematic," which is "arranged or conducted according to a system, plan, or organized method." *Id.* Similarly, "payment" means "the action or an act of paying money owed,"

106

so that a "payment" is comparable to a "withdrawal," which is defined as "the removal of money or securities from a bank or other place of deposit." *Id.*

Although the parties have cited parts of the specification in support of their respective constructions of "scheduled payment," the court did not find that any of the cited parts constitute the patentee's special definition of the term. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). Rather, each of the cited parts provides only further inferential support for the conclusion that a "scheduled payment" is a guaranteed "systematic withdrawal" under a "systematic withdrawal program." The '201 patent, Detailed Description, Col. 10, *ll.* 43-47 (explaining the second general method, in part, as follows: "Under such a program [permitting withdrawals from an active (unannuitized) deferred annuity contract], if these withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency, the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period."); Col. 11, *ll.* 8-10 ("[W]ithdrawals in excess of the amounts stated by the insurer to keep the guaranteed payout program in place may alter or may terminate the program."); Brief Summary, Col. 4, ll. 46-54 (briefly describing the second aspect of the invention involving a systematic withdrawal program); Description Of The Flow Charts, Col. 18, ll. 18-47 (explaining that the system determines whether a particular withdrawal is or is not "a scheduled withdrawal," and if so, making various other determinations).

Therefore, the court tentatively concluded that the construction of "scheduled payment" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'"

107

*Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: One of the systematic withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan.

     *iv.*    ***Oral and post-hearing arguments***. At the *Markman* hearing, Lincoln suggested that the court's tentative construction of this term be amended to replace "in a guaranteed minimum amount" with "not to exceed a guaranteed minimum amount." Lincoln argued that this change was consistent with the court's recognition that the specification states that the account owner can take less than or up to the scheduled amount without voiding the guarantee. Lincoln explained that the change was appropriate to avoid an accused infringer's contention that there was no literal infringement if the owner was allowed to take $1 less than the scheduled payment. *See Markman* Hearing Transcript at 55-58. The Transamerica Plaintiffs countered that Lincoln's change exported from the construction numerous limitations that the Transamerica Plaintiffs believed should be incorporated into it. *Id.* at 60-61. Somewhat more specifically, the Transamerica Plaintiffs argued that the construction should incorporate the act of paying money owed at regular intervals (*i.e.*, periodically), *id.* at 63-64, and should also incorporate that the guaranteed minimum payment is a "floor," *id.* at 64-65. Lincoln responded that the Transamerica Plaintiffs were, again, trying to "load up" the construction of a relatively simple term with extraneous additional limitations. *Id.* at 65-67.

     In their post-hearing brief, the Transamerica Plaintiffs requested modification of the court's tentative construction to read as follows, with strikeouts indicating deletions from and bold indicating additions to the court's tentative construction: One of the systematic withdrawals, in **at least** a guaranteed minimum amount, to be made to the owner **at the regular intervals required by** ~~under~~ a systematic withdrawal program of a variable annuity plan, **which, if not taken, may increase the amount of subsequent systematic**

**withdrawals.** The Transamerica Plaintiffs argue that the phrase "in at least a guaranteed minimum amount" is consistent with the court's construction of "guaranteed minimum payment" as a payment guaranteed by the insurer of at least a predetermined percentage of initial account value. The Transamerica Plaintiffs also offered yet another alternative construction of this term, as follows: One of the systematic withdrawals to be made to the owner pursuant to the regular intervals required by the plan, the amount of which increases or decreases in proportion to the account value, but does not decrease below the guaranteed minimum amount.

In its post-hearing response brief, Lincoln counters that the court has already rejected the Transamerica Plaintiffs' attempt to "load up" the construction of "scheduled payment" and that the Transamerica Plaintiffs' argument that reassertion of a "loaded up" construction is somehow consistent with the court's construction is nonsense. For example, Lincoln points out that the court has recognized that an owner may take less than the full amount of a scheduled payment, so that the Transamerica Plaintiffs' conception of the guaranteed minimum amount of the scheduled payment as a "floor" is not correct. Lincoln also argues that there is nothing in the claim or specification that requires that the plan establish a specific payment schedule, so that the Transamerica Plaintiffs' insertion of a "regular intervals" requirement is inappropriate. Lincoln also argues that incorporating a "regular intervals" requirement would render other limitations of the claim redundant or superfluous. Lincoln also argues that the Transamerica Plaintiffs distort the court's tentative draft ruling by asserting that the construction of "scheduled payment" should include reference to withdrawals not taken by the owner. Lincoln argues, further, that the court has recognized that withdrawals cannot exceed the guaranteed minimum amount without losing the guarantee on future withdrawals. Lincoln contends that the Transamerica Plaintiffs' alternative constructions are not supported by the claim or

109

specification. For its part, Lincoln asserts that the only "tightening" of the court's construction that is necessary is that the systematic withdrawals be described to be in an amount "not to exceed" the guaranteed minimum amount, as opposed to "in" a guaranteed minimum amount. This change, Lincoln argues, acknowledges the court's conclusion that the owner can take a smaller percentage than the specified amount, while still maintaining the guaranteed payments.

In their post-hearing reply brief, the Transamerica Plaintiffs assert that there is a fundamental disagreement between the parties concerning whether the scheduled payment is the amount of money that the insurance company is required to pay the contract owner, as they contend, or the amount of money that a contract owner accepts, as Lincoln contends. The Transamerica Plaintiffs argue that the court's tentative order makes clear that the scheduled payment is the amount of money that the insurance company is required to pay the contract owner. The Transamerica Plaintiffs argue that it follows that the guaranteed minimum payment is a "floor." Indeed, the Transamerica Plaintiffs argue that the scheduled payment can exceed the guaranteed minimum amount, depending upon account value. The Transamerica Plaintiffs also argue that the effect of "scheduled" payments cannot be ignored, because that term clearly indicates payment at regular intervals (periodically). The Transamerica Plaintiffs argue that, contrary to Lincoln's assertions, Claim **35** plainly recites a requirement for periodically determining and paying scheduled payments. The Transamerica Plaintiffs argue that this term cannot be properly construed without consideration of the "schedule" involved.

*v.* ***Post-hearing analysis***. Having carefully considered the parties' arguments at and after the *Markman* hearing, the court concludes that no modification of its tentative construction of "scheduled payment" is necessary or appropriate. In the court's view, both parties have confused what is permitted or required by *other* claim limitations with

110

limitations of the claim term, "scheduled payment," now at issue. There appears to be no disagreement and, for the reasons stated above in the court's tentative analysis, there could be no disagreement, that a "scheduled payment" is one of the systematic withdrawals to be made to the owner under a systematic withdrawal program of a variable annuity plan. What the parties fail to recognize is that it is the systematic withdrawal program of the variable annuity plan, separately claimed, that would impose other limitations, such as the "schedule" for or interval of such "scheduled payments," and whether taking or not taking the full amount of a "scheduled payment" or exceeding the guaranteed amount of the "scheduled payment" would change the amount of subsequent "scheduled payments" or void the guarantees of the plan. Moreover, the "scheduled payment" *is* "in a guaranteed minimum amount," pursuant to the terms of the systematic withdrawal program of the variable annuity plan, even if the plan elsewhere allows the owner to take none or less than all of the guaranteed minimum amount or even to exceed that guaranteed minimum amount. To put it another way, the "scheduled payment" that must be made available by the insurer is the full minimum amount guaranteed by the plan, but the insurer has not guaranteed to pay any amount in excess of that guaranteed minimum amount, nor is the insurer permitted to make available only some amount less than the guaranteed minimum amount, even if the owner decides to take less. In short, in the context of a particular scheduled payment, the guaranteed minimum amount is neither the "floor" nor the "ceiling" for the scheduled payment; it *is* the amount of the scheduled payment determined by the terms of the systematic withdrawal program of a variable annuity plan.

Therefore, the court reiterates that the construction of "scheduled payment" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: One of the systematic

111

withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan.

    *f.*   *"Periodically determining an amount [of a scheduled payment]"*

   *i.*   *Proffered constructions*.   The parties also dispute the construction of "periodically determining an amount [of a scheduled payment]" in the preamble to Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Preamble) | | |
| f.   Periodically determining an amount [of a scheduled payment] | From time to time calculating or establishing the amount of money to be distributed or disbursed in accordance with the guarantees of the annuity plan. '201, Patent col. 10, *ll.* 43-47; col. 11, *ll.* 8-10. WEBSTER'S NINTH COLLEGIATE DICTIONARY 875 (1991) (defining "periodic" as "occurring or recurring at regular intervals"); THE AMERICAN HERITAGE DICTIONARY 923 (2d ed. 1982) (defining "periodic" as "[h]aving periods or repeated cycles."). | The action undertaken at time intervals established by the "period of benefit payments" in which the insurance company authoritatively sets the amount of the required "scheduled payment" based upon the performance of the investments within the variable annuity account (net investment returns) as a necessary precursor to calculating and making the next required, minimum "scheduled payment" of at least the guaranteed (floor) amount. '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 24-28; '201 Patent Prosecution History at Document Control Numbers LIN078687; LIN078718; LIN078763; LIN078767; LIN078769; LIN078771; FIG. 16 (showing the actual returns are calculated in box 166). |

*ii.   **Initial arguments of the parties**.  In its opening brief, Lincoln contends that its definition of this claim term is based upon the claim language and the corresponding specification.  Specifically, Lincoln contends that its definition of "periodic" comports with the definition of the term in general purpose dictionaries and that nothing in the intrinsic record contradicts such a definition.  Lincoln contends that the Transamerica Plaintiffs are, again, importing non-existent limitations into the claim by inserting words found nowhere in the claim or parts of the specification that relate to a systematic withdrawal program, even if some of those terms are found in parts of the specification that relate to an annuitized contract.  It is not clear to the court whether the Transamerica Plaintiffs have offered any argument or cited any portion of the patent or its prosecution history in support of their definition of "periodically," but the Transamerica Plaintiffs do expressly argue that "determining" the "scheduled payment" is based on investment return data.  In support of their contention, they cite the portion of the specification describing the flow chart for calculation of account value; the definition of "variable annuity" in the prosecution history, which notes that the payments under such an annuity vary in accordance with market values of the underlying investments; and Figure **16**, which they contend shows that the amount of the scheduled withdrawal payment is "calculated" by the system/insurer, as opposed to the annuitant.

In its rebuttal brief, Lincoln contends that "determining" cannot be limited, as the Transamerica Plaintiffs assert, to a calculation based on the performance of the investments within the variable annuity account, because, *inter alia*, not every variable annuity plan includes a systematic withdrawal program.  Lincoln contends that nothing about "periodically determining an amount of a scheduled payment" supports an interpretation that scheduled payments *must* vary in accordance with market conditions, because such payments would need to be periodically determined even if the scheduled payments only

113

*may* vary, based upon a number of different circumstances, including excess withdrawals, additional deposits, or restatement of account value based on the terms of the annuity contract itself, for example, to account for a highest account value as the basis for subsequent calculations. In their rebuttal brief, the Transamerica Plaintiffs reiterate their contention that the prosecution history shows that the insurance company determines the "scheduled payments" using the investment return data.

    ***iii.***     ***Tentative analysis.***   In its tentative analysis, when the court began with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court found that the language of Claim **35** settles the question of who—or what—"periodically determin[es] an amount of a scheduled payment," which the Transamerica Plaintiffs apparently believe is disputed. Claim **35** expressly claims "[a] computerized method for . . . periodically determining an amount of a scheduled payment." The '201 patent, Claim **35**, preamble, Col. 25, *ll*. 12-15. The court also construed, above, the meaning of "scheduled payment." Thus, the court found that the remaining issues for construction of this claim term are the meaning of "periodically" and "determining."

    Lincoln construes "periodically" as "from time to time," asserting that this is the ordinary dictionary meaning of "periodically," and that nothing in the intrinsic evidence contradicts that meaning. The Transamerica Plaintiffs contend that "periodically" means "at time intervals established by the 'period of benefit payments,'" relying on the claim language and intrinsic evidence. The court is not completely satisfied with either of these constructions.

114

To obtain an understanding of the ordinary meaning of the word "periodically," the court turned to ordinary dictionaries. *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."). The ordinary dictionary definition of "periodically" is, for example, "at regular intervals of time" and "from time to time: FREQUENTLY." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 864 (10th ed. 1995); OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) (defining "periodically" as "at regularly recurring or definite intervals" and "from time to time, occasionally"). Thus, the court found that Lincoln has selected the broadest of the ordinary dictionary meanings of "periodically" as "from time to time." The court concluded, however, that intrinsic evidence suggests that a narrower meaning, "at regular intervals of time" or "at regularly recurring or definite intervals," is the appropriate meaning. *See Free Motion Fitness, Inc.*, 423 F.3d at 1348-49 ("Under *Phillips*, the rule that 'a court will give a claim term the full range of its ordinary meaning,' *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), does not mean that the term will presumptively receive its broadest dictionary definition or the aggregate of multiple dictionary definitions, *Phillips*, 415 F.3d at 1320-1322. Rather, in those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the intrinsic evidence in order to determine the most appropriate [dictionary] definition. *Id.* at 1322-23, 1324."). This is so, because Claim **35** states that the periodic determination is of a "scheduled payment," *i.e.*, the determination of a payment made

115

according to a schedule, not merely the determination of a payment made "from time to time."

The court concluded that this construction is consistent with the Transamerica Plaintiffs' assertion that the periodic determination is made "at time intervals established by the 'period of benefit payments,'" and the parties' constructions of "period of benefit payments." As the court read the claims and specification, "periodically" in the preamble to Claim **35** refers to a determination made at the same *frequency* as scheduled payments, where, as explained below, beginning on page 144, the parties have essentially agreed that "period of benefit payments" refers to the interval or frequency of payments, rather than to the *total period* prescribed for withdrawals, which may include a lifetime period. Moreover, the claims and specification further support reading "periodically" to refer to an action taken at some specific interval or frequency, not to actions taken over an entire term. *See, e.g.*, the '201 patent, Claim **35**, step **c** (periodically determining the account value and making the scheduled payment by withdrawing that amount from the account value); step **e** (periodically paying the scheduled payment for the period of benefit payments); Detailed Description, Col. 10, *ll.* 42-47 ("Under [a withdrawal program described as the second method], if these withdrawals do not exceed a predetermined percentage established by the insurer *for a given withdrawal frequency*, the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period.") (emphasis added).

Turning from "periodically" to "determining," the court found that the parties' proffered ordinary meanings of "determining" as "calculating" (Lincoln's) or "setting" (the Transamerica Plaintiffs') are consistent with each other and with the applicable ordinary dictionary meanings and, moreover, that those ordinary meanings are not contradicted by any intrinsic evidence. *See* MERRIAM WEBSTER'S COLLEGIATE

116

DICTIONARY 315 (10th ed. 1995) (defining "determine," in pertinent part, to mean "to find out or come to a decision about by . . . calculation"); OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) (defining "determine," in pertinent part, to mean "to ascertain definitely by . . . calculation"). Therefore, the court concluded that the appropriate construction of "determining" is, at least in part, "calculating."

The Transamerica Plaintiffs also contend, however, that the required "determination" must be construed to mean a determination based on investment return data. The court found that this construction imposes too narrow a limitation in light of the claim language and specification. Step **c** of Claim **35** states that the determination of the "scheduled payment" is made in relation to the periodic determination of "the account value associated with the plan." *See* the '201 patent, Claim **35**, step **c**, Col. 25, *ll*. 23-25. It does not say that the determination of the "scheduled payment" is made in relation to the investment return data, nor does it say that the sole factor in the determination of the account value is the investment return. Moreover, the claims and specification indicate that several factors, besides investment return, can influence the account value, and hence, the amount of a "scheduled payment," including whether the contract holder has elected to withdraw less than the allowable withdrawal amount, *see id*. at Col. 12, *ll*. 39-42 (Detailed Description of third method), whether the contract holder has made unscheduled or excess withdrawals, *see id.*, Claim **35**, step **d**, and whether the contract holder has made further deposits during the accumulation phase in which the "systematic withdrawal program" is active, *see id*. at Col. 11, *ll*. 40-63 ("deferred annuity account value (or mutual fund account value) must be maintained as usual for deferred annuities (or mutual funds), with special adaptation for additional deposits and for withdrawals in excess of the calculated withdrawal amount. . . ."); *see also id.*, Brief Summary, Col. 4, *ll*. 52-54 ("[A]ccount value varies due to withdrawals, fees and expenses, and appreciation."); *id.*,

117

Detailed Description, Col. 11, *ll.* 16-17 ("[A]ccount value necessarily recogniz[es] all withdrawals and fees as well as appreciation.").

Therefore, the court tentatively concluded that the construction of "periodically determining an amount of a scheduled payment" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: At the regular intervals for scheduled payments, calculating the amount of a scheduled payment based on the account value associated with the plan.

      *iv.*    **Oral and post-hearing arguments**.    At the *Markman* hearing, the Transamerica Plaintiffs suggested that "determining" had been construed too narrowly by the court as "calculating," because the "determination" in question involves more than a simple arithmetic exercise. For example, they contend that the "determination" requires action by the insurance company to establish the criteria used by the computer to "calculate" the amount of the scheduled payment. *Markman* Hearing Transcript at 77-78. Lincoln contended that, in some contexts, the "determination" is a simple exercise of arithmetic. Lincoln also agreed with the court's suggestion that "determining" might not need any separate construction at all. *Id.* at 83.

In post-hearing briefing, the Transamerica Plaintiffs also request modification of part of the construction of this term. Specifically, they assert that the construction should reflect who makes the determination (the "computerized method," which they equate with the insurance company), and they assert that "determining" should be construed as "specifying" rather than "calculating," because more than simple arithmetic is involved

in determining the amount of the scheduled payment.◼[10]  Thus, they propose that the proper construction of the term is the following, with strikeouts showing deletions from and bold showing additions to the court's tentative construction:  At the regular intervals for scheduled payments, ~~calculating~~ **the insurance company's action to specify** the amount of a scheduled payment based on the account value associated with the plan.

For its part, in post-hearing briefing, Lincoln rejects the Transamerica Plaintiffs' requested modifications, because the owner may participate in the determination of the amount of scheduled payments, and because "calculating" is appropriate where the determination may, in fact, be a simple mathematical calculation and, in any event, "determining" may not need any separate definition.  Lincoln does contend, however, that "the account value" in the court's construction should be modified to "an account value," because different embodiments of the invention may rely on something other than the current account value, such as a "high water mark" account value, to determine the amount of a particular scheduled payment.

In their post-hearing reply, the Transamerica Plaintiffs dispute Lincoln's assertion that the construction should be "an account value," rather than "the account value," because use of "an account value" would improperly expand the scope of the claim coverage beyond what is claimed and specified.  More specifically, the Transamerica Plaintiffs argue that the only account value at issue in Claim **35** is the account value referred to in other steps of Claim **35**, so that it is a particular account value at the time of the determination of the scheduled payment.

---

[10]The Transamerica Plaintiffs assert that similar changes should also be made to the construction of "determining an initial scheduled payment" in step **b** of Claim **35**.

119

*v.*    ***Post-hearing analysis***.  Taking the parties' post-hearing contentions in turn, the court reiterates that the language of Claim **35** settles the question of who—or what—"periodically determin[es] an amount of a scheduled payment," which the Transamerica Plaintiffs continue to assert is a crucial matter.  Claim **35** expressly claims "[a] computerized method for . . . periodically determining an amount of a scheduled payment."  The '201 patent, Claim **35**, preamble, Col. 25, *ll*. 12-15.  Whatever role the insurance company or the contract owner may have in selecting the value for various variables that may go into the determination, it is the claimed "computerized method" that ultimately makes the determination of the amount of a particular scheduled payment, not the insurance company or the contract owner unilaterally.  Moreover, the contract owner's ability to decline to take any or some part of a scheduled payment does not mean that the contract owner has "determined the amount of a scheduled payment" under the terms of the plan, where it is the computerized program that has determined what the amount of the scheduled payment in question would be under the terms of the plan absent some further decision by the owner concerning whether the owner will take none, some, or all of that particular scheduled payment.  Therefore, the court rejects the Transamerica Plaintiffs' contention that the construction of this term should specify that the action in question is taken by the insurance company, because the action in question is actually taken by the claimed "computerized method."

Next, the court turns to the Transamerica Plaintiffs' contention that the court should substitute "specifying" for "calculating" as the court's construction of "determining."  In the court's view, "calculating" does not necessarily suggest just "simple" arithmetic, or even use of only mathematical processes.  *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 315 (10th ed. 1995) (defining "determine," in pertinent part, to mean "to find out or come to a decision about by . . . calculation"); *id*. at 161 ("calculate" means "to

120

determine by mathematical processes," but also means "to reckon by exercise of practical judgment: ESTIMATE" and "to solve or probe the meaning of: FIGURE OUT"). "Specifying," on the other hand, does not appear to the court to be an appropriate construction, where "specify" means "to name or state explicitly or in detail." *Id.* at 1129. More than mere "naming" or "stating explicitly or in detail" is involved in the determination of the amount of a scheduled payment, and "specifying" does not encompass any of the "calculation" involved in "determining" the amount of a scheduled payment (or anything else). Thus, to the extent that "determining" requires any construction at all in the context of Claim **35**, the court is satisfied that "calculating" is a more appropriate construction than "specifying."

The court is equally unimpressed by Lincoln's post-hearing assertion that the construction in question should state "an account value" rather than "the account value." It is true that step **a** of Claim **35** claims storing data "relating to at least one of an account value," so that Claim **35** does envision the existence of more than one account value. *See* the '201 patent, Claim **35**, step **a**, Col. 25, *ll.* 19-20. On the other hand, step **c** of Claim **35** states that the determination of "the scheduled payment," that is, the particular scheduled payment in question, is made in relation to the periodic determination of "the account value associated with the plan," apparently meaning a particular account value. *See* the '201 patent, Claim **35**, step **c**, Col. 25, *ll.* 23-25. Further steps of Claim **35**, other claims, and the specification make clear that, in various embodiments, the account value that determines the amount of a particular scheduled payment may be an "initial" account value, *see, e.g., id.*, Claim **36**, Col. 25, *ll* 34-44; an account value adjusted in response to unscheduled withdrawals, *id.*, Claim **35**, step **d**; or a "high water mark" account value, *id.*, Detailed Description, Col. 11, *ll.* 12-34 (describing an embodiment in which guaranteed withdrawals are based on a percentage of the highest account value on any

121

policy anniversary).  Nevertheless, only *one* of those account values can be the basis for the determination of the amount of any particular scheduled payment.  The language used in the court's construction, "the account value associated with the plan," recognizes that the terms of the plan will determine which of the possible account values is *the* account value for determination of the amount of any particular scheduled payment.

Therefore, the court reiterates that the construction of "periodically determining an amount of a scheduled payment" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following:  At the regular intervals for scheduled payments, calculating the amount of a scheduled payment based on the account value associated with the plan.

### 2.    *Claim 35:  Step a*

Step **a** claims the following step in the computerized method claimed in Claim **35**, with bold indicating claim terms for which the parties have agreed on a construction and italics indicating claim terms for which the parties dispute the construction:

> a) **storing data relating to a variable annuity account**, including data relating to at least one of an *account value*, a *withdrawal rate*, a scheduled payment, a *payout term* and a *period of benefit payments*.

The '201 patent, Claim **35**, step **a** (emphasis added).   The Joint Claim Construction Statement And Chart shows that the parties dispute the proper constructions of five terms in step **a** of Claim **35**.  The court will consider in turn the proper construction of each of those terms.

### a.    *"Account value"*

*i.*   ***Proffered constructions***.   The parties dispute the construction of "account value" in step **a** of Claim **35**.   The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step a)** | | |
| g.   Account value | The dollar value of or amount of proceeds associated with a variable annuity account, that includes deposits and earnings, less disbursements, withdrawals or payments, benefits, and charges. '201 Patent, col. 11, *l*. 57 - col. 12, *l*. 10. | A monetary value that is maintained on a variable annuity contract upon which the required "scheduled payments" are based. '201 Patent, Col. 7, *ll*. 44-54; Col. 18, *ll*. 13-36. |

*ii.*   ***Initial arguments of the parties***.   In its opening brief, Lincoln contends that the specification provides that the "account value" is increased by "additional deposits" and decreased by benefit payments and withdrawals in excess of the calculated withdrawal amount, among other things.   Lincoln acknowledges that the Transamerica Plaintiffs' construction is correct, insofar as it refers to monetary value, but that the Transamerica Plaintiffs' construction then goes astray by improperly adding inapposite limitations.   The Transamerica Plaintiffs contend that their construction is correct, however, because the account value is calculated before the amount of a scheduled payment is determined, so that a scheduled payment is based on the account value.   In their rebuttal brief, the Transamerica Plaintiffs argue, further, that investment return must be used to calculate account value and that the account value must be known before any scheduled payment is made, because the scheduled payments vary in accordance with the market performance of the underlying investments.

123

***iii.***     ***Tentative analysis***. In its tentative draft, the court agreed with Lincoln that the construction of "account value," standing alone, does not require the court to determine whether "account value" is the basis for determining a "scheduled payment" or anything else. Rather, the *claims* will demonstrate the uses to which the "account value" may be put in the invention. In contrast, the manner in which "account value" is itself determined is a relevant part of the construction of that claim term.

The court agreed with the parties that "account value" is the dollar or monetary value associated with a variable annuity contract. Moreover, as explained above, the claims and the specification make clear that the dollar or monetary value associated with the contract is influenced by several factors in addition to investment return, including whether the contract holder has elected to withdraw less than the allowable withdrawal amount, *see id.* at Col. 12, *ll.* 39-42 (Detailed Description of third method); whether the contract holder has made unscheduled or excess withdrawals, *see id.*, Claim **35**, step **d**; and whether the contract holder has made further deposits during the accumulation phase, *see id.* at Col. 11, *ll.* 40-63 ("deferred annuity account value (or mutual fund account value) must be maintained as usual for deferred annuities (or mutual funds), with special adaptation for additional deposits and for withdrawals in excess of the calculated withdrawal amount. . . ."); *see also id.*, Brief Summary, Col. 4, *ll.* 52-54 ("[A]ccount value varies due to withdrawals, fees and expenses, and appreciation."); *id.*, Detailed Description, Col. 11, *ll.* 16-17 ("[A]ccount value necessarily recogniz[es] all withdrawals and fees as well as appreciation."). Consequently, a construction limiting the determination of "account value" to market performance or investment return is too limiting.

Therefore, the court tentatively concluded that the construction of "account value" that "'stays true to the claim language and most naturally aligns with the patent's

description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The dollar or monetary value associated with a variable annuity contract, including deposits and investment return, less withdrawals or payments, fees, and expenses.

 *iv.* ***Oral and post-hearing arguments***. In their post-hearing brief, the Transamerica Plaintiffs requested a "slight modification" of the court's tentative construction of "account value." They argue that the construction of the term should be made more consistent with the court's analysis by recasting it as follows, with bold indicating language that the Transamerica Plaintiffs believe should be added: The **varying** dollar or monetary value associated with a variable annuity contract, including deposits and investment return **and withdrawal amounts paid, but not taken by the owner**, less withdrawals or payments **paid and taken by the owner**, fees, and expenses. The Transamerica Plaintiffs request that the same modifications be reflected in the "periodically determining account value" term discussed below.

 At the *Markman* hearing, Lincoln suggested that, in various contexts, the court should use care to refer to "an" account value, rather than to "the" account value, because account value may be determined on numerous occasions. *See, e.g., Markman* Hearing Transcript at 22, *ll.* 4-13. In its post-hearing brief, Lincoln responds to the Transamerica Plaintiffs' proposed modifications by asserting that those modifications are absurd, because there is no such thing as a withdrawal (or payment) "paid, but not taken by the owner." Rather, Lincoln argues that the specification makes clear that the owner may receive amounts less than the guaranteed amount, so that amounts that the owner elects not to receive never leave the account and, consequently, cannot increase or decrease the account value. If, as the court suggested, payments are made, but then redeposited in whole or in part, because they were not wanted, the court's construction of "account value" already

takes into account the decrease in the account value by the amount of the payment and the subsequent increase by the redeposit. Thus, Lincoln asserts that the Transamerica Plaintiffs' clarification does not clarify anything.

In their post-hearing reply brief, the Transamerica Plaintiffs contend that a payment "made but not taken by the owner" is simply a redeposited payment. The Transamerica Plaintiffs argue that such a redeposit increases the account value.

*v.*     ***Post-hearing analysis***.   Upon review of the parties' arguments at the *Markman* hearing and in their post-hearing briefs, the court finds that only a modest change is required to the court's tentative construction of "account value." More specifically, although the Transamerica Plaintiffs now assert that an "account value" is not just "the dollar or monetary value associated with a variable annuity contract," but "the *varying* dollar or monetary value associated with a variable annuity contract," the court does not agree. Certainly, the account value may "vary" over time, but at any valuation date, the account value has only one dollar or monetary value. Thus, adding "varying" to "dollar or monetary amount" would only serve to confuse, not clarify, the meaning of the term. Although the court acknowledges Lincoln's observation that it is generally appropriate to refer to "an" account value, rather than to "the" account value, because the account value can vary over time, *see, e.g.,* The '201 patent, Claim **35**, step **a** (claiming "at least one account value"), the court notes that there can be only *one* account value at any given time or valuation date, so that it is proper to refer to "the" account value and "the" dollar or monetary amount, if the court adds the further limitation "at a given time or valuation date." Thus, the first clause of the construction of "account value" will be modified to state that "account value" is "the dollar or monetary value associated with a variable annuity contract *at a given time or valuation date*."

126

The court is unpersuaded by the Transamerica Plaintiffs' contentions that the construction of "account value" requires further modification, however. As Lincoln contends, the court believes that the court's construction of "account value" as "including deposits and investment return, less withdrawals or payments, fees, and expenses" addresses all deposits and withdrawals. Thus, that construction necessarily includes any change in value resulting from an owner's redeposit of unwanted withdrawals actually made by the insurer as well as payments and withdrawals paid by the insurer and taken by the owner. Consequently, the court finds it unnecessary to add that account value includes "withdrawal amounts paid, but not taken by the owner" along with deposits and investment returns or that account value is reduced by "withdrawals or payments paid and taken by the owner," despite the Transamerica Plaintiffs' contention that such limitations should be explicitly stated.

Therefore, the court now concludes that the construction of "account value" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The dollar or monetary value associated with a variable annuity contract at a given time or valuation date, including deposits and investment return, less withdrawals or payments, fees, and expenses.

**b.** **"*Withdrawal rate*"**

**i.** **_Proffered constructions_**. The parties also dispute the construction of "withdrawal rate" in step **a** of Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

127

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Step a) | | |
| h. Withdrawal rate | A percentage that may be applied when determining amounts to be distributed. '201 Patent, col. 11, *ll*. 11-22; col. 25, *ll*. 43-44. | A predetermined percentage of the "account value" which percentage is established by the insurance company for a given "scheduled payment" made during the "systematic withdrawal program." '201 Patent, Col 10, *ll*. 40-47; Prosecution History of US Patent Application No. 09/804,667 at page 9 of the April 6, 2006 Office Action Response. |

*ii.*     ***Initial arguments of the parties***.  In its opening brief, Lincoln notes that the

parties appear to agree that "withdrawal rate" is a percentage of some value to determine

withdrawals permitted under the plan.  Lincoln contends, however, that nothing in the

claim requires that the withdrawal rate be applied to account value to determine a given

scheduled payment, as the Transamerica Plaintiffs contend.  Indeed, Lincoln contends that,

in various embodiments, the withdrawal rate is applied to "initial account value" and/or

"the highest account value achieved on any policy anniversary."  Lincoln also points out

that, in step **a**, what is claimed is simply that the withdrawal rate is "stored" as part of the

claimed administrative method.  On the other hand, the Transamerica Plaintiffs contend

that, according to Figure **16** and parts of the specification, the "account value" is

calculated before the amount of the "scheduled payment" or "scheduled withdrawal

payment" is determined.  In their rebuttal brief, the Transamerica Plaintiffs contend that

Lincoln's own arguments concerning an "unscheduled withdrawal" and similar language

128

in the specification show that the insurer establishes the predetermined percentage to keep the guaranteed payment program in place.

        *iii.*    ***Tentative analysis.***   In its tentative draft, the court found Lincoln's construction of "withdrawal rate" problematic, because it does not make clear to what the "withdrawal rate" is applied to determine amounts to be distributed, and because it does not take into account the context of the claim in which the term is found. When the court begins with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court finds that Lincoln is correct that step **a** of Claim **35**, standing alone, only requires "storing" of certain data, including data relating to "a withdrawal rate," but does not specify the use to which this "withdrawal rate" is put or to what it applies. Nevertheless, the parties have stipulated that the preamble to Claim **35** "gives life and meaning to the claims, and the terms therein constitute positive limitations of the claim." Joint Claim Construction Statement And Chart, 1; *see also Aquatex Indus., Inc.*, 419 F.3d at 1380 ("'[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.'") (quoting *Phillips*, 415 F.3d at 1313); *Research Plastics, Inc.*, 421 F.3d at 1295 ("It is presumed that the person of ordinary skill in the art read the claim in the context of the entire patent, including the specification, not confining his understanding to the claim at issue."). Thus, step **a** must be read in the context of "a computerized method for administering a variable annuity plan having a guaranteed minimum payment feature associated with a systematic withdrawal program and for periodically determining an amount of a scheduled payment to be made to the owner under the plan." The '201 patent,

Claim **35**, preamble. In that context, it becomes clear that the "withdrawal rate" must be the rate that determines the "guaranteed minimum payment" for "scheduled payments" in the "systematic withdrawal program." Unfortunately, this context still does not make clear to what the "withdrawal rate" is applied to determine such payments. On the other hand, dependent Claim **36** claims the method of Claim **35**, with certain additional limitations, but specifically claims that "WD rate=% of the initial account value used to determine the initial scheduled payment." *Id.*, Claim **36**; *see also Intamin, Ltd.*, 483 F.3d at 1335 (observing that "dependent claims can supply additional context for construing the scope of the independent claims associated with those dependent claims," while adding particular limitations, citing *Phillips*, 415 F.3d at 1314). Thus, this dependent claim suggests that "withdrawal rate," in the related independent claim, is a percentage of some account value.

In its tentative draft, the court next turned to the specification for further guidance. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). The court found that Lincoln is correct that the specification describes embodiments in which a percentage withdrawal rate is applied to either the "initial account value," *see* the '201 patent, Col. 10, *ll.* 48-53, or "the highest account value achieved on any policy anniversary following inception of the program," *see id.* at Col. 11, *ll.* 11-34, to determine the amount of withdrawals that are guaranteed to last for the prescribed period. Thus, the court reasoned that it is apparent that the "withdrawal rate" does apply to some account value, as surmised from the claim language, and more specifically, applies to the initial account value or the account value at some subsequent date, as provided under the terms of the plan.

130

As the Transamerica Plaintiffs contend, the specification also states, in a general description of a systematic withdrawal program covered by the invention, that the "withdrawal rate" is "a predetermined percentage established by the insurer":

> In addition to distribution methods associated with true annuitizations, distributions associated with withdrawal programs—including systematic withdrawal programs—from active (unannuitized) deferred annuity contracts are also encompassed by this invention.
>
> For example, for a given attained age(s) and, where allowed, gender(s), an insurer may permit withdrawals from an active (unannuitized) deferred annuity contract. Under such a program, if these withdrawals do not exceed *a predetermined percentage established by the insurer for a given withdrawal frequency,* the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period.

The '201 patent, Detailed Description, Col. 10, *ll.*, 35-47 (emphasis added). Not coincidentally, the court relied on this same portion of the specification, above, beginning on page 97, for guidance concerning the proper construction of "guaranteed minimum payment feature." Thus, this part of the specification reinforces the understanding of one of ordinary skill in the art, reading the claims in the context of the specification, that the "withdrawal rate" determines the amount of the "guaranteed minimum payment" for "scheduled payments" under the "systematic withdrawal program" of the claimed plan, and clarifies that the "withdrawal rate" is a "predetermined percentage established by the insurer for a given withdrawal frequency."

Therefore, the court tentatively concluded that the construction of "withdrawal rate" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A percentage

131

rate, established by the insurer, of the initial account value or the account value at some subsequent date, as provided under the terms of the plan, that determines the "guaranteed minimum payment" for "scheduled payments" in the "systematic withdrawal program."

  *iv.*   ***Oral and post-hearing arguments***. At the *Markman* hearing, Lincoln asserted that the court's construction of this claim term is overly restrictive, in that it did not contemplate that there may be more than one withdrawal rate to be stored. ***See*** *Markman* Hearing Transcript at 29-30. For example, Lincoln asserted that the owner may elect to take a lesser percentage than the predetermined percentage guaranteed by the insurer for some number of years, so that the computerized method would store that withdrawal rate as well as the predetermined percentage guaranteed by the insurer. *Id.* at 30-31; *see also id.* at 32 (suggesting that the Transamerica Plaintiffs' construction is linked only to the insurance company's predetermined rate, as opposed to a rate that could be selected by the owner).

  In its post-hearing brief, Lincoln again argues that the court's construction is overly restrictive, because the patent specification contemplates that the computerized method may actually employ or use more than one withdrawal rate, but the court's construction references only the maximum predetermined percentage rate that determines the "guaranteed minimum payment." Lincoln argues that the court's construction does not address or account for the fact that the owner may elect a smaller percentage for his or her systematic withdrawals. To address these concerns and the court's prior concern that Lincoln's initial construction did not make clear to what the rate was applied, Lincoln now proposes the following construction for "withdrawal rate," with strikeouts showing deletions from and bold showing additions to the court's tentative construction: A percentage rate, **between zero and a maximum rate** established by the insurer, of the initial account value or the account value at some subsequent date, as provided under the

132

terms of the plan, that ~~determines~~ **is used to determine** the ~~"guaranteed minimum payment" for~~ "scheduled payments" in the "systematic withdrawal program."

In their post-hearing reply brief, the Transamerica Plaintiffs describe Lincoln's proposed modification as "radical." The Transamerica Plaintiffs argue that Lincoln's new construction states that the withdrawal rate is used to determined the "scheduled payments" rather than the "guaranteed minimum payment," but such a construction is directly at odds with the court's tentative analysis, which was that the "withdrawal rate" must be the rate that determines the "guaranteed minimum payment" for "scheduled payments." The Transamerica Plaintiffs are equally unimpressed with Lincoln's insertion of "between zero and a maximum rate," because they see this modification as another attempt to try to get the court to construe the percentage as a "guaranteed maximum" instead of a "guaranteed minimum," as the claim language provides. The Transamerica Plaintiffs contend that Lincoln's rationale for this change—that the court's tentative construction does not account for the fact that the owner may elect a smaller percentage for his or her systematic withdrawals—misses the fact that "scheduled payment" or "systematic withdrawal" refers to the amount of money that the insurance company is required to pay, which is what Claim **35** claims, not the amount of money that the contract owner actually accepts. Moreover, they argue that Lincoln's new construction would allow the contract owner to choose the "withdrawal rate" (albeit within a certain range) contrary to the court's conclusion that the "withdrawal rate" is a predetermined rate established by the insurer.

*v. Post-hearing analysis.* The court is not persuaded by Lincoln's contentions that the court's tentative construction of "withdrawal rate" requires modification. The court finds that Lincoln's proposed modifications fail to recognize that what is claimed is a percentage rate, established by the insurer, that determines the minimum amount of money that the insurance company has guaranteed to pay, not the amount of money that

the contract owner may actually decide to accept. Again, step **a** must be read in the context of "a computerized method for administering a variable annuity plan having a guaranteed minimum payment feature associated with a systematic withdrawal program and for periodically determining an amount of a scheduled payment to be made to the owner under the plan." The '201 patent, Claim **35**, preamble. In that context, it becomes clear that the "withdrawal rate" must be the rate that determines the "guaranteed minimum payment" for "scheduled payments" in the "systematic withdrawal program." *See also id.*, Detailed Description, Col. 10, *ll.*, 35-47 (quoted in full, above, in the court's tentative analysis). Lincoln's misunderstanding is reflected in both of its proposed modifications: insertion of a range of percentages, rather than a percentage rate established by the insurer, as well as deletion of the part of the court's tentative construction stating that the percentage rate determines the "guaranteed minimum payment" for "scheduled payments" and substitution of language stating that the percentage rate is used to determine the "scheduled payments" directly.

Therefore, the court reiterates its prior analysis and its conclusion that the construction of "withdrawal rate" that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A percentage rate, established by the insurer, of the initial account value or the account value at some subsequent date, as provided under the terms of the plan, that determines the "guaranteed minimum payment" for "scheduled payments" in the "systematic withdrawal program."

134

### c. *"Payout term"*

*i.* ***Proffered constructions***. The parties also dispute the construction of "payout term" in step **a** of Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step a)** | | |
| i. Payout term | The time period (e.g., lifetime) for which distributions or disbursements of money are guaranteed under the annuity plan. '201 Patent, col. 1, *ll.* 48-50; col. 1, *ll.* 64-67. | The duration of the systematic withdrawal program during the post–annuitization phase (also called the payout phase or distribution phase) of the "variable annuity" during which required "scheduled payments" are made by the insurance company. '201 Patent Col. 1, *ll.* 18-23; Col. 2, *ll.* 12-13; Col. 4, *l.* 40; Col. 10, *ll.* 3-10; Burger & Falk, LOMA, ANNUITY PRINCIPLES AND PRODUCTS, pp. 8, 25-26. |

*ii.* ***Initial arguments of the parties***. In its opening brief, Lincoln contends that its construction of "payout term" is correct, because the specification acknowledges that the guaranteed income can continue for specified periods, including lifetime periods, under systematic withdrawal programs. Lincoln contends that the Transamerica Plaintiffs' construction, on the other hand, is premised upon the Transamerica Plaintiffs' mistaken notion that Claim **35** applies to the post-annuitization phase of an annuity contract. Lincoln points out that the Transamerica Plaintiffs' own extrinsic evidence recognizes that benefit payments can be made from unannuitized variable annuity contracts. For their part, the Transamerica Plaintiffs contend that the term "payout term" is not found anywhere in the

135

specification of the '201 patent, but that the use of the term "payout" by the patentee is instructive. They contend that the patentee expressly defined "payout" as relating to the distribution phase of a variable annuity, *i.e.*, to the post-annuitization phase. Thus, they contend that "payout term" is a period in the post-annuitization phase of the annuity wherein payments are made.

In its rebuttal brief, Lincoln argues that the claims and specification make clear that a systematic withdrawal program is an alternative to a true annuitization and that it is improper to import limitations that relate to a post-annuitization phase into the claims at issue here, which relate to the accumulation phase. Thus, Lincoln asserts that interpreting "payout" and "benefit" to create an annuitization requirement would render the systematic withdrawal program limitations meaningless. Lincoln also contends that the term "payout" is used in the specification in relation to a "guaranteed payout program" in the form of a systematic withdrawal program. Lincoln also contends that the Transamerica Plaintiffs' own use of the term "payout" in relation to unannuitized variable annuities defeats their claim that one of ordinary skill in the art would necessarily understand any term including "payout" to relate to a post-annuitization phase. In their rebuttal brief, the Transamerica Plaintiffs reiterate their contention that this term relates to a post-annuitization phase.

*iii.* ***Tentative analysis***. The court rejected, above, the Transamerica Plaintiffs' strained assertions that a "systematic withdrawal program" relates to the post-annuitization phase of a plan. Thus, the court concluded that use of "payout term" in relation to a systematic withdrawal program does not mean that the systematic withdrawal program is associated with the post-annuitization phase of the annuity plan. To put it another way, even if "payout" is a term ordinarily associated with an annuitized contract, the patentee's use of the term here suggests a special definition of the term associated with a systematic withdrawal program in the unannuitized phase of a variable annuity. *See Phillips*, 415

136

F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).

Moreover, the court tentatively concluded that the plain language of this claim term, in the context of Claim **35**, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), shows that a "payout" is a systematic withdrawal (scheduled payment) from the systematic withdrawal program of Claim **35**. The court found that this is so, because Claim **35** claims a method for administering such a systematic withdrawal program, including calculating and making the systematic withdrawals. *See* the '201 patent, Claim **35**.

Moreover, the ordinary dictionary meaning of "term" suggests that a "payout term" is the length of time for which such systematic withdrawals of a systematic withdrawal program are guaranteed under the terms of the variable annuity plan. *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."). "Term," in the sense at issue here, is "a limited or definite extent of time; *esp*: the time for which something lasts: DURATION, TENURE." *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1216 (10th ed. 1995); OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com)

137

(defining "term," in pertinent part, to mean "a portion of time having definite limits; a period, *esp.* a set or appointed period; the space of time through which something lasts or is intended to last; duration, length of time").

Therefore, the court tentatively concluded that the construction of "payout term" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The length of time for which systematic withdrawals (scheduled payments) of a systematic withdrawal program are guaranteed under the terms of the variable annuity plan.

*iv.* ***Oral arguments***. At the *Markman* hearing, the Transamerica Plaintiffs expressed a "general concern" arising from the court's construction of "payout term." They argued that the patentee acting as its own lexicographer should be the rare situation and that, more generally, terms should be construed as they would be understood by one of ordinary skill in the art. *See Markman* Hearing Trancript at 70-71. Here, the Transamerica Plaintiffs contended, no "special definition" can be found, because the specification does not once define "payout term." *Id.* at 71-72. Therefore, the Transamerica Plaintiffs contended that there was a good foundation for their assertions that "payout term," in its usual sense for one of ordinary skill in the art, relates to a post-annuitization period.

Lincoln responded that the court had properly looked to ordinary dictionary definitions of the term, the claims, and the specification, and properly rejected the Transamerica Plaintiffs' contention that "payout term" related only to a "post-annuitized" annuity. *Id.* at 72-73. Lincoln did suggest, however, that construction of the claim term at issue could be "tightened" if the court deleted the first reference to "systematic withdrawals" and simply used "scheduled payments." *Id.* at 73-74.

138

*v.* ***Post-hearing analysis***.  The court reiterates its conclusion that "payout term," in the context of the claims and specification, clearly relates to a systematic withdrawal program in the unannuitized phase of a variable annuity, even if "payout term" is nowhere separately defined in the specification.  Upon further reflection, the court also does not believe that the tentative construction is really much improved by deleting the language equating "payouts," systematic withdrawals, and scheduled payments, of a systematic withdrawal program.  Again, Claim **35** claims a method for administering such a systematic withdrawal program, including calculating and making the systematic withdrawals, *see* the '201 patent, Claim **35**; the court separately construed "scheduled payment," above at page 111, as one of the systematic withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan; and, consequently, a "payout term" is  the length of time for which such systematic withdrawals (scheduled payments) of a systematic withdrawal program are guaranteed under the terms of the variable annuity plan.

Therefore, the court reiterates that the construction of "payout term" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following:  The length of time for which systematic withdrawals (scheduled payments) of a systematic withdrawal program are guaranteed under the terms of the variable annuity plan.

       *d.*    ***"Benefit payments"***

    *i.*    ***Proffered constructions***.  The parties also dispute the construction of "benefit payments" in step **a** of Claim **35**.  The parties' competing constructions of this claim term are reiterated in the following table:

139

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step a)** | | |
| j. Benefit payments | The "scheduled payments" referenced above. SEE Darlene K. Chandler, THE ANNUITY HANDBOOK 90 (Nat'l Underwriters Co., 4th ed.) to counter Transamerica's position that such payments are made in the post-annuitization phase. | Income payments made in the post-annuitization phase (also called the payout phase or distribution phase) of the "variable annuity." '201 Patent Col. 1, *ll*. 41-47; Col. 2, *ll*. 39-43; Col. 3, *ll*. 18-33; Col. 10, *ll*. 3-13; Col. 18, *ll*. 13-17; THE ANNUITY HANDBOOK, Chapter 6 – Variable Annuities, pp. 75, 86-87 (Bennett Affidavit Paragraph 12), Chapter 4 – The Various Types of Annuities, p. 57 (Bennett Affidavit Paragraph 12), Chapter 1 – The Definition of an Annuity, pp. 9-10 (Bennett Affidavit Paragraph 12), Chapter 3 – Standard Annuity Contract Provisions, pp. 35-36 (Bennett Affidavit Paragraph 12); LOMA, INTRO TO ANNUITIES – FUNDAMENTALS OF ANNUITY CONCEPTS AND PRODUCTS, pp. 11-12 (Bennett Affidavit Paragraph 13); Dellinger, THE HANDBOOK OF VARIABLE INCOME ANNUITIES, p. 381 (Bennett Affidavit Paragraph 12). |

*ii.* ***Arguments of the parties***. In its opening brief, Lincoln contends that "benefit payments" are, simply, the "scheduled payments" guaranteed by the annuity program claimed in Claim **35**. Lincoln contends that the Transamerica Plaintiffs' construction is in error, because it adheres to the Transamerica Plaintiffs' mistaken

140

contention that Claim **35** is limited to an annuitized contract or the post-annuitization phase of a contract. Lincoln points out that the extrinsic evidence that it has cited demonstrates that benefit payments can be made from unannuitized variable annuity contracts. The Transamerica Plaintiffs reiterate their contention that Claim **35**, and this term in particular, relates to payments in the post-annuitization phase. In its rebuttal brief, Lincoln points out that the Transamerica Plaintiffs repeatedly equate "benefit payments" with "scheduled payments" in their opening brief, thus conceding the correctness of Lincoln's construction. Lincoln contends that the Transamerica Plaintiffs have shown no basis for importing additional limitations into the term. In their rebuttal brief, the Transamerica Plaintiffs contend that the extrinsic source that Lincoln cites to support its contention that "benefit payments" can be made in the unannuitized phase of an annuity contract never uses the term "benefit payments."

      ***iii.***    ***Analysis***. The plain language of Claim **35**, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), shows that "benefit payments" are "scheduled payments" under a systematic withdrawal program of a variable annuity plan the administration of which is claimed in Claim **35**, because the "scheduled payments" are the only "benefits" mentioned in Claim **35**. The Transamerica Plaintiffs have conceded as much by equating the two terms in their own arguments concerning construction of claim terms.

      The court also rejects the Transamerica Plaintiffs' attempt to impose a post-annuitization limitation on this claim term, for the reasons previously stated. As to that contention, it is worthwhile to add here that "benefits" and "benefit payments" are not used in the specification of the '201 patent exclusively in relation to an annuitized plan.

Rather, the patentee used "benefits" to refer to all of the payments provided by various kinds of annuities. *See* the '201 patent, Field Of The Invention, Col. 1, *ll.* 15-26 ("[T]he present invention relates to a method and system for administering retirement income benefits."); *id.* at Brief Summary, Col. 4, *ll.* 55-62 (describing an aspect of the invention providing "a combination of benefits superior to both annuitizations and systematic withdrawal programs," because it "seamlessly" joins the two programs); *id.* at Detailed Description, Col. 10, *ll.* 40-55 (describing the second method or aspect of the invention, which pertains to a systematic withdrawal program in an unannuitized plan, as including a "guaranteed minimum benefit payment option"); *id.* at Col. 11, *ll.* 50-56 (describing an aspect of the invention involving a contract with both a liquidity phase and an annuitized phase and expressly equating "benefit payments" with "withdrawals"). Thus, to the extent that the patentee has used "benefits" in a special sense to mean any promised payments made at any phase of an annuity contract, that definition is controlling. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern).

Therefore, the court concludes that the construction of "benefit payments" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is "scheduled payments."

### e.     *"Period of benefit payments"*

*i.     Proffered constructions*.  The parties also dispute the construction of "period of benefit payments" in step **a** of Claim **35**.  The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Step a) | | |
| k.  Period of benefit payments | The frequency of distributions or disbursements of money (e.g., yearly, monthly, etc.). '201 patent, col. 7, *ll*. 22-32; col. 10, *ll*. 42-50. | The frequency or interval (a length of time) between "scheduled payments" (i.e., monthly distributions, quarterly distributions, semi-annual distributions, or annual distributions) during the "payout term" of the systematic withdrawal program.  '201 Patent, Col. 7, *ll*. 22-27; Col. 13, *l*. 64 – Col. 14, *l*. 2. |

*ii.     Arguments of the parties*.  In its opening brief, Lincoln contends that the parties agree that "period of benefit payments" means the frequency of payments, and that such a construction is consistent with the claim language and specification, but that the Transamerica Plaintiffs improperly import post-annuitization limitations into this term.  In their opening brief, the Transamerica Plaintiffs do agree that "period" indicates a "frequency or interval" of an event, but they argue that the patentee linked that term to "benefit payments."  Thus, they contend that "period of benefit payments" must relate to the post-annuitization phase of the contract, for the same reasons that they assert that "benefit payments," standing alone, must relate to the post-annuitization phase.  In its rebuttal brief, Lincoln reiterates that the Transamerica Plaintiffs improperly import post-

143

annuitization limitations into the definition of this claim term.  Similarly, in their rebuttal brief, the Transamerica Plaintiffs reiterate that this term must be understood to relate to the post-annuitization phase of an annuity contract.

*iii.*     *Analysis*.     The Transamerica Plaintiffs incorporate post-annuitization limitations into their construction of "period of benefit payments" by incorporating their construction of "benefit payments" and by linking their arguments concerning the constructions of "benefit payments" and "period of benefit payments."  However, the court has now repeatedly rejected the Transamerica Plaintiffs' contention that the terms of Claim **35** relate only to the post-annuitization phase of an annuity contract.  The court reiterates its rejection of that contention, but will not reiterate here its reasons for doing so.

More to the point, then, is the convergence of the parties' constructions on the meaning of "period of" as the frequency of or interval between events, in this case, "benefit payments."  The court finds that this meaning comports with one of the ordinary dictionary meanings of the term.  *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term.").  "Period" can mean "a portion of time determined by some recurring phenomenon" or "the interval of time required for a cyclic motion or phenomenon to complete a cycle and begin to repeat itself," *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 864 (10th ed. 1995); *cf. id.* (defining "periodic" as "occurring or recurring at regular intervals"), which is the sense asserted by the parties.  On the other hand,

144

"period" can also mean "a chronological division: STAGE," in other words, the entire duration of an event or series of events. *Id.* The question is, which of these ordinary meanings is intended here, in light of the claims and the specification?

The use of both "payout term" and "period of benefit payments" in the same claim initially suggests that "period" has a different meaning from "term," and specifically, that "period" refers to "frequency" of or "interval between" or "cycle of" benefit payments, while "term" refers to "duration" of all benefit payments. *Cf. Andersen Corp.*, 474 F.3d at 1369-70 (the doctrine of claim differentiation "is based on 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope,'" quoting *Karlin Tech., Inc.*, 177 F.3d at 971-72, and "'[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant,'" quoting *Tandon Corp.*, 831 F.2d at 1023). If "period of benefit payments" refers to the length of time that benefit payments will be paid, rather than to the interval or frequency or cycle of such benefit payments, then "period of benefit payments" is essentially redundant of "payout term," rendering one term or the other superfluous.

Reading "period" to mean the interval between or frequency of or cycle of certain events, however, is out of step with several uses of "period" in the specification. Throughout the specification, the patentee used "period" in contexts where it plainly means "the duration" or "length of time" that certain benefits will be paid, for example, a period of years or a lifetime, as well as in contexts in which "period" plainly means the interval at which benefits will be paid, for example, monthly, quarterly, or annually. *Compare, e.g., id.*, Brief Summary, Col. 5, *ll.* 7-13 ("The exchange of account value liquidity for payments guaranteed for life may be optional at or before the end of the liquidity *period.*

The liquidity *period* may be changed at any time, or the contract holder may also continue the withdrawal program on some other basis, or may elect to surrender the contract for its account value.") (emphasis added); *id.*, Col. 5, *ll* 15-20 ("This aspect of the invention provides a type of systematic withdrawal program (which may be applied to either deferred annuities or to mutual funds) that converts *at the end of a stated period (the liquidity period)* to an annuity.") (emphasis added); *id.*, Col. 5, *ll.* 40-42 ("[T]his program primarily applies to the accumulation *period* of the deferred annuity and does not require actual annuitization.") (emphasis added); *id.*, Col. 5, *ll.* 50-56 ("Since initial and subsequent payments are higher with shorter liquidity *periods*, contract holders may decide for themselves the appropriate length of the liquidity *period*. *Some my elect very short periods, such as five years. Others may elect very long periods, in effect maintaining complete access to their account values for the entirety of their lives.* ") (emphasis added); *with, e.g., id.*, Brief Summary, Col. 4, *l.* 67, to Col. 5, *l.* 4 ("The amount of this payment will change *from period to period* based on the same formula used in determining payment changes under a typical variable immediate annuity, or annuitization under a variable deferred annuity," suggesting that "period" means an interval in a cycle of events) (emphasis added); *id.*, Col. 5, *ll.* 27-30 ("Payments, first as withdrawals and later as annuity payments, are adjusted *each period* to reflect actual net investment returns.") (emphasis added); *id.*, Col. 5, *ll.* 62-65 ("Changes in payments *from period to period* are governed by the same formula as is used for life annuities and resulting payments are guaranteed for life.") (emphasis added). Both parties cite Col. 7, *ll.* 22-32, of the specification, or at least a portion of that excerpt, in support of their constructions, but the court finds that the cited excerpt only describes frequencies of payments, such as annual or monthly, but never expressly describes such frequencies as the period of benefit payments.

146

At first blush, Claim **35** itself could also logically permit both readings of "period." *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'") (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115). "Period of benefit payments" is only mentioned in step **a** of Claim **35** as one of a number of items about which data is stored, so that use of the term in step **a** is not very instructive. On the other hand, step **e**, the last expressly claimed step of the method claimed in Claim **35**, claims the following: "Periodically paying the scheduled payment to the owner *for the period of benefit payments*, even if the account value is exhausted before all payments have been made." The '201 patent, Claim **35**, step **e** (emphasis added). The claim term at issue could be read in this context as follows: "Periodically paying the scheduled payment to the owner *for the duration of all benefit payments*, even if the account value is exhausted before all payments have been made." In this sense, however, the term appears to be redundant of "payout term," as "payout term" was construed above, at page 138, 139. On the other hand, "period of benefit payments" could also logically be read in this context as follows: "Periodically paying *the scheduled payment* to the owner *for a particular interval or cycle of benefit payments*, even if the account value is exhausted before all payments have been made." This reading gives "period of benefit payments" a different meaning from "payout term." This reading also gains credence from the context provided by steps **b** through **d**, which, like step **e**, each state steps for determining, adjusting, and/or making *a particular scheduled payment*. *See* the '201 patent, Claim **35**, step **b** ("determining *an initial scheduled payment*") (emphasis added); step **c** ("periodically determining the account value associated with the plan and *making the scheduled payment* by withdrawing *that amount* from the account value") (emphasis added); step **d** ("monitoring for an unscheduled withdrawal made under the plan and adjusting the amount of *the scheduled payment* in

147

response to said unscheduled withdrawal") (emphasis added). Consequently, in this context, the reading of "period of benefit payments" as the interval between or cycle of benefit payments is the correct one.

Therefore, the court concludes that the construction of "period of benefit payments" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The interval between or cycle of benefit payments.

### 3.  *Claim 35: Step b: "Determining an initial scheduled payment"*

### a.  *The proffered constructions*

Step **b** of Claim **35** claims the following:  "b) determining an initial scheduled payment."  The '201 patent, Claim **35**, step **b**.  The parties dispute the construction of this entire limitation.  The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| Claim 35 (Step b) | | |
| *l.* Determining an initial scheduled payment | "Determining" is an act of calculating or establishing. '201 Patent, col. 7, *ll.* 4-35. "Initial scheduled payment" means a first amount of money to be distributed in accordance with the guarantees of the variable annuity plan. '201 Patent, col. 7, *ll.* 1-5. | The authoritative decision and action by the insurance company to set a dollar amount level for the first required distribution from the "account value" made during the "period of benefit payments" to the contract owner or beneficiary. '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 18-47; FIG. 16 step 164. |

148

### b. Initial arguments of the parties

In its opening brief, Lincoln contends that its definition of this claim term is based on the plain language of the claim and the specification, which illustrates how the initial benefit payment may be calculated. Lincoln contends that the Transamerica Plaintiffs' construction, on the other hand, improperly imports "authoritative decision" and "required" payment limitations, among others. In their opening brief, on the other hand, the Transamerica Plaintiffs argue that the insurer, not the owner or annuitant, determines an initial scheduled payment, because the specification explains, and Figure **16** shows, that "the system" calculates the initial withdrawal amount. In their rebuttal brief, the Transamerica Plaintiffs reiterate that the insurer determines the initial scheduled payment using the investment return data.

### c. Tentative analysis

The court concluded, above, in both its tentative and final constructions of "periodically determining an amount [of a scheduled payment]," that the appropriate construction of "determining" is "calculating." The parties agreed that the same construction of "determining" is appropriate in this context, as well, although they do not necessarily now agree with the court's construction. Moreover, the court initially concluded that the appropriate construction of "periodically determining an amount [of a scheduled payment]," in its entirety, is the following: At the regular intervals for scheduled payments, calculating the amount of a scheduled payment based on the account value associated with the plan. The court has now reiterated that conclusion, above, upon further, post-hearing consideration. Although there is no reference to "periodically" determining an amount of a scheduled payment in the claim term at issue in step **b**, it is nevertheless apparent, in light of the court's prior construction of "determining an amount of a scheduled payment," that "determining an initial scheduled payment" means

149

calculating the amount of a *first* scheduled payment of a systematic withdrawal program based on the account value associated with the plan.

In its tentative draft, the court concluded that, contrary to the Transamerica Plaintiffs' construction, the plain language of the claims shows that "the initial scheduled payment" is the first scheduled payment *of a systematic withdrawal program*, not merely the first required distribution made during the "period of benefit payments" in question. The court initially construed "period of benefit payments" above to mean the interval between or cycle of benefit payments, and that construction has not changed. Thus, Claim **35** claims only one scheduled payment during any particular "period of benefit payments." As the court also observed above, steps **b** through **e** each state steps for determining, adjusting, and/or making *a particular scheduled payment*, that is, the scheduled payment for a particular period of benefit payments. *See* the '201 patent, Claim **35**, step **b** ("determining *an initial scheduled payment*") (emphasis added); step **c** ("periodically determining the account value associated with the plan and *making the scheduled payment* by withdrawing *that amount* from the account value") (emphasis added); step **d** ("monitoring for an unscheduled withdrawal made under the plan and adjusting the amount of *the scheduled payment* in response to said unscheduled withdrawal") (emphasis added). In this context, the court concluded in its tentative draft that the "initial scheduled payment" determined in step **b** is the scheduled payment for the *first* period of benefit payments, and hence, a first scheduled payment for the systematic withdrawal program. All subsequent scheduled payments are or may be adjusted from this "initial scheduled payment," as claimed in subsequent steps in Claim **35**.

Therefore, the court tentatively adopted the following construction of "determining an initial scheduled payment" as the one that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the

150

correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250): Calculating the amount of a first scheduled payment of a systematic withdrawal program based on the account value associated with the plan.

### d. Oral and post-hearing arguments

The parties' oral and post-hearing arguments concerning construction of this claim term parallel their post-hearing arguments concerning construction of "determining an amount of a scheduled payment" in the preamble to Claim **35**. *See, supra*, beginning on page 118. In their post-hearing brief, the Transamerica Plaintiffs assert that, for this term, as for the "determining an amount of a scheduled payment," who or what does the "determining" is a significant issue for them. They contend, again, that the court's analysis answers that question by making clear that the insurance company must make the determination in question, because they equate the "computerized method" with the insurance company. They also reassert their contention that "determining" should be construed as "specifying," rather than "calculating." At the *Markman* hearing, they pointed out that the "calculation" here actually involves use of a complex demographic formula as an initial step. *Markman* Hearing Transcript at 79. Therefore, they contend that the construction of this claim term should be amended, as follows, with strikeouts indicating deletions from and bold indicating additions to the court's tentative construction: ~~Calculating~~ **The insurance company's action to specify** the amount of a first scheduled payment of a systematic withdrawal program based on the account value associated with the plan.

For essentially the same reasons that Lincoln rejected the Transamerica Plaintiffs' post-hearing suggested modifications to the court's construction of "determining an amount of a scheduled payment," Lincoln also rejects the Transamerica Plaintiffs' post-hearing suggested modifications of this claim term. Also for the same reasons stated in reference

151

to the prior claim term, Lincoln argues that the court should modify its construction of this claim term to refer to "an account value" rather than "the account value." The Transamerica Plaintiffs' post-hearing reply concerning this claim term is also consistent with their post-hearing reply concerning the prior "determining" claim term.

### e. *Post-hearing analysis*

For essentially the same reasons that the court rejected the comparable post-hearing proposed modifications of its tentative construction to the claim term "periodically determining an amount of a scheduled payment," the court rejects that parties' proposed post-hearing modifications of the court's tentative construction of this claim term. *See, supra*, beginning at page 120. Therefore, the court reiterates that the proper construction of "determining an initial scheduled payment"—that is, the one that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250)—is the following: Calculating the amount of a first scheduled payment of a systematic withdrawal program based on the account value associated with the plan.

### 4. *Claim 35: Step c*

Step **c** claims the following step in the computerized method claimed in Claim **35**, with italics indicating claim terms for which the parties dispute the construction:

> c) *periodically determining the account value* associated with the plan and *making the scheduled payment by withdrawing that amount from the account value*.

The '201 patent, Claim **35**, step **c** (emphasis added). The Joint Claim Construction Statement And Chart shows that the parties dispute the proper construction of two terms

152

in step **c** of Claim **35**. The court will consider in turn the proper construction of both of those terms.

          *a.*      *"Periodically determining account value"*

       *i.*     **Proffered constructions**. The parties dispute the construction of "periodically determining account value" in step **c** of Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step c)** | | |
| m. Periodically determining account value | From time to time calculating the account value. '201 Patent Fig. 6 (showing the periodic determination of account value); WEBSTER'S NINTH COLLEGIATE DICTIONARY 875 (1991) (defining "periodic" as "occurring or recurring at regular intervals"); THE AMERICAN HERITAGE DICTIONARY 923 (2d ed. 1982) (defining "periodic" as "[h]aving periods or repeated cycles."). | The action by the insurance company to calculate the net investment return of the "variable annuity account" at the predetermined intervals established by the "period of benefit payments" as a necessary precursor to calculating and making the next required "scheduled payment" of at least the guaranteed (floor) amount taken from the "account value." '201 Patent, Col. 18, *ll.* 13-36; Col. 7, *ll.* 44-54; '201 Patent Prosecution History at Document Control Numbers LIN078687; LIN078718; LIN078763; LIN078767; LIN078769; LIN078771; FIG 16. |

       *ii.*     **Initial arguments of the parties**. In its opening brief, Lincoln contends that its construction is consistent with the ordinary meaning of "periodically" and with the specification of the '201 patent and, in particular, Figure **6**, which shows the periodic

determination of account value. Lincoln contends that, in contrast, the Transamerica Plaintiffs' three-stage definition is fatally flawed, because it improperly imports and limits the factors that would impact account value; it requires that the determination occur at the same time that scheduled payments are made, when the determination may, but does not have to be made at that time; and it improperly imports a "necessary precursor" limitation. On the other hand, the Transamerica Plaintiffs argue that their construction is correct, because steps of Figure **16** of the '201 patent specification demonstrate that "account value" must be calculated by the insurer before the amount of the scheduled withdrawal payment is known. In their rebuttal brief, they argue, further, that the prosecution history makes clear that account value is based on investment return and that the account value does need to be determined at the same time as or as a precursor to the making of the scheduled payments.

 *iii.* *Tentative analysis*. The court has already separately construed "periodically determining" and "account value." Specifically, the court concluded, above, on page 122, that the proper construction of "periodically determining" (in the context of "periodically determining an amount [of a scheduled payment]" in the preamble to Claim **35**) means "calculating" something "at the regular intervals" required by the plan, not just "from time to time." In the case of "periodically determining an amount of a scheduled payment," the court concluded that the regular intervals for determining scheduled payments were the regular intervals for the scheduled payments themselves. The court also concluded, above, on page 127, that "account value" (in step **a** of Claim **35**) means "the dollar or monetary value associated with a variable annuity contract at a given time or valuation date, including deposits and investment return, less withdrawals or payments, fees, and expenses," not merely the dollar value based on investment return. In arriving at the construction of "account value," the court observed that the *claims* will demonstrate the

154

uses to which the "account value" may be put in the invention, so that it is improper to include a purpose for which "account value" may be used as part of the definition of that term. *See, supra*, page 124. These constructions also apply here, where the same terms are used in a different portion of the same claim.

Thus, the remaining question for construction of "periodically determining account value" is the regular interval at which "account value" must be determined. In its tentative analysis, the court concluded that the claims establish the regular intervals at which "account value" must be calculated. Specifically, step **c** of Claim **35** pairs the determination of account value with making the scheduled payment by withdrawing that amount from the account value. *See* the '201 patent, Claim **35**, step **c** ("periodically determining the account value associated with the plan and making the scheduled payment by withdrawing that amount from the account value"). The court observed above, in its construction of "periodically determining an amount of a scheduled payment," that Claim **35** states that the periodic determination is of a "scheduled payment," *i.e.*, the determination of a payment made according to a schedule, not merely the determination of a payment made "from time to time." Where periodic determination of "account value" is expressly associated with "making the scheduled payment by withdrawing that amount from the account value," it follows that the periodic determination of "account value" is, likewise, made according to the schedule for scheduled payments, not merely made "from time to time." Determinations of account value may, of course, be made at other times; however, in step **c** of Claim **35**, the periodic determination of account value is made according to the schedule for scheduled payments.

Therefore, the court tentatively concluded that the construction of "periodically determining account value" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the

155

correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: At the regular intervals for scheduled payments, calculating the dollar or monetary value associated with a variable annuity contract, including deposits and investment return, less withdrawals or payments, fees, and expenses.

*iv.* **Oral arguments**. At the *Markman* hearing, Lincoln did not quibble with the court's tentative conclusion that "periodically" means "at regular intervals," rather than just "from time to time." Lincoln did, however, dispute the court's conclusion that the determining account value step must necessarily be tied to the same interval of the calculation of determining scheduled payment. *See Markman* Hearing Transcript at 75. Although both might be determined at the same interval, Lincoln argued that the account value aspect itself may not necessarily need to be calculated at the same time as a scheduled payment is made, where, for example, withdrawals are based on a percentage of initial account value. *Id.* at 76. The Transamerica Plaintiffs, on the other hand, agreed with the court's tentative construction. *Id.* at 77.

*v.* **Post-hearing analysis**. The court is not persuaded that any change to its tentative construction of this term is required. Although Lincoln is correct that, in some embodiments, withdrawals are based on a percentage of initial account value, rather than any subsequent account value, the court notes that, even in those embodiments, it may be necessary to calculate account value "periodically" for other reasons. Specifically, step **c** of Claim **35** pairs the determination of account value with making the scheduled payment by withdrawing that amount from the account value. *See* the '201 patent, Claim **35**, step **c** ("periodically determining the account value associated with the plan and making the scheduled payment by withdrawing that amount from the account value"). In this context, the periodic determination of account value is not for the purpose of *determining* the scheduled payment, but for the purpose of determining the account value from which the

scheduled payment is taken, *i.e.*, for the simple accounting purpose of determining the *current* account value from which the *current* scheduled payment is taken. Such a determination of *current* account value at the time that the *current* scheduled payment is withdrawn is necessary, *inter alia*, because step **e** provides that the scheduled payment is made, "even if the account value is exhausted before all payments have been made." *Id.* at step **e**. Thus, to perform step **e**, it is necessary to determine whether the account value before the scheduled payment has been exhausted, and step **c** provides for that determination. Moreover, as the court observed above, in its tentative analysis, where periodic determination of "account value" is expressly associated with "making the scheduled payment by withdrawing that amount from the account value," it follows that the periodic determination of "account value" is, likewise, made according to the schedule for scheduled payments, not merely made "from time to time." As the court also observed above, determinations of account value may, of course, be made at other times; however, in step **c** of Claim **35**, the periodic determination of account value is made according to the schedule for scheduled payments.

Therefore, the court reiterates its conclusion that the construction of "periodically determining account value" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: At the regular intervals for scheduled payments, calculating the dollar or monetary value associated with a variable annuity contract, including deposits and investment return, less withdrawals or payments, fees, and expenses.

### b. "Making the scheduled payment [by withdrawing that amount from the account value]"

**i.** **Proffered constructions.** The parties also dispute the construction of "making the scheduled payment [by withdrawing that amount from the account value]" in step **c** of Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
| --- | --- | --- |
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step c)** | | |
| n. Making the scheduled payment [by withdrawing that amount from the account value] | Distributing money from the account value in accordance with the guarantees of the variable annuity plan. '201 Patent, col. 10, *ll.* 40-55; col. 25, *ll.* 23-26; '201 File History at LIN078825. | The action by the insurance company of periodically paying the required distribution at the predetermined intervals established by the "period of benefit payments" during the "systematic withdrawal program." '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 18-36; and Claim 36 of the '201 Patent; FIG. 16. |

**ii.** **Arguments of the parties.** In its opening brief, Lincoln contends that step **c** specifically provides that the scheduled payment is "withdraw[n] . . . from the account value." Lincoln also points out that the specification describes an embodiment in which contract owners may elect to receive a certain percentage of guaranteed distributions from the initial account value and that the prosecution history reveals that this step was amended to clarify that the scheduled payments are made by withdrawing the periodically-determined amounts from the account value. Lincoln contends that the Transamerica Plaintiffs' construction, on the other hand, unduly restricts the meaning of the phrase to "required" distributions at "predetermined intervals" "during a systematic withdrawal

158

program," thereby reading non-existent limitations into the claim. In their opening brief, the Transamerica Plaintiffs contend that they have merely made their construction of this claim term consistent with their definitions of "scheduled payment" and "systematic withdrawal program."

     ***iii.***     ***Analysis.*** When the court begins with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court finds nothing ambiguous about this claim term. Step **c** of Claim **35** plainly states the manner in which the "scheduled payments" are "made": "by withdrawing that amount from the account value." It is also clear that the withdrawal is "made" as part of the computerized method for administering a variable annuity plan, having certain features, as set out in the preamble to Claim **35**, so that there is no ambiguity about who "makes" the withdrawal or pursuant to what plan or program. In short, the additional layers of detail imposed on this straight-forward claim term in both parties' constructions are unnecessary. The claim term simply requires no further construction.

     ***5.***     ***Claim 35: Step d***

     Step **d** claims the following step in the computerized method claimed in Claim **35**, with italics indicating claim terms for which the parties dispute the construction:

> d) *monitoring* for an *unscheduled withdrawal* made under the plan and *adjusting the amount of the scheduled payment in response to said unscheduled withdrawal*.

The '201 patent, Claim **35**, step **d** (emphasis added). The Joint Claim Construction Statement And Chart shows that the parties purportedly dispute the proper constructions

159

of five terms in step **d** of Claim **35**. The court will consider in turn the proper construction of those terms.

### a. *"Monitoring"*

The Joint Claim Construction Statement And Chart shows that the parties dispute the construction of "monitoring" in step **d** of Claim **35**, but only Lincoln has offered a construction of that purportedly disputed claim term. Lincoln's construction is the following: An act of observing, checking, or keeping track of. Lincoln relies on the specification and ordinary dictionary definitions to support this construction.

The court finds nothing in the claim language itself that provides an indication of a specific meaning of "monitoring," other than its use as a gerund, not a verb. The court finds that Lincoln's definition of "monitoring," as a gerund, is supported by the cited portions of the specification, to the extent that those portions provide any guidance at all, *see* the '201 patent, Col. 11, *ll*. 57-63 ("Since the first adjustments are made during the liquidity period, the deferred annuity account value (or mutual fund account value) must be maintained as usual for deferred annuities (or mutual funds), with special adaptation for additional deposits and for withdrawals in excess of the calculated withdrawal amount."); Col. 18, *ll*. 28-32 ("If the subject withdrawal is not a scheduled withdrawal, the system checks to determine whether the withdrawal is a premium payment or deposit (i.e., is a negative withdrawal) (block **170**)."), and the applicable ordinary dictionary definition of the term, *see* OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) (defining "monitoring," as a noun, as "the action of monitor *v.*; overseeing; surveillance, listening in," and defining "monitor," as a verb, as "to observe, supervise, or keep under review; to keep under observation; to measure or test at intervals, esp. for the purpose of regulation or control"). The Transamerica Plaintiffs have offered no contrary construction.

160

Therefore, the court concludes that the construction of "monitoring" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The act of observing, checking, or keeping track of.

### b. *"Unscheduled withdrawal"*

### i. *Proffered constructions*. The parties do dispute the construction of "unscheduled withdrawal" in step **d** of Claim **35** by offering competing constructions. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step d)** | | | |
| p. | Unscheduled withdrawal | A withdrawal means that exceeds a predetermined percentage established by the insurer to keep the guaranteed payment program in place. '201 Patent, col. 11, *ll.* 7-34. | A discretionary monetary distribution of an amount set by the authoritative decision of the contract owner or beneficiary made by the insurance company on a date selected by the contract owner or beneficiary. An "unscheduled withdrawal" is always an excess withdrawal in that it exceeds the "withdrawal rate" and the guaranteed minimum payment feature. An "unscheduled withdrawal" is never a "scheduled payment." '201 Patent, Col. 6, *ll.* 64-67; Col. 13, *ll.* 51– Col. 14, *l.* 2; Col. 18, *ll.* 18-53; FIG. 16 step 178. |

*ii.*    ***Arguments of the parties***.  In its opening brief, Lincoln contends that its construction of "unscheduled withdrawal" is supported by the portion of the specification cited in the table above, as well as by Col. 13, *ll.* 50-59.  In contrast, Lincoln argues that the Transamerica Plaintiffs' construction is incorrect, because it is not based on the specification and is nonsensical.   More specifically, Lincoln contends that the Transamerica Plaintiffs' construction imports a limitation that an unscheduled withdrawal is always an excess withdrawal that is not found in the claim itself or the specification and includes a limitation that an "unscheduled withdrawal" is "never a scheduled payment" that lacks any support in the specification.  Lincoln argues that nothing in the claim or specification precludes a withdrawal that is, in part, a scheduled payment and, in part, an unscheduled withdrawal.  The Transamerica Plaintiffs, on the other hand, contend that Figure **16** is the only embodiment in the '201 patent in which both "unscheduled withdrawals" and "scheduled payments" are mentioned.  Because of the intended contrast between these terms, the Transamerica Plaintiffs argue that an "unscheduled withdrawal" is discretionary, because it is elected by the contract owner, while a "scheduled payment" is mandatory, because the insurer must make such a payment under the plan.   The Transamerica Plaintiffs also point out that the specification indicates that the "unscheduled withdrawal" is always an "excess withdrawal," because the specification explains that an "unscheduled withdrawal" exceeds a predetermined percentage established by the insurer to keep the guaranteed payment program in place.

In its rebuttal brief, Lincoln argues that there is no rule of claim construction that allows reading a limitation ("required" or "mandatory" in relation to "scheduled payment") into a claim term based upon a negative limitation of another term ("unscheduled withdrawal").  Presumably, Lincoln's argument also encompasses the converse, that a term that includes "scheduled," and is purportedly "mandatory," does not

162

mean that a term that includes "unscheduled" is "discretionary." In their rebuttal brief, the Transamerica Plaintiffs reiterate that the language of step **d** demonstrates that an "unscheduled withdrawal" is always an excess withdrawal, because such a withdrawal requires an adjustment of the "scheduled payment." The Transamerica Plaintiffs also argue that, if "scheduled payments" were discretionary, then every "scheduled payment" would also be an "unscheduled withdrawal" requiring an adjustment to subsequent payments.

*iii.* **Analysis**. When the court begins with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court finds that "unscheduled withdrawals" are contrasted with "scheduled payments" and that *a claimed effect* of an "unscheduled withdrawal" is that it requires an adjustment to subsequent "scheduled payments" in response. *See* the '201 patent, Claim **35**, step **d** ("monitoring for an *unscheduled withdrawal* made under the plan and *adjusting the amount of the scheduled payment in response* to said unscheduled withdrawal"). The claimed effect, however, is not part of the construction of "unscheduled withdrawal" itself, for the same reasons that the court concluded that the manner in which "account value" may be used is a matter of what is *claimed*, not part of the construction of that claim term. Therefore, the "adjusting" limitation also claimed in step **d**, which explains the effect of an "unscheduled withdrawal," must be separately construed, below.

Because "unscheduled withdrawals" are contrasted with "scheduled payments" in Claim **35**, and the court has construed "scheduled payment" to mean "one of the systematic withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan," an ordinary person—and

163

even one of ordinary skill in the art—would expect the contrast between a "scheduled payment" and an "unscheduled withdrawal" to be that an "unscheduled withdrawal" is not "systematic," is not guaranteed in amount, or is neither "systematic" nor guaranteed in amount. Claim **35** makes clear that such an "unscheduled withdrawal" is nevertheless "made under the plan," so that the distinction between "unscheduled withdrawals" and "scheduled payments" is *not* that a "scheduled payment" is authorized by the plan, but an "unscheduled withdrawal" is not.

The contrast between the ordinary dictionary meanings of "scheduled" and "unscheduled" suggests the correctness of the court's reading of the plain language of the claim as suggesting that "unscheduled withdrawals" are not systematic, are not guaranteed in amount, or are neither systematic nor guaranteed. *See Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."); *and compare* OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) ("scheduled," as an adjective, means "entered on a schedule or list; included in a schedule"); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1044 (10th ed. 1995) ("scheduled" means "appoint[ed], assign[ed], or designate[d] for a fixed time," from "scheduled" as a *v.*); *with* OXFORD ENGLISH DICTIONARY ("un-" expresses "negation," so that "unscheduled," as an adjective, means not scheduled). On the other hand, the court has already rejected the Transamerica Plaintiffs' attempts to read the plain language of the claim to require the insertion of "mandatory" or "required" limitations on "scheduled payments," except to the extent that the insurer has guaranteed

that it will make such payments. Consequently, the court does not believe that "discretionary" is a necessary limitation to contrast an "unscheduled withdrawal" with a "scheduled payment" based on the plain claim language.

The court turns to the specification for further guidance. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). The parties have identified uses of the term "unscheduled withdrawal" in only two portions of the specification. The first is at Col. 6, *ll.* 64-67, which briefly describes Figure **16** as showing "a flow chart illustrating a computerized method which provides for scheduled and unscheduled withdrawals in an investment program, in accordance with one aspect of the present invention." The second is at Col. 18, *ll.* 37-59, which describes in detail the steps of the computerized method to administer the annuity plan if a transaction is determined to be an "unscheduled withdrawal." The flow chart in question, at steps 160, 170, and 178, identifies the kinds of transactions as "scheduled withdrawal," "premium or deposit," and "unscheduled withdrawal." *See* FIG. **16**. These portions of the specification reinforce the distinction between an "unscheduled withdrawal" and a "scheduled payment," although they do not necessarily identify the precise basis for the distinction.

The parties have also identified portions of the specification demonstrating that "withdrawals," in amounts and at times not guaranteed as "scheduled payments," can be made. *See* the '201 patent, Col. 11, *ll.* 7-10 ("[W]ithdrawals in excess of the amounts stated by the insurer to keep the guaranteed payout program in place may alter or may terminate the program."); Col. 13, *ll.* 50-59 ("The contract holder may make additional deposits and may make withdrawals in excess of the designated withdrawal amount,

165

provided the end of the liquidity period has not yet been reached. In such instances, the withdrawal program must be adjusted. Adjustments are made by increasing or decreasing the current withdrawal amount by the same proportion as the amount of the new transaction (deposit or withdrawal) bears to the account value just prior to the transaction."). Both of these portions of the specification state that the withdrawal in question is "in excess of amounts" guaranteed by the insurer; thus, "unscheduled payments," in the only embodiments described, are in excess of amounts guaranteed as "scheduled payments." Lincoln's own construction incorporates such a limitation, because it describes an "unscheduled withdrawal," in part, as one "that exceeds a predetermined percentage established by the insurer to keep the guaranteed payment program in place." Whatever Lincoln may now argue, the specification does not support a construction of "unscheduled withdrawal" as a withdrawal that is not in excess of the predetermined percentage. Even if one could contemplate that a contract holder might elect to take only part of a scheduled payment at the regular payment date, then later take a withdrawal that only makes up the underpayment of the scheduled payment, such a two-step withdrawal would amount to taking no more than the scheduled payment, even if part of the withdrawal was at an "unscheduled" time. Again, the specification only discloses withdrawals in excess of the predetermined percentage in contrast to "scheduled payments"; therefore, taking a withdrawal at an unscheduled time that does not also exceed the predetermined percentage is not taking an "unscheduled withdrawal" as disclosed and claimed.

On the other hand, neither the claim language nor the specification appears to the court to exclude the possibility that the "unscheduled withdrawal," *i.e.*, a withdrawal in excess of the predetermined percentage, could be taken at the *same time* as a "scheduled payment." Rather, the specification seems to suggest that the portion of a single

166

withdrawal that does not exceed that predetermined percentage is the "scheduled" portion, while the portion that exceeds the predetermined percentage would be the "unscheduled" portion. This is so, again, because the specification describes an "unscheduled withdrawal" only in terms of a withdrawal "in excess of the designated withdrawal amount," but never expressly describes an "unscheduled withdrawal" in terms of a withdrawal that occurs at a different time from a "scheduled payment." In short, an "unscheduled withdrawal" *may*, not *must*, be at a different time from a "scheduled payment."

The specification does make clear, as the Transamerica Plaintiffs' construction somewhat inartfully suggests, that the contract holder, not the insurer, makes an "unscheduled withdrawal." *See* the '201 patent, Col. 13, *ll*. 51-54 ("The contract holder may make additional deposits and may make withdrawals in excess of the designated withdrawal amount, provided the end of the liquidity period has not yet been reached."). Thus, an "unscheduled withdrawal" is made by the contract holder.

Therefore, the court concludes that the construction of "unscheduled withdrawal" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A withdrawal by the contract holder that is in excess of the predetermined percentage established by the insurer to keep the guaranteed payment program in place and that may be made at a different time than a scheduled payment.

167

### c.    *"Adjusting the amount of the scheduled payment in response to said unscheduled withdrawal"*

*i.    Proffered constructions*.    The parties also dispute the construction of "adjusting the amount of the scheduled payment in response to said unscheduled withdrawal" in step **d** of Claim **35** by offering competing constructions.    The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step d)** | | |
| q.    Adjusting the amount of the scheduled payment in response to said unscheduled withdrawal | Reducing the amount of the scheduled payment in response to an unscheduled withdrawal. '201 Patent, col. 13, *l*. 51 - col. 14, *l*. 2. | The actions by the insurance company of reducing the "account value" maintained under the annuity contract by the amount of the "unscheduled withdrawal" and calculating the decrease factor resulting in a reduction of the amount of the required "scheduled payments" to be made for the remainder of the "payout term" of the "systematic withdrawal program." '201 Patent, Col. 18, ll. 18-47; Col. 13, ll. 51–66; '201 Patent, Figure 16, Steps 160, 166, 168; and Steps 178, 182, 184, 186. |

*ii.    Arguments of the parties*.    In its opening brief, Lincoln contends that the claim language makes clear that the "unscheduled withdrawal" may impact or reduce the guaranteed scheduled payment, and the specification provides that additional deposits and withdrawals in excess of the guaranteed withdrawal amount are tracked to determine adjustments to disbursements.    Although Lincoln recognizes that the meaning of

"adjusting" is broad enough to include "changing," "increasing," or "reducing," Lincoln has chosen to use "reducing" as the appropriate meaning here, where a reduction is the natural consequence of the actions recited in the claim. Lincoln contends that the Transamerica Plaintiffs' construction is a convoluted string of eleven prepositional phrases resulting in an incoherent definition. Lincoln also contends that the Transamerica Plaintiffs' construction also improperly appears to limit the adjustment to the precise formula disclosed in the specification. For their part, the Transamerica Plaintiffs assert that, in plans not covered by the '201 patent, it may be possible for an annuitant to take an unscheduled withdrawal without being penalized by a reduction in future scheduled payments, but that Claim **35**, step **d**, makes clear that every "unscheduled withdrawal" is an "excess withdrawal" that requires an adjustment in the "scheduled payment" amount. The Transamerica Plaintiffs assert that their construction in this respect is supported by the pertinent steps of Figure **16**, which show that there is a reduction in the amount of future "scheduled payments" every time that there is an "unscheduled withdrawal." In their rebuttal brief, the Transamerica Plaintiffs contend that Lincoln's expert believes that the method of Claim **38** is embodied within Figure **16**, which is a dependent claim of Claim **35**, so that Claim **35** is also embodied in Figure **16**, and as such, Figure **16** supports their construction.

 *iii.* *Analysis.* From the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court finds that the only possible ambiguity in the plain language of this claim term that requires construction—at least where some constituent terms have already been construed—is the precise "adjustment" to the "scheduled payment" required "in response to said unscheduled

169

withdrawal." The parties agree that the pertinent "adjustment" is a "reduction," and both cite the same portion of the specification in support of that construction.

Specifically, the specification describes the effect of additional deposits and withdrawals as follows:

> The contract holder may make additional deposits *and may make withdrawals in excess of the designated withdrawal amount,* provided the end of the liquidity period has not yet been reached. *In such instances, the withdrawal program must be adjusted. Adjustments are made by increasing or decreasing the current withdrawal amount by the same proportion as the amount of the new transaction (deposit or excess withdrawal) bears to the account value just prior to the transaction.* For example, if the current account value is $50,000 and the current withdrawal amount is $1,500, an additional deposit of $5,000 increases the account value by 10% and the withdrawal amount is therefore increased by 10%. *In the same example, an unscheduled withdrawal of $5,000 (which is therefore an excess withdrawal of $5,000) reduces the account value by 10% and the current withdrawal amount reduces by 10%.* In the adjustments, the investment return for the period from the most recent scheduled withdrawal to the date of the new transaction may be reflected in the adjustment.

The '201 patent, Col. 13, *l.* 51, to Col. 14, *l.* 2 (emphasis added). From this portion of the specification, it is, indeed, clear that the "adjustment" in future scheduled payments that is required by an "unscheduled withdrawal" is necessarily a "reduction."

Therefore, the court concludes that the construction of "adjusting the amount of the scheduled payment in response to said unscheduled withdrawal" in Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316

170

(quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: Reducing the amount of the scheduled payment in response to said unscheduled withdrawal.

   **6.      Claim 35:  Step e:  "Periodically paying the scheduled payment. . . ."**

      **a.      The proffered constructions**

Step **e** claims the following step in the computerized method claimed in Claim **35**:

> e) periodically paying the scheduled payment to the owner for the period of benefit payments, even if the account value is exhausted before all payments have been made.

The '201 patent, Claim **35**, step **e**. The parties dispute the construction of the entirety of step **e** of Claim **35**. The parties' competing constructions of this claim term are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 35 (Step e)** | | |
| r. | Periodically paying the scheduled payment to the owner for the period of benefit payments even if the account value is exhausted before all payments have been made | The guarantee of scheduled distributions or disbursements of money will continue if the account value reaches zero or an amount less than the amount of the scheduled payment during the payout term. '201 Patent, co1. 10, *ll.* 40-47; co1. 5, *ll.* 55-62; '201 File History at LIN078825-26; '201 Patent Fig. 6 (showing the distribution of money even though the account value reaches zero). | Making the required scheduled distribution of at least the guaranteed (floor) amount taken from the "account value" at predetermined intervals during the postannuitization phase (also called the payout phase or distribution phase) of the "variable annuity," *see* '201 Patent, Col. 4, *ll.* 46-54; Col. 18, *ll.* 18-36; and Claim 36 of the '201 Patent, where "exhausted" means that the "account value" is zero, *see* '201 Patent, Col. 3, *l.* 44; Col. 8, *ll.* 33-34, and "before all payments have been made" means during the "payout term" of the "systematic withdrawal program." |

### b.     *Arguments of the parties*

In its opening brief, Lincoln contends that the specification supports its construction, because it describes an embodiment in which the insurer guarantees that withdrawals under this program will last for the period described, including a lifetime period, provided that withdrawals do not exceed a predetermined percentage established by the insurer for a given withdrawal frequency. Lincoln also contends that the prosecution history shows that step **e** was amended to further clarify that the scheduled payments will be made for the period of the benefit payments, even if the account value is exhausted before all of the payments have been made. Lincoln contends that the Transamerica Plaintiffs continue to

172

import inapposite limitations. Lincoln specifically disputes the Transamerica Plaintiffs' construction of "exhausted" as "fall[ing] to zero," because the whole phrase must be understood to mean that disbursements will continue if the account value falls below a scheduled payment amount. On the other hand, the Transamerica Plaintiffs contend that their construction of the entire claim term incorporates proper constructions of "scheduled payment" and "benefit payments." More importantly, in light of Lincoln's contentions, they also contend that "exhausted" means that the account value equals zero, because "exhausted" means "to consume entirely," citing a portion of the specification referring to account value that "goes to zero." They also contend that "before all payments have been made" must mean during the "payout term" of the "systematic withdrawal program" and, consequently, the systematic withdrawal program must have a finite period of operation.

### c.    *Analysis*

The court has twice previously construed "periodically" taking some action to mean taking that action "at the regular intervals" required by the plan, not just "from time to time"; the court has previously construed "scheduled payment" to mean "one of the systematic withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan"; the court has previously construed "period of benefit payments" to mean "the interval between or cycle of benefit payments"; and the court has previously construed "account value" to mean "the dollar or monetary value associated with a variable annuity contract, including deposits and investment return, less withdrawals or payments, fees, and expenses." Those constructions apply here, as well, where the terms are used again in a different part of the same claim. However, it is unnecessary to substitute these constructions for each of the claim terms in this step of Claim **35**. Rather, the claim terms that the court has already

construed must be understood to have the court's construction, just as each word in this sentence must be construed to have its ordinary definition, without expressly substituting those ordinary definitions. An exception, for the sake of consistency with the construction of step **c**, is that the court will substitute its construction for "periodically." The court also finds nothing ambiguous about either "paying" or "to the owner." Thus, the focus of construction of step **e**, in both the court's and the parties' view, is the second clause, "even if the account value is exhausted before all payments have been made." The still finer focus in on the meaning of "exhausted."

When the court begins with the words of the claims, *see Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."), the court finds that the patentee stated only that the scheduled payment will be made "even if the account value is *exhausted* before all payments have been made." The '201 patent, Claim **35**, step **e** (emphasis added). The patentee did not state any other alternative conditions. The ordinary dictionary meaning of "exhausted," *see Free Motion Fitness, Inc.*, 423 F.3d at 1348 (recognizing that an ordinary dictionary may be used to assist in understanding the commonly understood meaning of words, citing *Phillips*, 415 F.3d at 1320); *Phillips*, 415 F.3d at 1324 ("[A] judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term."), is, as the Transamerica Plaintiffs contend, "consume[d] entirely; USE[D] UP." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 406 (10th ed. 1995) (also defining the word to mean "empt[ied] by drawing off the contents; *specif*: to create a vacuum in"); *see also* OXFORD ENGLISH DICTIONARY (on-line ed. at http://dictionary.oed.com) ("exhausted"

174

means "consumed, used up, expended," and "emptied of contents" and "deprived of resources, completely impoverished"). Nothing about this ordinary definition of "exhausted" suggests that it means something short of completely used up, *i.e.*, that account value is less than the amount of a scheduled payment, but not necessarily zero.

Of course, the patentee could have stated the pertinent claim term to include expressly the meaning that Lincoln wishes it to have by stating the claim term as follows: "Periodically paying the scheduled payment to the owner for the period of benefit payments even if the account value *is less than the amount of the scheduled payment or* is exhausted before all payments have been made." That is simply not what the claim term *actually says*, however. On the other hand, what the claim term *may imply* is that the scheduled payment will be made, whatever the account value might be. This is so, because the first clause of the claim term expressly claims that the scheduled payment will be made for the period of benefit payments. In essence, the claim term states that the scheduled payment is guaranteed, while the "even if" clause appears to state only the most extreme circumstance in which the guaranteed scheduled payment will still be made.

The court turns to the specification for further guidance. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). In support of its contention that "exhausted" means that the account value is zero, the Transamerica Plaintiffs cite the following portion of the specification:

> Annuitants may be apprehensive about electing a variable annuity benefit option, even when it may be in their best long-term interest, due to the fact that the dollar amount of such benefit payments could theoretically *decrease to zero*.

175

The '201 patent, Background Of The Invention, Col. 3, *ll.* 41-44 (emphasis added). This citation is inapposite, however, because it says nothing about the account value itself decreasing to zero. Instead, it describes *benefit payments* decreasing to zero. The Transamerica Plaintiffs' second excerpt states, "The insurer pays all amounts after the account value is exhausted." *Id.*, Detailed Description Of The Invention, Col. 8, *ll.* 33-34. Thus, this excerpt does use the word "exhausted" in relation to "account value," as in the claim term currently being construed. However, this excerpt of the Detailed Description relates to an annuitized plan, the first aspect of the invention, that Lincoln contends and the court finds is not covered by Claim **35**. Moreover, this excerpt sheds no light on what "exhausted" means, because it simply uses the term in the same way it is used in step **e** of Claim **35** without additional clarification.

Some of Lincoln's citations to the specification are also, at best, only slightly illuminating on the meaning of "exhausted." The first, from the portion of the Detailed Description describing the second method, which pertains to unannuitized plans, does little more than explain that, where certain conditions are met, "the insurer guarantees that withdrawals under this program will last for the period prescribed, including a lifetime period." *See id.*, Col. 10, *ll.* 40-47. The second, from the portion of the Brief Summary pertaining to a plan that "seamlessly" combines a systematic withdrawal program with an annuitized phase, likewise, describes a plan in which the insurer "guarantee[s] that payments will be made regardless of how long the contract holder lives." *See id.*, Col. 5, *ll.* 55-62. These excerpts are instructive to the extent that they show that the patentee contemplated that the insurer might guarantee that payments will last for an open-ended period, up to the lifetime of the annuitant, not merely for a definite term of years, but that information may be more relevant to issues below than to the meaning of the "exhausted" element of step **e** of Claim **35**. These excerpts do, however, give rise to an inference that

the patent discloses a plan in which the insurer may guarantee payments at a certain level, regardless of the actual account value, because these excerpts stress the guarantee that payments will continue for the promised term, if certain conditions are met, and none of the stated conditions has to do with the account being sufficient to make the scheduled payments in full.

The portion of the specification that the court finds most clearly shows how the payment guarantee works, in relation to account value, is Figure **6**. Figure **6** is described in the portion of the Detailed Description describing what the court has identified as the "never annuitized" aspect of the invention, so that it pertains to the portion of the specification that Lincoln contends and the court finds is covered by Claim **35**. Figure **6** is described as "illustrat[ing] the operation of this aspect of the invention." The '201 patent, Col. 11, *ll*. 35-36. More specifically, in the example illustrated in Figure **6**, "the initial account value is $100,000, the withdrawal guarantee is 7.5% of the highest account value attained, the investment return is assumed to be as illustrated, and the term is 15 years." *Id.*, Col. 11, *ll*. 36-39. Although Figure **6** is also shown at page 31, it is included again here for ease of reference:

| Withdrawal Number | Account Value BOY | Withdrawal Amount | Investment Return | Account Value EOY |
|---|---|---|---|---|
| 1 | $100,000.00 | $7,500.00 | 12% | $103,600.00 |
| 2 | $103,600.00 | $7,770.00 | 16% | $111,162.80 |
| 3 | $111,162.80 | $8,337.21 | 12% | $115,164.66 |
| 4 | $115,164.66 | $8,637.35 | -5% | $101,200.95 |
| 5 | $101,200.95 | $8,637.35 | -10% | $83,307.24 |
| 6 | $83,307.24 | $8,637.35 | -21% | $58,989.21 |
| 7 | $58,989.21 | $8,637.35 | 5% | $52,869.45 |
| 8 | $52,869.45 | $8,637.35 | -14% | $38,039.61 |
| 9 | $38,039.61 | $8,637.35 | 1% | $29,696.28 |
| 10 | $29,696.28 | $8,637.35 | -15% | $17,900.09 |
| 11 | $17,900.09 | $8,637.35 | -5% | $8,799.61 |
| 12 | $8,799.61 | $8,637.35 | 15% | $186.60 |
| 13 | $186.60 | $8,637.35 | 23% | $0.00 |
| 14 | $0.00 | $8,637.35 | 10% | $0.00 |
| 15 | $0.00 | $8,637.35 | 8% | $0.00 |

This Figure shows that, in the invention disclosed, the thirteenth through fifteenth withdrawals (scheduled payments) are made in full, even when the account value is less than the scheduled payment amount, not just when the account value is zero. The full payment of the scheduled payments, even when the account value is less than the scheduled payment amount or zero, is, of course, consistent with the guarantee of the program. This Figure does not show that partial scheduled payments are made when the account value is less than the scheduled payment amount, *until* the account value reaches zero, at which time the scheduled payments are suddenly made in full again.

Thus, this Figure is consistent with the court's suggested reading of the claim term at issue as claiming, first and foremost, a guarantee that the scheduled payment will be made for the period of benefit payments in question, and illustrating the most extreme circumstance in which this guarantee applies, that is, when the account value is "used up"

178

or zero. Indeed, reading the claim term at issue to claim a plan in which partial scheduled payments are made when the account value is less than the scheduled payment amount, *until* the account value reaches zero, at which time the scheduled payments are suddenly made in full again, would make what is claimed nonsensical, because such a reading would be contrary to the guarantee that scheduled payments will be made for the duration of the plan. Therefore, the court reads the first clause of step **e** to be the "guarantee" language, requiring "periodically paying the scheduled payment to the owner for the period of benefit payments." The remaining "even if" clause is an illustration of the most extreme circumstance in which the guaranteed scheduled payment will be made, that is, "even if the account value is exhausted before all payments have been made." For the sake of clarity, consistency with the clause guaranteeing the payment of the scheduled payments, and consistency with what is disclosed in Figure **6**, however, the court deems it appropriate to construe the "even if" clause, in part, to mean "even if the account value *is less than the scheduled payment amount or zero* before all payments have been made."

The Transamerica Plaintiffs contend that, in the "even if" clause, "before all payments have been made" must be construed to mean "before all payments during the 'payout term' of the 'systematic withdrawal program' have been made." Lincoln apparently asserts that this phrase means "scheduled payments will continue during the 'payout term' until all payments have been made."[11] The court believes that the proper construction, however, is "before all payments *guaranteed by the plan* have been made." This construction conforms to the claim language, which is all in the context of the

---

[11]The court has paraphrased both parties' constructions of this phrase to conform to the grammatical structure of the actual claim language.

preamble to Claim **35**, which claims "[a] computerized method for administering a variable annuity plan" with certain payment guarantees.

Therefore, the court tentatively concluded that the construction of "periodically paying the scheduled payment to the owner for the period of benefit payments, even if the account value is exhausted before all payments have been made" in step **e** of Claim **35** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: At the regular intervals required by the plan, paying the scheduled payment to the owner for the period of benefit payments, even if the account value is less than the scheduled payment amount or zero before all payments guaranteed under the plan have been made.

In post-hearing briefing, Lincoln requests that the court change "required by the plan" to "under the plan." Lincoln contends that such a change is necessary to prevent later distortion of the court's construction, where Lincoln contends that the Transamerica Plaintiffs seek to add "required by the plan" language into the "scheduled payment" limitation to suggest that the owner has no input with respect to the timing of scheduled payments. In their post-hearing reply brief, the Transamerica Plaintiffs contend that Lincoln offers no rational reason for its proposed modification and that there is none. The court is not persuaded that the modification of its tentative construction that Lincoln proposes is required. The "required by the plan" language simply does not reasonably suggest that the owner has no input with respect to the timing of scheduled payments, because the owner may have (or may have had) input into selection of the interval at which the plan requires that payments be made. Therefore, the court reiterates its conclusion that the proper construction of "periodically paying the scheduled payment to the owner for the period of benefit payments, even if the account value is exhausted before all payments have

been made" in step **e** of Claim **35** is the following: At the regular intervals required by the plan, paying the scheduled payment to the owner for the period of benefit payments, even if the account value is less than the scheduled payment amount or zero before all payments guaranteed under the plan have been made.

### 7.  *Claim 36*

Claim **36**, a dependent claim depending from Claim **35**, claims the following, with italics indicating claim terms for which the parties dispute the construction:

> **36**.  The method of claim **35**, wherein the amount of the *scheduled withdrawal payment* is determined by the following formula:

$$\textit{Scheduled Payment} = \text{Account Value}_O \text{xWD Rate}$$

> Where:  *Scheduled Payment* = dollar amount of the *scheduled payment*

> Account Value$_O$ = *initial account value*

> WD Rate = % of the *initial account value* used to determine the *initial scheduled payment*.

The '201 patent, Claim **36** (emphasis added). The Joint Claim Construction Statement And Chart shows that the parties purportedly dispute the proper constructions of three terms in Claim **36**. The court will consider in turn the proper construction of those terms.

### a.  *"Scheduled withdrawal payment"*

The Joint Claim Construction Statement And Chart shows that the parties purportedly dispute the construction of "scheduled withdrawal payment" in Claim **36**, but only the Transamerica Plaintiffs have offered a construction of that purportedly disputed claim term. The Transamerica Plaintiffs contend that "scheduled withdrawal payment" simply means "a 'scheduled payment' made during the 'systematic withdrawal program.'"

181

The Transamerica Plaintiffs cite two portions of the specification in support of their construction.

The court finds that the claim language itself does, indeed, suggest that a "scheduled withdrawal payment" is simply a "scheduled payment" made during the "systematic withdrawal program." *See Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."). Claim **36** states that it claims "[t]he method of claim **35**," *see* the '201 patent, Claim **36**, that is, "[a] computerized method for administering a variable annuity plan with a systematic withdrawal program, and for periodically determining an amount of a scheduled payment to be made to the owner under the plan." *See id.*, Claim **35**, preamble. Thus, both claims relate to payment of scheduled payments under a systematic withdrawal program. Claim **36** adds that it claims the method of Claim **35** "wherein the amount of the scheduled withdrawal payment is determined by [a stated] formula." *Id.*, Claim **36**. Although "scheduled withdrawal payment" is not used in Claim **35**, Claim **36** then provides a formula for determining a "scheduled payment," clearly equating a "scheduled withdrawal payment" with a "scheduled payment."

The court turns to the portions of the specification cited by the Transamerica Plaintiffs to see what further guidance they may provide. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). The first portion of the specification cited by the Transamerica Plaintiffs in support of their construction of this term, Col. 4, *ll*. 46-54, is a portion of the Brief Summary that the court has identified as describing a second aspect of the invention relating to systematic

182

withdrawal programs in which the term "withdrawal" is used rather than "scheduled payment." The second portion of the specification cited by the Transamerica Plaintiffs, Col. 18, *ll*. 18-36, describes a portion of the flow chart in Figure **16** in which there are repeated references to "scheduled withdrawals," but no references to "scheduled payments." These portions of the specification do demonstrate that the patentee equated "scheduled withdrawal payments" under a "systematic withdrawal program" with "scheduled payments." Lincoln has offered no contrary construction or authority.

Therefore, the court concludes that the construction of "scheduled withdrawal payment" in Claim **36** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A "scheduled payment" made during a "systematic withdrawal program."

### b. "[Initial] scheduled payment"

*i.* *Proffered constructions*. The parties also dispute the construction of "[initial] scheduled payment" in Claim **36** by offering competing constructions for at least part of this claim term. The parties' competing constructions are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 36** | | |
| t. [Initial] scheduled payment | Dependent claim 36 narrows the manner in which the scheduled payment of claim 35 is calculated. Under claim 36, the "scheduled payment" is calculated by multiplying initial account value by a withdrawal rate or percentage. [Not addressing "initial."] | The first required withdrawal payment taken from the "account value" and made pursuant to the "period of benefit payments" during the "systematic withdrawal program." |

      *ii.*    **Arguments of the parties.**  In its opening brief, Lincoln contends that Claim **36** narrows the manner in which the "scheduled payment" of Claim **35** is calculated, but offers no specific argument in support of its construction of "scheduled payment" or "initial scheduled payment" other than to refer to the formulas in Claim **36**.  The Transamerica Plaintiffs do not offer here an argument concerning the construction of "scheduled payment" separate from their construction of "initial scheduled payment," which argument is simply a reference to their prior argument concerning the construction of "scheduled payment" in Claim **35**.

      *iii.*    **Analysis.**  The court previously construed "scheduled payment," in independent Claim **35**, to mean "one of the systematic withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan."  For the reasons stated in support of that construction, the court finds that the term has the same meaning in a subsequent dependent claim, where there is no indication that the term is intended in a narrower sense in the dependent claim.  *See, e.g., Intamin, Ltd.*, 483 F.3d at 1335 (a dependent claim is "narrower" than the

184

independent claim from which it depends). Moreover, the court construed "initial scheduled payment," in the context of step **b** of independent Claim **35** as "a first scheduled payment of a systematic withdrawal program based on the account value associated with the plan." For the reasons stated in support of that construction, the court finds that the term has the same meaning in a subsequent dependent claim, *except to the extent that the dependent claim narrows that construction. See, e.g., id.*

The language of Claim **36** does, however, expressly claim a narrower, that is, more specific, method for calculating the "scheduled payment." *See Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."). Specifically, in Claim **36**, the dollar amount of a scheduled payment is calculated by multiplying the initial account value by the withdrawal rate, where the withdrawal rate is a predetermined percentage of the initial account value. Specifically, the withdrawal rate is "predetermined" in the sense that it is the percentage of the initial account value used to determine the initial scheduled payment.

Therefore, the court concludes that the construction of "[initial] scheduled payment" in Claim **36** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: A "scheduled payment" is a systematic withdrawal, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan, wherein the dollar amount of the scheduled payment is calculated by multiplying the initial account value by the withdrawal rate and wherein the withdrawal rate is a predetermined

185

percentage of the initial account value; thus, an "initial scheduled payment" is the first such systematic withdrawal.

In its post-hearing brief, Lincoln argues that the court should modify this construction to incorporate two of the changes to comparable language that it has previously asserted. Thus, Lincoln contends that the court's construction should be modified, as follows, with strikeouts showing deletions and bold showing additions: A "scheduled payment" is a systematic withdrawal, in **an amount not to exceed** a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan, wherein the dollar amount of the scheduled payment is calculated by multiplying ~~the initial~~ **an** account value by the withdrawal rate and wherein the withdrawal rate is a predetermined percentage of the initial account value; thus, an "initial scheduled payment" is the first such systematic withdrawal.

The court finds that neither of the modifications that Lincoln proposes post-hearing is appropriate. First, for the reasons stated above, at page 111, the "scheduled payment" *is* "in a guaranteed minimum amount," pursuant to the terms of the systematic withdrawal program of the variable annuity plan, even if the plan elsewhere allows the owner to take none or less than all of the guaranteed minimum amount or even to exceed that guaranteed minimum amount. In the context of a particular scheduled payment, the guaranteed minimum amount is neither the "floor" nor the "ceiling" for the scheduled payment; it *is* the amount of the scheduled payment determined by the terms of the systematic withdrawal program of a variable annuity plan. Second, dependent Claim **36** expressly defines "scheduled payment" (and "initial scheduled payment") in reference to one and only one "account value," the "initial account value. *See* the '201 patent, Claim **36** (claiming "Account Value$_O$=initial account value"). Because Claim **36** is a dependent claim depending from independent Claim **35**, the scope of the dependent claim may be (and in

186

this case is) narrower than the scope of the independent claim *in precisely the manner in which the dependent claim claims a narrower scope for terms also used in the independent claim. See, e.g., Intamin, Ltd.*, 483 F.3d at 1335 (a dependent claim is "narrower" than the independent claim from which it depends).

Therefore, the court reiterates that the proper construction of "[initial] scheduled payment" in Claim **36** is the following: A "scheduled payment" is a systematic withdrawal, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan, wherein the dollar amount of the scheduled payment is calculated by multiplying the initial account value by the withdrawal rate and wherein the withdrawal rate is a predetermined percentage of the initial account value; thus, an "initial scheduled payment" is the first such systematic withdrawal.

      ***c.***       ***"Initial account value"***

    ***i.***     ***Proffered constructions.*** The parties dispute the construction of "initial account value" in Claim **36** by offering competing constructions of this claim term. The parties' competing constructions are reiterated in the following table:

| THE '201 PATENT | | |
|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** |
| **Claim 36** | | |
| u. Initial account value | The account value at the time the guaranteed payment program begins. '201 Patent, col. 10, *ll.* 50-52. | The account value at the beginning of the "systematic withdrawal program." |

    ***ii.***     ***Arguments of the parties.*** In its opening brief, Lincoln contends that "initial account value" means the account value at the time that the guaranteed payment program begins, based on the claim language and the portion of the specification cited. Lincoln

contends that the Transamerica Plaintiffs' construction of this term improperly ties "initial account value" to the beginning of the "systematic withdrawal program," rather than to the beginning of the guaranteed payment program. Lincoln contends that the Transamerica Plaintiffs' construction is incorrect, because the specification makes clear that initial account value is measured at the time the "systematic withdrawal program, *inclusive of this guaranteed minimum payment option*, commences," so that the guaranteed minimum payment option can be added after the withdrawal program begins, and it is the date that option begins that is used to measure initial account value. In support of their construction, the Transamerica Plaintiffs simply refer to their argument concerning the meaning of "account value," which the court finds provides no insight into when the initial account value is determined.

  ***iii.***   ***Analysis****.* The court finds nothing in the language of Claim **36** itself that specifically clarifies when the "initial account value" is determined. *See Nystrom*, 424 F.3d at 1142 (courts must "begin [their] claim construction analysis with the words of the claim"); *see also Playtex Prods., Inc.*, 400 F.3d at 906 ("It is axiomatic that claims, not the specification embodiments, define the scope of protection."). However, because Claim **36** is a dependent claim from Claim **35**, and expressly claims "[t]he method of Claim **35**," it follows that the "initial account value" is the initial account value of "a variable annuity plan *having* a guaranteed minimum payment feature *associated with* a systematic withdrawal program." *See* the '201 patent, Claim **35**, preamble (emphasis added). Thus, dependent Claim **36**, like independent Claim **35**, only involves a "systematic withdrawal program" *with* a "guaranteed minimum payment feature." Consequently, a "systematic withdrawal program" is not the kind claimed until and unless it has a "guaranteed minimum payment feature," and "initial account value" necessarily relates to the beginning of that "systematic withdrawal program" of the variable annuity.

The portion of the specification cited by Lincoln is not to the contrary. *See Phillips*, 415 F.3d at 1314-16 (the specification is intrinsic evidence of the meaning of claim terms, and where the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, then the patentee's definition must govern). The cited portion of the specification states, "Initial account value is that account value at the time a systematic withdrawal program, inclusive of this guaranteed minimum benefit payment option, commences." The '201 patent, Detailed Description, Col. 10, *ll.* 50-52. Thus, the cited portion of the specification expressly relates the "initial account value" to the commencement of the "systematic withdrawal program" that has a guaranteed minimum payment feature. Again, the specification makes clear that a "systematic withdrawal program" is not the kind disclosed until and unless it has a "guaranteed minimum payment feature," and "initial account value" is expressly tied to the commencement of such a "systematic withdrawal program."

To address Lincoln's argument directly, a "systematic withdrawal program" to which a "guaranteed minimum payment feature" is later added is not covered by Claim **36** until that "guaranteed minimum payment feature" is added. Thus, while the addition of the "guaranteed minimum payment feature" might be what "triggers" coverage of Claim **36**, it is the commencement of the "systematic withdrawal program" *with* the specified "guaranteed minimum payment feature" that is the date for determination of "initial account value."

Therefore, the court concludes that the construction of "initial account value" in Claim **36** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The account

189

value at the beginning of a "systematic withdrawal program" with a "guaranteed minimum payment feature."

### 8. Claim 37

Claim **37**, another dependent claim depending from Claim **35**, claims the following, with italics indicating claim terms for which the parties dispute the construction:

> **37**. The method of claim **35**, wherein the *account value is periodically determined by the following formula*:

$$\text{Account Value}_{t+1} = \text{Max}[(\text{Account Value}_t - \text{Withdrawal}), 0] \times (1+i)$$

> Where:
> Account Value$_{t+1}$=account value at time t+1
> Account Value$_t$=account value at time t
> Withdrawal=dollar amount of the scheduled payment at time t
> i=*net fund performance* during the period t to t+1.

The '201 patent, Claim **37** (emphasis added). The Joint Claim Construction Statement And Chart shows that the parties purportedly dispute the proper constructions of two terms in Claim **37**. The court will consider in turn the proper construction of those terms.

#### a. "Account value is periodically determined by the [stated] formula"

**i.** ***Proffered constructions***. The parties apparently dispute the construction of "account value is periodically determined by the [stated] formula" in Claim **37**, but only Lincoln has offered a construction of this claim term in the Joint Claim Construction And Chart. Lincoln contends that dependent Claim **37** narrows the manner in which the account value of Claim **35** is periodically determined. Specifically, Lincoln's construction of this claim term is the following: Periodically calculating the account value by

190

subtracting scheduled payments from account value and multiplying the amount by one plus the net fund performance during the particular time period.◼[12]

*ii.*　***Arguments of the parties***.　In its opening brief, Lincoln contends that the Transamerica Plaintiffs have offered nothing to dispute Lincoln's construction of this claim term or any other claim term of Claim **37**.　Indeed, in neither their opening brief nor their rebuttal brief do the Transamerica Plaintiffs offer any argument concerning construction of this claim term.

*iii.*　***Analysis***.　Notwithstanding the lack of any argument for a contrary construction of this term, the court must fulfill its independent obligation to construe the term.　*See Maytag Corp.*, 411 F. Supp. 2d at 1042-43 (concluding that this court has an obligation to construe the patent terms independently, applying the *Phillips* methodology, and is not bound to adopt either party's proffered construction of any claim term); *Ideal Instruments, Inc.*, 498 F. Supp. 2d at 1155 (same).　The court finds nothing in either the claim language or the specification that contradicts Lincoln's construction, recognizing that the court has construed "periodically" taking some action to mean taking that action "at the regular intervals" required by the plan, not just "from time to time."　More specifically, the court has also previously determined that the periodic determination of account value in step **c** of Claim **35**, from which Claim **37** depends, must occur at the regular intervals for scheduled payments.　Therefore, the court concludes that the construction of "account value is periodically determined by the [stated] formula" in Claim **37** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415

---

[12]This statement is a paraphrase of Lincoln's construction to fit a slightly different grammatical context.

F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: Account value is determined at the regular intervals for scheduled payments by subtracting scheduled payments from account value and multiplying the amount by one plus the net fund performance during the particular time period.

> **b.** *"Net fund performance"*

> **i.** *Proffered constructions*. The parties also apparently dispute the construction of "net fund performance" in Claim **37**, but only the Transamerica Plaintiffs have offered a construction of this claim term in the Joint Claim Construction And Chart. The Transamerica Plaintiffs' construction is the following: "The financial gains and/or losses of the investment(s) into which the 'account value' of the owner's variable annuity contract have been invested."

> **ii.** *Arguments of the parties*. In their opening brief, the Transamerica Plaintiffs contend that their construction is supported by portions of the specification that explain how the differences between the actual "fund performance" and the assumed interest rate (AIR) affect the annuity unit value. *See* the '201 patent, Col. 3, *ll*. 27-33; Col. 18, *ll*. 24-28. In its opening brief, Lincoln generally agrees with the Transamerica Plaintiffs' construction, but nevertheless proposes to define the phrase to mean "financial gains and/or losses impacting account value."

> **iii.** *Analysis*. Acting on its independent obligation to construe the claim term in question, *see Maytag Corp.*, 411 F. Supp. 2d at 1042-43 (concluding that this court has an obligation to construe the patent terms independently, applying the *Phillips* methodology, and is not bound to adopt either party's proffered construction of any claim term); *Ideal Instruments, Inc.*, 498 F. Supp. 2d at 1155 (same), the court finds nothing in the claim language or specification that is contrary to the Transamerica Plaintiffs' construction of "net fund performance," although the court finds that some essentially

192

editorial changes should be made to reflect the context of Claim **37** as relating to the variable annuity contract of Claim **35** involving investment of deposits to the variable annuity plan. The court also finds that Lincoln's "tweak" of what it otherwise admits is an acceptable construction is unsatisfactory, because it fails to indicate in what the "financial gains and/or losses" occur. The court finds that the claim term expressly refers to "fund performance," and Claim **37** depends from Claim **35**, which pertains to a variable annuity plan, so that the financial gains and/or losses in question occur in the "fund(s)" in which the deposits to the annuity contract have been invested. *See, supra*, page 75, 79, 201 (court's construction of "variable annuity" as, in part, ""an annuity contract in which the account value may either increase or decrease with time, depending on the performance of the fund(s) in which deposits have been invested").

Therefore, the court concludes that the construction of "net fund performance" in Claim **37** that "'stays true to the claim language and most naturally aligns with the patent's description of the invention,'" and as such, is "'the correct construction,'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw P.L.C.*, 158 F.3d at 1250), is the following: The financial gains and/or losses of the investment(s) into which the deposits to the variable annuity plan have been invested.

### 9. **Claim 38: "The scheduled payment is adjusted in response to an unscheduled withdrawal, according to the [stated] formula"**

Claim **38**, another dependent claim depending from Claim **35**, claims the following, with italics indicating claim terms for which the parties dispute the construction:

> **38**.    The method of claim **35**, wherein *the scheduled payment is adjusted in response to an unscheduled withdrawal, according to the following formula:*
> Scheduled   Payment$^t$=Scheduled   Paymentx$(1+$US Withdrawal$_t$/Account Value$_t)$.

193

The '201 patent, Claim **38** (emphasis added). The Joint Claim Construction Statement And Chart shows that the parties purportedly dispute the proper construction of one term in Claim **38**. The court will consider the proper construction of that term.

### a.    *The proffered construction*

The parties purportedly dispute the construction of "the scheduled payment is adjusted in response to an unscheduled withdrawal, according to the [stated] formula" in Claim **38**, but only Lincoln has offered a construction of this claim term in the Joint Claim Construction And Chart. Lincoln contends that Claim **38** narrows the manner in which a scheduled payment of Claim **35** is adjusted in response to an unscheduled withdrawal "by multiplying the scheduled payment amount by an amount equal to one minus the unscheduled withdrawal divided by account value." In support of this construction, Lincoln cites the '201 patent, Col. 13, *l*. 51, to Col. 14, *l*. 2, and the affidavit of Dr. Donald F. Behan, indicating that the claim, as written, contains a scrivener's error.

### b.    *Arguments of the parties*

Notwithstanding that the Transamerica Plaintiffs have not offered a contrary construction, there is a vigorous dispute between the parties concerning the proper construction of this claim term. In its opening brief, Lincoln contends that the claim, as stated, contains a scrivener's error, consisting of the insertion of a plus sign before "unscheduled withdrawals" (US Withdrawal$_i$), when what was intended was a minus sign. Lincoln contends that the error would be readily apparent to one skilled in the art from a review of the patent alone, as shown by Dr. Behan's affidavit, so that it is appropriate for the court to retroactively correct the error.

In their rebuttal brief, however, the Transamerica Plaintiffs contend that the "correction" that Lincoln requests is a major change to the claim language that is *not* evident from the face of the '201 patent, so that the correction can only be made by the

194

Patent Office. The Transamerica Plaintiffs point out that the formula claimed in Claim **38** appears nowhere in the written description of the patent. Thus, the specification does not clearly demonstrate that the plus sign in Claim **38** should be a minus sign. The Transamerica Plaintiffs point out that the '201 patent was prosecuted for seven years before it was issued and that, during this time, neither the patentee nor the examiner identified or attempted to change the purportedly obvious error. Moreover, the Transamerica Plaintiffs contend that the proposed alteration would result in the claim term having the complete opposite meaning of what it currently conveys to the public. Finally, the Transamerica Plaintiffs contend that Lincoln could have rectified a truly obvious mistake by other means, such as filing a Certificate of Correction with the Patent Office pursuant to 35 U.S.C. § 255 and paying the nominal fee. The Transamerica Plaintiffs contend that the court should allow the Patent Office to determine whether the proposed correction should be made.

### c. Analysis

The Federal Circuit Court of Appeals most recently explained the circumstances under which it is appropriate for the court to correct errors in a patent retroactively, as follows:

> [W]e have held that in some circumstances the district court can correct errors retroactively. *But the district court can correct an error only if the error is evident from the face of the patent. Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003). "A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Id.* (emphasis added). Because a reader of the patent at issue in *Novo Industries* could not ascertain the error from the face of the patent, we held that

195

it was beyond the district court's authority to guess at what was intended, and that the error, if any, could only be corrected by the PTO. *Id.* at 1357-58. We recently followed *Novo Industries* in *Hoffer*, holding that an error apparent from the face of the patent could have been corrected by the district court. *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005).

This rule also comports with our prior case law. In *Lemelson*, we permitted correction of a patent by inserting the word "toy" in a claim where the patent on its face was clearly directed at a toy trackway rather than an actual trackway. *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1203 & n. 3 (Fed. Cir. 1992). In *Southwest Software*, the patent lacked multiple pages of software code due to a PTO error, and the content of the missing code could not be known by simply looking at the face of the patent lacking the code. *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1291, 1296 (Fed. Cir. 2000); *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1331 n. 1 (Fed. Cir. 2003) (court refused to correct PTO error not apparent from the face of the patent). While we upheld the PTO's issuance of a certificate of correction, we limited the effect of the correction to actions arising after the correction, and assumed that the district court could not correct the error. *Southwest Software*, 226 F.3d at 1293-97.

The error here is not evident on the face of the patent. The prosecution history discloses that the missing language was required to be added by the examiner as a condition for issuance, but one cannot discern what language is missing simply by reading the patent. The district court does not have authority to correct the patent in such circumstances. The district court found the missing language essential to the validity of claim 1 of the '492 patent, and Group One has made no claim that the omitted language is not essential to validity. The same defect exists with respect to the other claims. Thus, we affirm the district court's determination that the claims of the '492 patent are invalid.

196

*Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005).

The court finds that the erroneous insertion of the plus sign in Claim **38** where Lincoln contends a minus sign was obviously intended is "evident from the face of the patent." *See id.* (stating this test for corrections that the court may make). Claim **38** narrows Claim **35** by specifying the formula by which a scheduled payment is adjusted in response to an unscheduled withdrawal. *See* the '201 patent, Claim **38**. The court noted, above, that the parties agree that the pertinent "adjustment" in Claim **35**, step **d**, is a "reduction," and that both parties cite the same portion of the specification in support of that construction. Specifically, the specification describes the effect of additional deposits and withdrawals as follows:

> The contract holder may make additional deposits *and may make withdrawals in excess of the designated withdrawal amount,* provided the end of the liquidity period has not yet been reached. *In such instances, the withdrawal program must be adjusted. Adjustments are made by increasing or decreasing the current withdrawal amount by the same proportion as the amount of the new transaction (deposit or excess withdrawal) bears to the account value just prior to the transaction.* For example, if the current account value is $50,000 and the current withdrawal amount is $1,500, an additional deposit of $5,000 increases the account value by 10% and the withdrawal amount is therefore increased by 10%. *In the same example, an unscheduled withdrawal of $5,000 (which is therefore an excess withdrawal of $5,000) reduces the account value by 10% and the current withdrawal amount reduces by 10%.* In the adjustments, the investment return for the period from the most recent scheduled withdrawal to the date of the new transaction may be reflected in the adjustment.

The '201 patent, Col. 13, *l*. 51, to Col. 14, *l*. 2 (emphasis added).  As the court previously noted, from this portion of the specification, it is, indeed, clear that the "adjustment" in future scheduled payments that is required by an "unscheduled withdrawal" is necessarily a "reduction."  The formula in Claim **38**, however, would necessarily result in an *increase* in the scheduled payments as a result of an "unscheduled withdrawal," because *adding* the unscheduled withdrawal to the numerator of a fraction (in which the denominator is the account value), then multiplying that fraction times the initial scheduled payment, would result in a *larger* adjusted scheduled payment, not a *smaller* one.  Under these circumstances, "the correction is not subject to reasonable debate based on consideration of the claim language and the specification," either because the Transamerica Plaintiffs have admitted that the "adjustment" in the "scheduled payment" that results from an "unscheduled withdrawal" is necessarily a "reduction" or because the math is incontrovertible, thus satisfying the first requirement of *Group One* for correction of an error by the court.  *Group One, Ltd.*, 407 F.3d at 1303 (the first requirement for a court to correct a patent is that "the correction is not subject to reasonable debate based on consideration of the claim language and the specification").

As to the second requirement for correction of an error in a patent by the court, the Transamerica Plaintiffs have pointed to absolutely nothing in the prosecution history that suggests a different interpretation of the claims.  *See id.* (the second requirement for the court to correct a patent is "the prosecution history does not suggest a different interpretation of the claims").  Indeed, they make no reference to this requirement in their attempt to block a correction by the court of the error identified by Lincoln.

Instead, the Transamerica Plaintiffs argue that the court should not correct the error, because the patentee and the examiner missed the mistake through seven years of prosecution and because Lincoln has alternative methods to correct the problem.  Neither

198

argument is persuasive. First, the fact that the patentee and the examiner, presumably persons of ordinary skill in the art, missed the mistake does not make the error any less apparent from the face of the patent, when the claim is subjected to reasonable scrutiny. The court is all too aware that typographical errors, even painfully obvious ones, can escape diligent efforts to correct them until the language in question is actually put to use or subjected to outside scrutiny. Second, the fact that Lincoln has other relatively easy means available to correct the mistake in question does not mean that the court should not exercise its authority, in what are otherwise appropriate circumstances, to correct the error. The correction by the court would be both immediate and retroactive, while any correction by the Patent Office could take considerable time and would then only be prospective, *see Group One, Inc.*, 407 F.3d at 1303 (stating the standards for "retroactive" correction); *see also Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1356-57 (Fed. Cir. 2003) ("The district court always would apply its own corrections retroactively in the action before it, unlike certificates of correction issued by the PTO, which apply only in actions brought after the certification of correction is issued."), which is perhaps the precise result that the Transamerica Plaintiffs want, but not the one dictated by applicable law.

Therefore, the court corrects by construction the plus sign in Claim **38** to be a minus sign, so that the formula in Claim **38** for adjusting the scheduled payment in response to an unscheduled withdrawal claimed therein is the following: Scheduled Payment$^t$ = Scheduled Payment x $(1 - $ US Withdrawal$_t$/Account Value$_t$). Such correction has retroactive application in the action now before the court. *Novo Indus., L.P.*, 350 F.3d at 1357.

### III.  CONCLUSION

Perhaps the most effective way to present the court's conclusions concerning claim construction is to present a side-by-side comparison of the claim language that the court finds is actually in dispute with each party's proffered construction and the court's own construction.  Such a comparison follows:

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Preamble) | | | |
| a. Annuity | A contract that guarantees the payment or distribution of a sum of money at intervals of time. | [None offered.] | A contract that guarantees the payment or distribution of a sum of money at intervals of time. |
| b. Variable annuity | An annuity in which the owner bears the investment risks, as opposed to a "fixed annuity," in which the insurer bears the investment risks. | A contract that pays an annuitant "benefit payments" of which the amounts vary in accordance with the market value of the securities in the separate account of the insurer on the respective valuation days. | An annuity contract in which the account value may vary with time, depending on the performance of the fund(s) in which deposits have been invested, and the dollar amount of the annuity benefit payments may also vary depending upon the account value at each succeeding valuation date |

201

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Preamble) (continued) | | | |
| c. Systematic withdrawal program | A process for distributing money from a deferred annuity contract without requiring the owner to irrevocably exchange or relinquish the account value and without any guarantee that distributions will continue. | Required "scheduled payments" taken from the "account value" and made to the owner or beneficiary at the predetermined intervals established by the "period of benefit payment" during the "payout term." | A program for withdrawals from an active, unannuitized deferred annuity contract (or mutual fund) that, as an alternative to annuitzation, provides full liquidity and provides for distributing retirement income to contract holders in the form of scheduled withdrawals that are set either at a specified dollar level or as a percent of account value in which the insurer must allow and pay the full scheduled withdrawal or make it available to the contract holder, but the contract holder may elect to take none, some, or all of the scheduled withdrawal up to the specified dollar level or specified percent of account value. |

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Preamble) (continued) | | | |
| d. Guaranteed minimum payment feature associated with a systematic withdrawal program | Distributions or disbursements of money from an annuity plan that do not exceed a predetermined percentage established by the insurer and that are guaranteed by the insurer without a relinquishment of account value by the owner. | "Guaranteed minimum payment feature" means that the "scheduled payment" will not fall below an amount (floor) predetermined by the insurance company. Therefore, "guaranteed minimum payment feature associated with a systematic withdrawal program" means required "scheduled payments" of an amount equal or greater than a preset minimum (floor) level made on a periodic basis during a systematic withdrawal program. | A feature of a systematic withdrawal program in which the insurer guarantees that withdrawals of at least a predetermined percentage of the initial account value or the account value at some subsequent date, as provided under the terms of the plan, for a given withdrawal frequency will last the period prescribed, if the (actual) withdrawals under the systematic withdrawal program do not exceed that predetermined percentage. |

203

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Preamble) (continued) | | | |
| e. Scheduled payment | A distribution or disbursement of money in accordance with the guarantees of an annuity plan. | A required monetary distribution taken from the "account value" of at least the guaranteed (floor) amount periodically paid at the predetermined intervals established by the "period of benefit payments" during the "systematic withdrawal program." | One of the systematic withdrawals, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan. |
| f. Periodically determining an amount [of a scheduled payment] | From time to time calculating or establishing the amount of money to be distributed or disbursed in accordance with the guarantees of the annuity plan. | The action undertaken at time intervals established by the "period of benefit payments" in which the insurance company authoritatively sets the amount of the required "scheduled payment" based upon the performance of the investments within the variable annuity account (net investment returns) as a necessary precursor to calculating and making the next required, minimum "scheduled payment" of at least the guaranteed (floor) amount. | At the regular intervals for scheduled payments, calculating the amount of a scheduled payment based on the account value associated with the plan. |

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| **Claim 35 (Step a)** | | | |
| g. Account value | The dollar value of or amount of proceeds associated with a variable annuity account, that includes deposits and earnings, less disbursements, withdrawals or payments, benefits, and charges. | A monetary value that is maintained on a variable annuity contract upon which the required "scheduled payments" are based. | The dollar or monetary value associated with a variable annuity contract at a given time or valuation date, including deposits and investment return, less withdrawals or payments, fees, and expenses. |
| h. Withdrawal rate | A percentage that may be applied when determining amounts to be distributed. | A predetermined percentage of the "account value" which percentage is established by the insurance company for a given "scheduled payment" made during the "systematic withdrawal program." | A percentage rate, established by the insurer, of the initial account value or the account value at some subsequent date, as provided under the terms of the plan, that determines the "guaranteed minimum payment" for "scheduled payments" in the "systematic withdrawal program." |
| i. Payout term | The time period (e.g., lifetime) for which distributions or disbursements of money are guaranteed under the annuity plan. | The duration of the systematic withdrawal program during the post–annuitization phase (also called the payout phase or distribution phase) of the "variable annuity" during which required "scheduled payments" are made by the insurance company. | The length of time for which systematic withdrawals (scheduled payments) of a systematic withdrawal program are guaranteed under the terms of the variable annuity plan. |

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| **Claim 35 (Step a) (continued)** | | | |
| j. Benefit payments | The "scheduled payments" referenced above. | Income payments made in the post-annuitization phase (also called the payout phase or distribution phase) of the "variable annuity." | Scheduled payments |
| k. Period of benefit payments | The frequency of distributions or disbursements of money (e.g., yearly, monthly, etc.). | The frequency or interval (a length of time) between "scheduled payments" (i.e., monthly distributions, quarterly distributions, semi-annual distributions, or annual distributions) during the "payout term" of the systematic withdrawal program. | The interval between or cycle of benefit payments. |
| **Claim 35 (Step b)** | | | |
| l. Determining an initial scheduled payment | "Determining" is an act of calculating or establishing. "Initial scheduled payment" means a first amount of money to be distributed in accordance with the guarantees of the variable annuity plan. | The authoritative decision and action by the insurance company to set a dollar amount level for the first required distribution from the "account value" made during the "period of benefit payments" to the contract owner or beneficiary. | Calculating the amount of a first scheduled payment of a systematic withdrawal program based on the account value associated with the plan. |

206

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Step c) | | | |
| m. Periodically determining account value | From time to time calculating the account value. | The action by the insurance company to calculate the net investment return of the "variable annuity account" at the predetermined intervals established by the "period of benefit payments" as a necessary precursor to calculating and making the next required "scheduled payment" of at least the guaranteed (floor) amount taken from the "account value." | At the regular intervals for scheduled payments, calculating the dollar or monetary value associated with a variable annuity contract, including deposits and investment return, less withdrawals or payments, fees, and expenses. |
| n. Making the scheduled payment [by withdrawing that amount from the account value] | Distributing money from the account value in accordance with the guarantees of the variable annuity plan. | The action by the insurance company of periodically paying the required distribution at the predetermined intervals established by the "period of benefit payments" during the "systematic withdrawal program." | The claim term requires no further construction. |

207

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Step d) | | | |
| o. Monitoring | An act of observing, checking or keeping track of. | [None offered.] | The act of observing, checking, or keeping track of. |
| p. Unscheduled withdrawal | A withdrawal means that exceeds a predetermined percentage established by the insurer to keep the guaranteed payment program in place. | A discretionary monetary distribution of an amount set by the authoritative decision of the contract owner or beneficiary made by the insurance company on a date selected by the contract owner or beneficiary. An "unscheduled withdrawal" is always an excess withdrawal in that it exceeds the "withdrawal rate" and the guaranteed minimum payment feature. An "unscheduled withdrawal" is never a "scheduled payment." | A withdrawal by the contract holder that is in excess of the predetermined percentage established by the insurer to keep the guaranteed payment program in place and that may be made at a different time than a scheduled payment. |
| q. Adjusting the amount of the scheduled payment in response to said unscheduled withdrawal | Reducing the amount of the scheduled payment in response to an unscheduled withdrawal. | The actions by the insurance company of reducing the "account value" maintained under the annuity contract by the amount of the "unscheduled withdrawal" and calculating the decrease factor resulting in a reduction of the amount of the required "scheduled payments" to be made for the remainder of the "payout term" of the "systematic withdrawal program." | Reducing the amount of the scheduled payment in response to said unscheduled withdrawal. |

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 35 (Step e) | | | |
| r. Periodically paying the scheduled payment to the owner for the period of benefit payments even if the account value is exhausted before all payments have been made | The guarantee of scheduled distributions or disbursements of money will continue if the account value reaches zero or an amount less than the amount of the scheduled payment during the payout term. | Making the required scheduled distribution of at least the guaranteed (floor) amount taken from the "account value" at predetermined intervals during the postannuitization phase (also called the payout phase or distribution phase) of the "variable annuity," and "before all payments have been made" means during the "payout term" of the "systematic withdrawal program." | At the regular intervals required by the plan, paying the scheduled payment to the owner for the period of benefit payments, even if the account value is less than the scheduled payment amount or zero before all payments guaranteed under the plan have been made. |
| Claim 36 | | | |
| s. Scheduled withdrawal payment | [None offered.] | A "scheduled payment" made during the "systematic withdrawal program." | A "scheduled payment" made during a "systematic withdrawal program." |

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| **Claim 36 (continued)** | | | |
| t. [Initial] scheduled payment | Dependent claim 36 narrows the manner in which the scheduled payment of claim 35 is calculated. Under claim 36, the "scheduled payment" is calculated by multiplying initial account value by a withdrawal rate or percentage. | The first required withdrawal payment taken from the "account value" and made pursuant to the "period of benefit payments" during the "systematic withdrawal program." | A "scheduled payment" is a systematic withdrawal, in a guaranteed minimum amount, to be made to the owner under a systematic withdrawal program of a variable annuity plan, wherein the dollar amount of the scheduled payment is calculated by multiplying the initial account value by the withdrawal rate and wherein the withdrawal rate is a predetermined percentage of the initial account value; thus, an "initial scheduled payment" is the first such systematic withdrawal. |
| u. Initial account value | The account value at the time the guaranteed payment program begins. | The account value at the beginning of the "systematic withdrawal program." | The account value at the beginning of a "systematic withdrawal program" with a "guaranteed minimum payment feature." |

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| Claim 37 | | | |
| v. Account value is periodically determined by the [stated] formula | Dependant claim 37 narrows the manner in which the account value of claim 35 is periodically calculated. Under claim 37, the account value is calculated by subtracting scheduled payments from account value and multiplying the amount by one plus the net fund performance during the particular time period. | [None offered.] | Account value is determined at the regular intervals for scheduled payments by subtracting scheduled payments from account value and multiplying the amount by one plus the net fund performance during the particular time period. |
| w. Net fund performance | [None offered.] | The financial gains and/or losses of the investment(s) into which the "account value" of the owner's variable annuity contract have been invested. | The financial gains and/or losses of the investment(s) into which the deposits to the variable annuity plan have been invested. |

211

| THE '201 PATENT | | | |
|---|---|---|---|
| **Claim Term** | **Lincoln's Construction** | **The Transamerica Plaintiffs' Construction** | **Court's Construction** |
| **Claim 38** | | | |
| x. The scheduled payment is adjusted in response to an unscheduled withdrawal, according to the [stated] formula | Dependant claim 38 narrows the manner in which a scheduled payment of claim 35 is adjusted in response to an unscheduled withdrawal by multiplying the scheduled payment amount by an amount equal to one minus the unscheduled withdrawal divided by account value. | [None offered, but the Transamerica Plaintiffs dispute the substitution of "minus" for "plus."] | Correcting the stated formula to read as follows: Scheduled Payment$^t$ = Scheduled Payment x (1 – US Withdrawal$_i$/Account Value$_i$). Such correction has retroactive application in the action now before the court. |

The court hereby adopts the foregoing as its constructions of the patent claim terms in dispute. The court also accepts and adopts the parties' agreed constructions of various claim terms, as set out in the table beginning on page 43.

**IT IS SO ORDERED.**

**DATED** this 10th day of March, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

213